**FILED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

2004 MAR 10 P 3: 45

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| STEWARD MACHINE COMPANY | : | 3:00 CV 00834 (SRU) |
| PLAINTIFF | : | |
| | : | |
| VS. | : | |
| | : | |
| WHITE OAK CORPORATION et al | : | |
| DEFENDANT | : | March 10, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF
### MOTION IN LIMINE TO PRECLUDE
### EXPERT TESTIMONY OF J. LESTER ALEXANDER III

The defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") hereby submits this Memorandum of Law in support of its Motion in Limine to preclude any expert testimony by J. Lester Alexander, III. Pursuant to the principles articulated in <u>Daubert v. Merrell Dow Pharmaceuticals Inc.</u>, 509 U.S. 579 (1993), and its progeny, Mr. Alexander should not be permitted to offer expert testimony because his methodology and his opinions are unreliable. In addition, any of the time studies and inefficiency measurements created by Mr. Alexander should likewise be excluded.

In this case the Plaintiff Steward Machine Company ("Steward") seeks damages based on its alleged storage of certain machinery. The machinery was the subject of a purchase order between Steward and the Defendant White Oak Corporation ("White Oak"). Steward claims that its alleged storage of the machinery from 1996 through 2000 caused it to incur in excess of $4 million in damages. These damages purportedly arise out of the impacts which the storage of the machinery had upon other Steward projects in its Birmingham, Alabama facility. In support of this claim, Steward has disclosed Mr. Alexander as an expert witness. In his report dated

September 15, 2003, Mr. Alexander states "I am of the opinion that White Oak caused Steward to incur economic cost of $2,915,493, plus prejudgment interest of $1,128,878, for a total economic cost of $4,044,371, due to the business interruption resulting from the storage and maintenance of the White Oak Project." See Alexander Expert Report, attached as Exhibit 1.

**Law and Argument**

The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony is competent, relevant, and reliable. See Daubert, 509 U.S. at 592 n. 10, Perkins v. Origin Medsystems, 2004 WL 90034, p. 3 (D. Conn. 2004) (Underhill, J.) (copy attached as Exhibit 2) (hereinafter "Perkins"); Koppell v. New York State Board of Elections, 97 F.Supp.2d 477, 479 (S.D.N.Y.2000). If the expert is deemed competent, the trial court must then determine, pursuant to its "gatekeeping" function, whether the proffered expert testimony is "relevant" and "reliable." See Perkins, p. 3 citing Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 (noting that trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony").

Rule 702 provides guidance to the trial court in determining whether the proffered expert testimony is sufficiently reliable. Rule 702 states, in relevant part, that expert testimony may be considered reliable if: (1) "the testimony is based on sufficient facts or data;" (2) the expert's technique or methodology in reaching the conclusion is considered reliable; and (3) the expert has applied the methodology reliably to the facts of the case. Fed.R.Evid. 702. Perkins, p. 4. Moreover, in order for the testimony to be admissible, all three components of Rule 702's reliability analysis must be met. Id. See also Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) ("The reliability analysis applies to all aspects of the expert's

testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion.") (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir.1994)).

In Daubert, the Supreme Court set out a list of non-exclusive factors the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique on which the expert relies has been tested--that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted by the scientific community. See Daubert, 509 U.S. at 593-94 as discussed in Perkins, p. 4. No single factor is necessarily dispositive of the reliability of a particular expert's testimony, because a trial court need only "consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150, (1999). The test of reliability therefore is a "flexible" one depending on the "nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. (quoting Daubert, 509 U.S. at 593).

If the court finds the methodology reliable, the court must then determine if the methodology was reasonably applied to the facts of the case. See Perkins, p. 4.Amorgianos v. National Railroad Passenger, 137 F.Supp.2d 147, 162 (E.D.N.Y.2001). In making this assessment, the court's inquiry under Daubert must focus not on the substance of the expert's

conclusions, but on whether those conclusions were generated by a reliable methodology. See Daubert, 509 U.S. at 590, 595; Perkins, p. 4; Amorgianos, 137 F.Supp.2d at 162 (E.D.N.Y.2001). Nevertheless, an expert's testimony must be held inadmissible if "there is simply too great an analytical gap between the data and the opinion proffered," such that the opinion is "connected to the existing data only by the ipse dixit of the expert." Perkins, at p. 4 citing Amorgianos, 303 F.3d at 266 (quoting General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997)); see also Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1441 (S.D.N.Y.1997) ("[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.") (internal citations omitted) (quoting Boucher v. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir.1996)). At the same time, the court should afford the expert some deference because a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Amorgianos, 303 F.3d at 267.

The gatekeeping responsibility of the trial court is not to weigh the correctness of an expert's opinion, or to choose between conflicting opinions, or to analyze and study the science in question in order to reach its own conclusions from materials in the field. Perkins, p. 5. Ultimately, it is the role of the trial court as gatekeeper to ensure the reliability and relevancy of expert testimony. Id. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Id.; Kumho Tire, 526 U.S. at 152.

The evidence will show that Mr. Alexander's opinions are not sufficiently reliable under Daubert. In the first instance his methodology is inherently unreliable. Mr. Alexander's opinions are based upon efficiency studies which he conducted regarding Steward's machine and fabrication shops. In conducting these studies, Alexander took a sample of Steward projects from 1996 through 2002, compared Steward's estimated hours for these projects, derived an "inefficiency factor" based on variances between the estimated hours and the actual hours, and calculated economic damages based on the inefficiency factor. Alexander's sample of jobs was based on subjective criteria which he apparently applied to include certain jobs, and exclude others. Therefore, instead of a study which purported to examine all jobs at Steward's facilities during the relevant time periods, Alexander's study include only the jobs which he subjectively believed should have been in the study. The studies are therefore incomplete on their face. The subjectiveness of Alexander's study also makes it inherently unreliable from an evidentiary and scientific perspective. Moreover, Mr. Alexander is not qualified to make the type of subjective determinations which he apparently made in including certain jobs and excluding others. He is a CPA. He has no apparent expertise in the field of specialty machine and fabrication shops. His study also fails to apply any statistical methodologies with respect to projects included or excluded.

The methodology used by Alexander is also fundamentally flawed because it fails to take into account other obvious causes and explanations for inefficiencies in Steward's machine and fabrication shops. Stated differently, Alexander's approach assumes that all variances between estimated hours and actual hours were directly caused by the presence of the White Oak equipment. It is illogical and inconceivable that all bid-to-actual variances were caused by the

presence of the White Oak machinery. Even Steward's employees recognize that this is not the case. In his letter to White Oak dated June 14, 1999 (copy attached as Exhibit 3), Steward's project manager identified certain projects which Steward believed had been impacted by the presence of the White Oak machinery. In his letter, the project manager states: "It is difficult to say how much of this cost is directly related to the inconvenience factor, but even if it was as small as 10%, that would total $472,728.00." See Exhibit 3. Alexander's failure to account for other potential causes of variances and inefficiencies cannot be reconciled with the obvious fact that other causes of variances and inefficiencies existed and were documented in Steward's own project files. These project files disclose numerous other causes of inefficiencies in Steward's operations, including out-of-sequence work, lack of materials, design errors, workmanship errors, and inefficiencies caused by other project owners.

Moreover, Alexander's study disregarded the jobs which had been identified by Steward's project manager as "impacted jobs" in his letter of June 14, 1999. To satisfy the Daubert standard, Steward must show that its expert has applied the methodology reliably to the facts of the case. It is inherently unreliable for an expert such as Alexander to use subjective criteria to exclude certain jobs from his study, while at the same time disregarding the Plaintiff's own list of impacted projects.

Alexander's methodology is also flawed because, in a conclusory and subjective fashion, he chose to disregard the results of his study as it related to Steward's performance during the so-called "construction period". According to his study, <u>Steward was more efficient in its machine shop during the "storage period" than it was in the "construction period"</u>. This is so because Steward suffered "unfavorable variances" of -50.1% in the construction period, compared to only

-26.5% in the "storage period". On its face, this result must mean that the presence of the White Oak machinery during the "storage period" did not make Steward less efficient in its machine shop operations. Recognizing that such a conclusion would undermine Steward's entire claim, Alexander has simply chosen to ignore the results of the study as it relates to the "construction period".

In his final report, Alexander indicates that he is now prepared to render an opinion that the presence of the White Oak machinery "caused" Steward to incur economic cost of $4,044,371 due to the business interruption resulting from the storage and maintenance of the White Oak Project. Alexander should not be permitted to testify regarding any issues of causation. He is not competent to testify on this issue, and his methodology is not sufficiently reliable to allow for any opinion on the issue of causation. Alexander admitted as much in his deposition testimony of June 20, 2003. When questioned about the scope of his retention and his opinions in the case, Alexander testified that it would "very difficult ... if not impossible" for a CPA such as Mr. Alexander to render any opinion on the issue of causation:

> Q. Now, is it your opinion that the unfavorable variance of 19.4 percent during the storage period was caused by the presence of the White Oak equipment in storage?
>
> A. While I'm not aware of any evidence that would indicate there were other causes, that is beyond the scope of my engagement.
>
> Q. What is the scope of your engagement just so we're clear?
>
> A. To determine the impact of the interference.
>
> Q. Okay. And in determining the impact of the interference, you would

> necessarily have to determine the degree to which the presence of the White Oak equipment caused the variance in bid to actual. Is that fair to say?

A. Yes. You would have to make a reasonable inspection, yes. Yes. And I've done that.

Q. All right. So, let me re-ask the question. Is it your opinion that the presence of the White Oak equipment during the storage period impacted Steward such that the actual fabrication hours exceeded the bid fabrication hours as reflected in Appendix H?

A. I know we're walking this fine line here. As a CPA, any time I make estimates, I have to make an assessment of the reasonableness of that estimate. And I have made an inspection, and I and others under my direction made inquiries to project managers. I have specifically inquired of the management of Steward, the CFO of Steward, and others of other possible causes. **However, I have not done a causation study. I have not done that. And since I haven't done enough work to issue the opinion you're asking, I'm just telling you simply what I said before, which was I'm not aware of - and have attempted to eliminate any other possible causes for my number. But giving you the affirmative position that it was the cause is beyond the scope of my engagement.**

Q. All right. And it's your understanding that you have not been retained to perform that type of causation analysis as you described it?

A. Generally speaking, it would be pretty difficult for someone who was not there to render that opinion, and that is a professional opinion in this case. But you're correct. I haven't been asked to do that.

Q. Do you have any intent, as you sit here today, to perform that type of analysis?

> A. **I think it would be something very difficult for any CPA who wasn't there to do, and I don't intend to do something that would be, in my judgment, very difficult to do, if not impossible.**
>
> Q. Why is it difficult or impossible from your perspective?
>
> A. If you inspect the records, you can see the impact of what occurred and the numbers, and that's all you can see. And you can look at the pictures and you can look at the drawings and you can see the evidence as it exists. But if you weren't there, you weren't there, so you don't have first-hand knowledge.
>
> Q. All right. So, is it fair to say that you view your role here as simply looking at the numbers and drawing conclusions based upon the numbers?
>
> A. I don't know what you mean by that. I mean, I think I've described my role. In other words, I've looked for and made attempts to eliminate other -- the impact of other possible causes, things that would give me a misread, cause me to make a miscalculation. And as a result, I'm not aware of any facts that would indicate that there are other causes that would cause these variances other than the White Oak job occupying the space that it occupied in the fab shop. And that's the extent of my opinion.

Emphasis added. See Alexander Deposition, pp. 123-127 (copy of pertinent pages attached as Exhibit 4). In his deposition, Alexander testified that neither he nor any CPA could provide an opinion on the issue of causation. Now Alexander is now prepared to render an opinion on the issue. Such a blatant contradiction underscores the inherent unreliability of Mr. Alexander's methodologies and his opinions.

Alexander's methodology when applied to the so-called "other jobs" category is also internally inconsistent. Based on his deposition and his report, it appears that he has calculated an inefficiency factor based on a sampling of certain selected jobs by comparing the estimated hours to actual hours for these jobs. He then takes this inefficiency factor and applies it to "other jobs". However these "other jobs" are never identified, have no estimates associated with them, and apparently represent unaccounted-for shop hours which Steward claims to have incurred during the relevant time period. Alexander failed to compare the estimates for these "other jobs" with the actual hours incurred, to determine whether in fact these "other jobs" were under budget, over budget or on budget. He simply assumes that the "other jobs" were subject to the same alleged inefficiencies without determining what the jobs entailed, and whether in fact they were performed inefficiently. His application of an inefficiency factor to these "other jobs" is pure speculation and is flatly inconsistent with his methodology in connection with the jobs included in his sample. See Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1441 (S.D.N.Y.1997) ("[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.")

There are numerous other deficiencies associated with Alexander's methodology, which are set forth more fully in the Report of Frank Zito, National Union's expert, copy of which is attached as Exhibit 5. In summary, Mr. Zito concludes that:

- He subjectively includes certain jobs but excludes others;
- He fails to account for errors in Steward's bidding and estimation;

- He ignores the fact that Steward intentionally underbid at least one job during the storage period;

- He fails to take into account other causes for delays and inefficiencies, many of which are documented in Steward's other project files, which are common to the construction industry and which are not the responsibility of White Oak;

- His own calculations reveal that Steward was in fact more efficient in its operations during the "holding period" than it was in the "construction period"; with no rationale he utterly disregards Steward's performance during the "construction period", presumably because reference to Steward's "construction period" performance would demonstrate that Steward's operations were not adversely affected at all by the presence of the equipment;

- His analysis assumes that White Oak was responsible for 100% of all inefficiencies on all other jobs, an assumption which is at odds with common sense, and which ignores the evidence obtained by National Union from Steward's other project files, which evidence points to numerous other causes of inefficiencies in Steward's operations, including out-of-sequence work, lack of materials, design errors, workmanship errors, and inefficiencies caused by other project owners, etc;

- His analysis fails to take into account other conditions which would explain Steward's improvement in its efficiencies after 2000, including the fact that Steward opened a new plant facility at or around that time, and the fact that the Steward took on larger projects after 2000;

- His report suggests that he is prepared to testify that the presence of the White Oak equipment "caused" Steward to incur damages in excess of $2,000,000; however, at his deposition he testified that he would not render an opinion on the issue of causation; and
- His analysis includes certain assumptions regarding the commencement and duration of the "storage period", which assumptions are inaccurate and incorrect.

**Conclusion**

For the above reasons, together with those which may be offered at a hearing hereon, National Union hereby asks that this Court grant its Motion in Limine.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

BY _____
Gary M. Case
Wolf, Horowitz, Etlinger & Case, LLC
99 Pratt Street – Suite 401
Hartford, CT 06103
(860) 724-6667
ct09610

**CERTIFICATION**

    This is to certify that a true copy of the foregoing document was mailed via first class postage, prepaid, this 10th day of March, 2004 to all counsel of record.

William Egan
Barbara Crowley
Egan & Crowley
234 Church Street
New Haven, CT  06510

Jane Milas
Garcia & Milas
44 Trumbull Street
New Haven, CT  06510

BY _____
Gary M. Case

41302