THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEWARD MACHINE CO, INC. | : | CIVIL ACTION NO. |
| | : | |
| | : | 3:00CV00834(SRU) |
| V. | : | |
| | : | |
| WHITE OAK CORPORATION | : | |
| | : | |
| AND | : | |
| | : | |
| NATIONAL UNION FIRE INSURANCE | : | |
| COMPANY OF PITTSBURGH, PA. | : | JANUARY 25 2005 |

**RESPONSE OF STEWARD MACHINE CO., INC.**
**TO NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT**

Steward Machine Co. Inc. ("Steward") submits this memorandum in opposition to National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National") motion in limine and/or summary judgment. In its motion National argues that <u>as a matter of law</u> Steward is not entitled to, storage charges or business interruption/lost efficiency costs arising from its principal's, White Oak Corporation's ("White Oak"), breach of its purchase order contract with Steward, or to the statutory interest mandated by C. G. S. §49-42. The first fundamental problem with National's motion is that National either misstates or misunderstands the facts and Steward's theories of recovery. The second fundamental problem is that National ignores or misstates the applicable law including two lines of cases going back over 100 years.

In this memorandum Steward will first set forth the facts it will establish at trial regarding the events that occurred after August 1996 when White Oak requested Steward to store and maintain the machinery at its plant in Birmingham, Alabama because White Oak could not accept delivery due to delays at the Tomlinson Bridge job site in New Haven.

Steward will then define its own theories of recovery on the three claims challenged by National and apply the applicable law and the facts to its theories of recovery.[1]

## FACTS

The facts are set forth in the affidavit of Charles Debardeleben, Vice President of Steward, and the affidavit of J. Lester Alexander, III, each of which has been submitted herewith.

### Original Contract

On August 8, 1994, White Oak entered into a purchase order contract Steward under the terms of which Steward agreed to specially manufacture the Machinery required for the Tomlinson Bridge project and to deliver it to White Oak in New Haven for the contract price of $7,553,000. The Purchase Order required White Oak to pay Steward's invoices within 10 days after the State paid White Oak for the Machinery or within 60 days of Steward's invoice, whichever was sooner. The Purchase Order also provided for a service charge of 1% per month on all amounts not paid in accordance with the payment terms of the Purchase Order. (Debardeleben Affidavit paragraphs 8-10). As September 1, 1996 the amount past due Steward from White Oak was in excess of $1,000,000. (Debardeleben Affidavit paragraph 14).

### Storage Agreement

In accordance with a schedule supplied by White Oak, Steward was planning to complete shipment of Machinery in September 1996. However, in August 1996, White Oak advised Steward that the Project had been delayed and directed Steward not to ship the

---

[1] The facts, theories and arguments raised by Steward in this memorandum are those necessary to respond to National's motion and are not meant to limit Steward's presentation and submission of its case at the time of trial.

2

machinery until the delay issues had been resolved. (Debardeleben Affidavit paragraphs 12-13.) White Oak further advised Steward that the delay issues would be resolved within three months, and requested Steward to store and maintain the Machinery until the delay issues were resolved. Steward advised White Oak that it was not interested in storing and maintaining the Machinery because of the disruption it would cause to Steward's on-going manufacturing operations and because White Oak was delinquent in its payment obligations to Steward. For these reasons Steward requested that White Oak arrange for the storage of the Machinery someplace other than Steward's manufacturing facilities. (Debardeleben Affidavit paragraphs 15 -17).

The storage of the Machinery involved a great deal more than simply placing it in a warehouse or outside and protecting it from the weather. Each piece of Machinery was manufactured to precise tolerances and was designed to function with other pieces of Machinery. In order to preserve the precise tolerances during storage it was necessary to periodically lubricate and rotate the moving parts of each piece of Machinery. These maintenance activities involved large pieces of equipment, including a 250-ton overhead crane, and personnel with experience and expertise in the maintenance of precision equipment. White Oak did not have the facilities, personnel, or equipment to store and maintain the machinery. (Debardeleben Affidavit paragraphs 18-21).

Since there was no practical alternative, Steward and White Oak agreed that Steward would store and maintain the Machinery at its plant at the rate of $8.00 per square foot per month for inside storage and the rate of $5.00 per square foot per month for outside storage. By letter dated November 15, 1996 to White Oak Steward confirmed that it would provide inside storage for the machinery at the rate of $8.00 per square foot per month and enclosed

3

an invoice for the months of September and October. A copy of the letter is attached to the Debardeleben affidavit as Exhibit A.  By letter dated December 15, 1996 to White Oak Steward confirmed that it would provide outside storage for the machinery at the rate of $5.00 per square foot per month. A copy of the letter is attached to the Debardeleben affidavit as Exhibit B. (Debardeleben Affidavit paragraphs 19-24). Near the end of the original three months of storage White Oak advised Steward that the storage period had to be extended by an additional three months. Near the end of the second three month period White Oak advised Steward that the storage period would have to be extended by an additional six months; and then White Oak advised Steward that machinery would have to be stored indefinitely. (Debardeleben Affidavit paragraphs 25-27).

Steward sent White Oak an invoice for the storage charges for each of the 47 months from September 1996 to August 2000. At no time prior to the commencement of this lawsuit did White Oak dispute even one of the invoices for storage. White Oak has yet to pay a single invoice for storage. (Debardeleben Affidavit paragraphs 30-32)

**Impact of Storage on Steward's Operations**

Throughout the continually expanding storage period, Steward advised White Oak that Steward did not want to store the machinery, and that the presence of the machinery was greatly interfering with operations of Steward's facilities, and causing Steward to incur economic costs significantly in excess of the amount of the storage fees White Oak had agreed to pay. (Debardeleben Affidavit paragraph 28).  The presence of the White Oak machinery interfered with Steward's operations in a number of ways, including but not limited to:

a)    It hampered the lay out of other jobs by taking up space needed for the layouts of the pieces for those jobs; thereby resulting in the jobs having to be done in a more piece meal fashion..

b)    At various times different pieces of the machinery would have to be moved around to different locations within Steward's facilities, so that Steward's employees could access various machines, tools and work stations  necessary  for other jobs; which required Steward's employees to spend time and utilize overhead cranes and other equipment to move the machinery.

d)    It reduced the assembly work areas requiring assembling on other jobs to be done in a piece meal fashion.

c)    The machinery required regular maintenance by Steward's  employees (Debardeleben Affidavit paragraph 29). Steward keeps track of its labor hours on a given project by assigning a job record number to each job. Steward's workers then, in addition to punching in a regular time clock for their daily hours, punch in on a job ticket for the particular project they are working on. (Debardeleben Affidavit paragraph 33).

In or about April of 1998, Steward instructed its employees that when ever they had to perform any work directly related to the stored White Oak machinery, such as moving a piece of equipment, they were to: punch out on the job ticket of the project they had been working on; punch in on the job ticket for White Oak storage, perform the work related to the stored White Oak equipment; punch out on the White Oak storage job ticket; and punch back in on the job ticket for the project they had been working on. (Debardeleben Affidavit paragraph 34).  Despite these instructions, many times Steward's employees would not go through the punch out, punch procedure just described. (Debardeleben Affidavit paragraph

29). Steward realized that although it knew it had incurred substantial economic costs because of the storage of the White Oak material, it did not know how to quantify these losses; and accordingly retained the services of J. Lester Alexander, CPA, to quantify those economic costs. (Debardeleben Affidavit paragraph36)

## 3.    Measure of Storage Damages

Mr. Alexander was retained and disclosed as an expert witness for Steward; and in that capacity prepared a report dated September 15, 2003, and a supplemental report dated September 2, 2004, detailing his expert opinion as to the economic costs incurred by Steward as a result of the storage of the White Oak machinery. (Alexander Affidavit, paragraph 3). Copies of the narrative sections of both reports are attached to the Alexander affidavit as Exhibits A and B.

Mr. Alexander's methodology for determining the   damages associated with the storage of White Oak machinery was to establish a benchmark of normal operating efficiencies of Steward when not affected by the presence of the White Oak machinery. (Alexander Affidavit, paragraph 4).He then used this benchmark to determine the number of excess labor hours required of Steward while storing the White Oak machinery; and used Steward's accounting records to determine the actual cost associated with the excess labor hours.  (Alexander Affidavit, paragraphs 5-6).

Mr. Alexander investigated the causes of excess labor hours and eliminated or mitigated the excess labor hours that could be attributable to causes other than White Oak. Examples of causes that are not attributable to White Oak are jobs whose scope materially increased (more than 15%) and jobs or portions of jobs that were fabricated elsewhere.

been referred to as the "costs of storage". (Alexander Affidavit, paragraph 10).[4] For purposes

of this memorandum the total of these figures, $2,327,250 will be collectively referred to as

"the storage damages".

## STEWARD'S ALTERNATE THEORIES OF RECOVERY

### 1.    Breach of Base Contract and Storage Agreement

Steward's primary theory is very simple and straight forward. There was a base

contract for the specially manufactured bridge parts; which, since it was a contract for the

sale of goods is controlled by the Uniform Commercial Code. (Connecticut General Statutes

42a-1-101 et seq.) Subsequently Steward modified the original agreement by making a

collateral agreement for the storage of the parts at Steward's facility for a short-term period.[5]

Since the latter is a collateral or ancillary agreement not involving the sale of goods, damages

for breach of that collateral agreement are governed by general contract law and not the

U.C.C.[6] White Oak breached both the base contract and the collateral storage agreement.

---

[3] These values appear in Exhibit D attached to the Alexander Affidavit.

[4] There were no labor hours recorded in Steward's storage job record for the entire year of 1997 or for the first three and one-half months of 1998; that is, for the period prior to Steward instructing its employees to go through the punch out, punch in procedure previously discussed. (Alexander Affidavit, paragraph 10; Debardeleben Affidavit paragraph 34))

[5]  See Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2nd Cir. 1983):
> A "collateral" agreement is a separate, side agreement, connected with the principal contract . . .

See also Cornell University v. UAW Local 2300, 942 F2d 138, 140 (2nd Cir. 1991), a collateral agreement "creates an entirely distinct and different obligation" from the original agreement, which may be "parallel or coordinate" to the original agreement.

[6] C.G.S. Sec. 42a-2-701, entitled  Remedies for breach of collateral contracts not Impaired provides:
> Remedies for breach of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of this article.

8

Steward is therefore entitled to damages against White Oak under the U.C.C. for breach of the prime contract and damages pursuant to general contract law for breach of the collateral storage agreement. National is liable to Steward for all of the damages recoverable against White Oak based on the provisions of C.G. S. 49-41, the terms of the bond, and Connecticut law, as hereinafter discussed.

As damages under this theory of recovery Steward is claiming:

1)  The contract balance on the base contract, including retainage of $1,170,253, pursuant to C.G.S. 42a-2-709;[7]

2)  The contract balance on the corollary or ancillary storage agreement in the amount of $2,095,476 pursuant to general contract law; and

3) Incidental damages under C.G.S. 42a-2-710[8] for breach of the base contract, and damages under general contract law for breach of the storage agreement, in the amount of $231,774, which is the excess of the storage damage claim over the storage contract balance ($2,327,250 - $2,095,476).

In addition, if Steward prevails in this action, it has a statutory right under Sec. 49-42 to "the costs for bringing such proceeding and [allow] interest at the rate of interest specified in the labor or materials contract under which the claim arises or, if no such interest

---

[7] Sec. 42a-2-709. entitled "Action for the price" provides in relevant part:
> (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under section 42a-2-710, the price (a) of goods accepted . . .

[8] Sec. 42a-2-710, entitled "Seller's incidental damages" provides:
> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

9

rate is specified, at the rate of interest as provided in section 37-3a upon the amount recovered".

**2.     Breach of Prime Contract Where No Storage Agreement**

Assuming arguendo that the court finds that there was no agreement for the storage of the machinery, the total damages figure claimed by Steward remains the same. The difference is the categorization of those dollars, and the applicable sections of the commercial code. If there was no agreement for Steward to store the machinery, then necessarily the additional four years that the machinery remained in Steward's facilities were the result of White Oak's failure to accept delivery.

Under this alternate theory of recovery Steward is claiming as damages:

1)  The contract balance on the base contract, including retainage of $1,170,253, pursuant to both C.G.S. § 42a-2-709 and/or § 42a-2-708[9]; and

3) The entire storage damage claim of $2,327,250 as damages for nonacceptance under § 42a-2-709 and incidental damages under § 42a-2-710.

---

[9]  Sec. 42a-2-708, entitled "Seller's damages for nonacceptance or repudiation provides":
> (1) Subject to subsection (2) and to the provisions of section 42a-2-723 with respect to proof of market price, the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in section 42a-2-710, but less expenses saved in consequence of the buyer's breach.
> (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 42a-2-710, due allowance for cost reasonably incurred and due credit for payments or proceeds of resale.

Again, as stated above, if Steward prevails it has a statutory right to costs and interest pursuant to C.G.S. Sec. 49-42.

### THERE IS NO BASIS FOR FINDING AS A MATTER OF LAW THAT THERE WAS NO STORAGE AGREEMENT

National argues at page 29 of its brief that there can be no "modification or oral agreement" with respect to the storage fees. In support of this allegation National relies on the paragraph in the base contract which states:

> There are no terms, conditions, understandings, or agreements between Buyer and seller other than those stated herein . . .No terms and conditions in anyway altering or modifying the provisions hereof shall be binding upon Buyer or seller unless in writing and signed by an authorized representative of Buyer and Seller.

And it then claims "Connecticut courts routinely enforce integration clauses of this type". (Id). This argument is disingenuous at best. Only the first sentence of the cited paragraph is an integration clause. Integration clauses refer to <u>antecedent</u> agreements.[10] **CITE.** In regard to the clause providing that <u>subsequent</u> modifications can only be in writing, it is difficult to believe that the defendant is unaware of the century old black letter law on this issue. Citing a string of cases which began in the 1800's, the Court in <u>Blakeslee v. Water Commissioners</u>, 121 Conn. 163, 183 (1936) stated:

> . . . hence the general rule is stated to be that, <u>despite a provision in the contract that it may not be changed except in</u>

---

[10] See for example, <u>Vezina v. Nautilus Pools, Inc.</u>, 27 Conn. App. 810, 813 (1992), 610 A.2d 1312:

> "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Corbin, Contracts.[Citation omitted, emphasis added]

11

> writing, a parol agreement modifying its terms will be given
> effect. [Emphasis added].

Moreover, this basic principle has been expanded to include modifications implied in fact

from the parties' conduct.

> … Further, we reject the defendant's claim that there could be
> no modification because the contract specifically provided for
> modifications to be in writing. It is well settled that despite the
> presence of such a clause in a contract, a modification by
> subsequent parol agreement will be given effect. Blakeslee v.
> Water Commissioners, 121 Conn. 163, 182-83, 183 A. 887
> (1936). We see no reason why this principle should not also
> apply to a modification implied in fact from the conduct of the
> parties.

McKenna v. Woods, 21 Conn. App. 528, 533 (1990), 574 A.2d 836.

In the present case, the affidavit of Charles DeBardeleben submitted in support of

this memorandum, clearly sets forth facts upon which the court could find either that 1) by

virtue of the correspondence, there was a writing signed by White Oak agreeing to payment

of the storage fees; or 2) by virtue of the discussions between the parties there was a parol

agreement for the storage fees: or 3) by virtue of White Oak receiving invoices to which it

never objected, the storage agreement should be implied in fact from the parties conduct.

However, it should be noted that in the context of National's motions seeking findings of

law, the issue of whether a contract has been modified is an issue of fact.

> Whether a contract or a subsequent modification exists is a
> question of fact for the court to determine. [Citations omitted]

New England Rock Services, Inc. v. Empire Paving, 53 Conn. App. 771, 775, 731 A.2d 771

(1999). See also McKenna, supra at p. 532.

## NEITHER CONNECTICUT'S BOND STATUTES OR THE LANGUAGE OF THE BOND LIMIT NATIONAL'S LIABILITY FOR ANY OF STEWARD'S DAMAGES

12

1.    **National Is Liable For All of Steward's Damages under Connecticut's Payment Bond Statutes**

The starting point for the discussion is Sec. 49-41 which provides in relevant part:

> Every person who has furnished labor or materials in the prosecution of the work provided for in such contract in respect of which a payment bond is furnished under the provisions of section 49-41 and who has not been paid in full therefore. . . may bring an action upon the payment bond . . .

National Union's argument seems to be that the words "labor or materials" define the limit of the surety's liability on the payment bond. (National Br. p. 11) The quoted language defines "who" can recover on the bond not "what" a proper claimant can recover.

> Clearly, the "who" is limited to those supplying "labor and material." The what is not so limited and is described simply as "sums justly due." "Sums justly due" refers back to back to the term "paid in full" contained in the earlier pat of that same sentence. Thus a provider of labor or materials is entitled to be paid in full for all sums justly due, meaning that the provider is entitled to be paid in full under the subcontract. Only that reading makes sense of the entirety of the Act

Taylor Construction Inc. v. ABT Service Corporation, 363 F. 3d 119, 122 (9th Cir. 1998).

Although Taylor speaks in terms of the claimant being "entitled to be paid in full under the subcontract", the subcontract is not the bonded contract. The subcontract merely defines the payment terms between the sub-contractor and the general contractor. Blakeslee Arpaia Chapman, Inc. v. EI Construction, Inc., 239 Conn. 708, XXX (1997) The bonded contract is the contract between the general contractor and the owner; in this case, the contract between the general contractor, White Oak, and the, owner, DOT:

> [T]he "Contract" to which the bond refers is the prime contract between [the general contractor] and the [owner], not the subcontract between the [claimant] and the [general contractor].

CAM-FUL Industries v. Fidelity & Deposit Co., 922 F. 2d 1992 (2nd Cir. 1991).

The facts and rationale of the CAM-FUL decision are particularly applicable to the case at bar. In CAM-FUL the Second Circuit overturned a district's court ruling relieving a surety of liability under a payment bond for the claim of a subcontractor who, at the request of the prime contractor, performed extra work that was required by the prime contract, but was beyond the scope of its subcontract. Focusing on the "prime contract" the Court stated:

> . . . the prime contract permitted the city's engineer to require [the extra work]. Under the prime contract, [the general contractor] was, therefore, bound to provide [the extra work]. [The subcontractor], however, was not bound to do the work. . .
> [The] payment bond guaranteed payment for all work required by the prime contract, and this included a guarantee of [the extra work]. To the extent that [the general contractor] may owe [the subcontractor] additional money over and above the subcontract price, and if that additional amount is not "paid" . . . [the surety] will be liable to [the subcontractor] under the payment bond. (At p. 161)

In the present case, National's bond expressly incorporated the prime contract between White Oak and DOT "together with all plans and specifications therefore."[11] Among the specifications included in the contract was DOT's "Standard Specifications for Roads Bridges and Incidental Construction" ("DOT's Standard Specifications") Section 1.08.9.06 of DOT's Standard Specifications provides in relevant part:

> Non-perishable materials which meet specification requirements, specifically produced or purchased for incorporation into contract items of work, and delivered at the site or at such location as the Engineer may approve, but not incorporated in the work, may be included in current estimates at such fraction of the contract unit price as he may consider to represent fair value for the material when such materials have

---

[11]   See Choctaw Generation Ltd. v. American Home A., 271 F.3d 403, 405, 409 (2nd Cir. 2001); when payment bond provides that the Construction Contract is "referred to" "and made a part" of the Bond "as if fully set forth" therein, "the Bond incorporates the Construction Contract by reference".

> been paid for by the Contractor as shown by receipted bills, or
> in lieu of such receipted bill or bills, a duly executed
> Certification of Title executed by the Contractor and the
> Vendor. When partial payment is made for delivered materials,
> such materials shall become the property of the State and <u>such
> payment shall in no way release the Contractor from his
> responsibilities for the condition, protection and, in case of
> loss, replacement of such materials *or from any liability
> resulting in any manner from the presence of such materials
> wherever they may be stored or kept.*</u>  (Emphasis added)

The DOT's engineer approved storage of the machinery at Steward's facility and DOT paid

White Oak for the stored materials pursuant to 1.08.9.06. Steward clearly provided the extra

work, as well as materials, equipment and facilities necessary to provide the storage and

protection of the machinery required under the bonded contract between White Oak and the

State of Connecticut. Pursuant to the <u>CAM-FUL</u> decision, under either of Steward's alternate

theories of recovery, the amount owed to Steward by White Oak for such storage and

maintenance is the amount for which National is liable under the bond.

Moreover, for over a century it has been clear that the coverage of a payment bond is

not limited to labor and materials directly incorporated into the public work. <u>Brogan v.

National Surety Company</u>, 246 US 257, 261, (1918). Brogan involved a project located in a

remote area with no hotels or boarding houses and the general contractor was required to

provide board and lodging for its workers. Brogan furnished groceries and provisions that

were used by the contractor in its boarding houses. In holding that Brogan was entitled to

recover for the groceries and provisions under the payment bond furnished by the general

contractor the court first explained the parameters of the issue:

> The supplies furnished by Brogan under these
> circumstances were clearly used in the prosecution of the work,
> just as supplies furnished for the soldiers' mess are used in the
> prosecution of war. In each case the relation of food to the
> work in hand is proximate. But the surety contends that the

15

> words "in the prosecution of" the work are not used in the bond
> and the act in their natural sense, but should be given a
> conventional meaning so as to exclude labor and materials
> which contribute to construction only indirectly, as do the
> supplies consumed by a contractor in operating his plant.

(Id. p. 260). The court then went on to state:

> This court has repeatedly refused to limit the application of
> the act to labor and materials directly incorporated in to the
> work. . . In *United States Fidelity Co.* v. *Bartlett*, 231 U.S.
> 237,where the work contracted for was building a breakwater,
> recovery was allowed for all the labor at a quarry opened fifty
> miles away. This included, as the record shows, the labor not
> only of men who stripped the earth to get at the stone and who
> removed the debris, but carpenters and blacksmiths who
> repaired the cars in which the stone was carried to the quarry
> dock for shipment; and who repaired the tracks upon which the
> cars moved. And the claims allowed included also the wages of
> stablemen who fed and drove the horses which moved the cars
> on those tracks.

The essential analysis, according to the Brogan court, in establishing "the conditions essential

to liability on the bond" was consideration of "the special circumstances under which the

supplies were furnished" and "findings of fact . . . that they were necessary to and wholly

consumed in the prosecution of the work provided for in the contract and the bond". (Id. p.

262). Applying that analysis the court concluded:

> The furnishing of board by the contractor was an integral part
> of the work and necessarily involved in it. Like the supplying
> of coal to operate engines on the dredges, it was indispensable
> in the performance of the work. Groceries furnished to a
> contractor under such circumstances and consumed by the
> laborers, are materials supplied and used in the prosecution of
> the public work.

Id. at 263. The <u>Brogan</u> rationale remains the law in the Second Circuit, the State of

Connecticut, and this case.

In J.P. <u>Byrne v. Fire Associates of Philadelphia</u>, 260 F.2d 541 (2nd Circuit 1958)

16

J. P. Bryne sought payment under the bond for the sales price of new and recapped tries sold

to the general contractor for its heavy earthmovers, where "conditions at the excavation site

subjected these tires to unusual wear" and "from the inception of the contract the repair and

replacement of tires was expected to be a constantly recurring item". (Id, p. 543). The surety

argued that the tires were additions to the contractor's capital equipment and "that even if the

tires are held to be materials, not capital equipment, plaintiff must show that they were in fact

substantially consumed by the work; and that it is not liable as surety for tires which were

diverted by the contractor for use on non-bonded jobs". The Second Circuit rejected the

surety's arguments, stating:

> Although none of these contentions are completely foreclosed
> by existing case law, in our view they each run counter to the
> expressed Congressional policy embodied in the Miller Act.
>     . . . Both the bond and the statute obligate the surety for
> the payment of persons furnishing "material in the prosecution
> of the work provided for in [the] contract." The courts have
> refrained from attempting an all-inclusive definition of material
> furnished in the prosecution of the work. [Citations omitted].
> We make no attempt to do so here, for the facts and
> circumstances of each case are the sole determinants of the
> definition. Any inquiry must begin, however, with the
> repeatedly noted principle that the Miller Act should be
> liberally construed to effect Congress' remedial purpose.
> [Citations omitted]

(Emphasis added, Id. p. 543-544) And, instead of adopting the surety's argument that the

plaintiff must prove that the materials were in fact consumed on the job, the court held:

> A more recent view, which we here adopt, focuses on the
> degree of expected consumption of the items on the particular
> job for which they were furnished.
> [Citation omitted]. See Brogan v. National Surety Co., 246
> U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, reversing National
> Surety Co. v. United States, for Use of Pittsburgh & Buffalo
> Co., 6 Cir., 228 F. 577, L.R.A. 1917A, 336.

The Connecticut Supreme Court explicitly adopted the rationales and holdings of

J.P. Byrne in its decision in International Harvester Co. v. DeFelice And Son, Inc. 152 Conn.

325, 334-336 (1964); and held

> We conclude that it is not possible to state a comprehensive
> definition of what labor and materials used in making repairs
> are allowable under the statute. Little difficulty is presented in
> the class of minor items which are uniformly allowed. It is in
> the area of major items where the difficulty is encountered.
> Although the generally accepted legal and tax accounting
> principles which are applicable to expenses of operation and
> capital improvements are persuasive, they can have no
> conclusive force. We are in accord with the reported decisions
> which hold that the most significant single factor in
> distinguishing materials contemplated by the statute from
> capital equipment is the element of substantial consumption on
> the job. Recognition must be given to the fact that the present
> statute . . . does not require that the materials be used in the
> work but, as in the Miller Act, specifies that they be furnished
> in the prosecution of the work.

In the present case Steward is seeking storage damages for the extra labor and plant

facilities that were consumed by the storage of the White Oak parts. Under Brogan, supra,

and its progeny it is impossible to rule as a matter of law that these damages are not

recoverable under Secs. 49-41 and 49-42. The presence or absence of a modification to the

contract and the facts and special circumstances surrounding the storage all involve factual

determinations to be made by the court.

## 2.    National Is Liable For All Of Steward's Damages Under The Terms Of The Bond

National Union's argument, at page 10 of its brief, that the bond language, "NOW

THEREFORE, if said principal shall well and faithfully make payment for all materials and

labor used or employed in the execution of such contract", limits the bond's coverage to only

the minimum required by the statute was explicitly rejected in Newman & Partners v. CFC

18

Construction Ltd., 236 Conn. 750, 757 (1996). The core issue in Newman was whether an

architect could make a claim against the bond when the statute does not provide for payment

of "services".

The court first examined the issue of whether a payment bond executed pursuant to

Sec. 49-41 can "establish broader protection that that required by the statute". (Id, p. 755); a

question which the court answered resoundingly in the affirmative:

> .  .  .  In accordance with the plain and unambiguous
> language of § 49-41, however, the coverage of a payment bond
> need not be limited to the coverage required by the statute.
> With exceptions not at issue in this case, § 49-47 (b) provides
> that "[n]othing in this section or sections 49-41a to 49-43,
> inclusive, shall be construed to limit the authority of any
> contracting officer to require a  performance bond or other
> *security in addition to the bond herein referred to* . . . ."
> [Original emphasis] Thus, § 49-41 expressly contemplates that
> the parties to a payment bond, although they must provide the
> coverage required by the statute, may incorporate additional
> provisions that expand the coverage required by the statute.
> [Citation omitted]
>
> . . . The statute's provisions are to be liberally construed to
> effect its remedial purpose. [Citations omitted]  The
> construction of § 49-41 proffered by the defendants, which
> would limit payment bond coverage for those parties whom §
> 49-41 was enacted to protect to the coverage expressly required
> by the statute, would frustrate the very purpose that the statute
> was designed to further.
>
> Moreover, federal precedents reflect the principle that
> statutory requirements establish only a floor of protection
> beneath which the coverage of a payment bond cannot fall,
> rather than an upper limit upon the scope of a bond's coverage.
> [Emphasis added].

(Id, p. 756-757).

The next analytical step, the court explained, is to "examine the terms of the payment

bond executed by the defendants in this case in order to ascertain the extent of protection

afforded therein to the plaintiff". (Id, p. 758) ". The surety argued that although, in the body

19

of the bond language there was a reference to "labor, services and materials", the closing

"NOW THEREFORE" clause only referred to "labor and services", and thus this final clause

necessarily limited its coverage to only "labor and materials". The court firmly rejected this

argument:

> We agree with the plaintiff that, at most, this provision, when
> read together with the other provisions of the payment bond,
> raises an ambiguity concerning the scope of the bond's
> coverage. "Since the bond was furnished by the defendants, it
> must be interpreted most strongly against them." [Citations
> omitted].    In accordance with this rule of construction, we
> construe the payment bond's "labor or services" provision as
> the controlling coverage provision in the bond. The
> architectural services rendered by the plaintiff, therefore, fall
> within the scope of the payment bond's coverage.

(Id., p. 759).

Contrary to National's argument, the language of the payment bond in this case, like

the language in the payment bond in the Newman case, extends the coverage required by the

statute. As discussed above, National's bond expressly incorporated Section 1.08.9.06 of

DOT's Standard Specifications, which provides in relevant part:

> Non-perishable materials . . .and delivered  . . .at such location
> as the Engineer may approve, but not incorporated in the work,
> . . . When partial payment is made for delivered materials, such
> materials shall become the property of the State and such
> payment shall in no way release the Contractor from his
> responsibilities for the condition, protection and, in case of
> loss, replacement of such materials or from any liability
> resulting in any manner from the presence of such materials
> wherever they may be stored or kept. (Emphasis added)

As previously stated, DOT"S engineer approved storage of the machinery at

Steward's facilities and DOT paid White Oak for the stored materials pursuant to 1.08.9.06.

Under the express terms of the contract White Oak is responsible to Steward "for any

liability resulting in any manner from the presence of such materials wherever they may be

stored or kept." As National, by incorporation, has bonded this liability, National is liable to Steward under the bond for any and all liability which White Oak may have to Steward, on any of Steward's alternate theories of recovery, resulting from the "continued presence" of such machinery at Steward's plant in Birmingham.

### WHETHER THE AMOUNT OF STORAGE DAMAGES IS THE NET DIFFERENCE ABOVE THE STORAGE FEES OR THE TOTAL STORAGE DAMAGES CLAIM THERE IS NO BASIS FOR LIMITING NATIONAL'S LIABILITY ON THE BASIS THAT THE DAMAGES ARE FOR "LOST PROFITS" OR FOR "INCIDENTAL DAMAGES" UNDER THE COMMERCIAL CODE

The starting point when examining Steward's storage damages is to understand the nature of the claims. As previously explained, these damages claims are based on labor consumed by storing the White Oak machinery in Steward's plant, with the attributable shop and general overhead charges allocable to those labor costs, as well as the lost profit attributable to those direct and indirect costs. These damage claims are directly comparable to the inefficiency and delay damages typically awarded in payment bond suits involving standard subcontracted construction work, including charges for inefficiencies, increased labor costs and extended field office and home office overhead.

That the method by which Steward's damages are computed is different than that usually seen in construction cases is a function of the nature of the specialized manufacturing business in which Steward is engaged. It is not necessary for Steward to prove its damages in the same manner as is usually employed in a standard construction claim, nor in fact is it even necessary for Steward to prove these damages with "mathematical exactitude".

> Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier . . . this situation does

> not invalidate a damage award as long as the evidence afforded
> a basis for a reasonable estimate by the [trier] of that amount. .
> . . Mathematical exactitude in the proof of damages is often
> impossible, but the plaintiff must nevertheless provide
> sufficient evidence for the trier to make a fair and reasonable
> estimate. . . ." All that is required is that Steward prove those
> damages with "reasonable certainty" [Citations omitted]

Lawson v. Whitey's Frame Shop, 241 Conn. 678, 689-690 (1997), 697 A.2d 1137.  Nor is

this measure of damages varied by the fact that the base contract is controlled by

Connecticut's version of the U.C.C. As the Connecticut Supreme Court stated in Bead Chain

v. Saxton Products, Inc., 183 Conn. 266, 279 fn 5 (1981) 439 A.2d 314:

> Official Comment 1 to Uniform Commercial Code 1-106, 42a-
> 1-106, states that one of its purposes is "to reject any doctrine
> that damages must be calculable with mathematical accuracy.
> Compensatory damages are often at best approximate; they
> have to be proved with whatever definiteness and accuracy the
> facts permit, but no more." Official Comment 2 to Uniform
> Commercial Code 2-708, 42a-2-708, states that "[i]t is not
> necessary to a recovery of 'profit' to show a history of
> earnings, especially if a new venture is involved."

1.    **National Can Not Avoid Liability For Steward's Storage Damages Based On Its
      "Lost Profits" Theory**

Firstly, National's attempt to mischaracterize the storage damages as simply lost

profits on other jobs is without merit. The nature of the various elements of costs incurred,

and the actual profit claimed are clearly set forth in the facts and the affidavit of Mr.

Alexander. Secondly, its' attempt to claim that only the direct labor, materials and

subcontract expenses captured by Steward on its storage job record are recoverable in a

payment bond action is patently absurd. As explained above, the incurred costs which

Steward is seeking to recover in its storage damages claim are directly comparable to the

inefficiency and delay damages typically awarded in standard construction cases. In fact, the

very cases cited by National at p.16-17 of its brief acknowledge the recoverability of such

22

direct and indirect damages. For example, in <u>United States v. Piracci Construction Co., Inc.</u>,

(1975), 405 F. Supp. 904, 905 (National Br. p. 16-17) the "out-of-pocket" delay costs

awarded were:

> 1) increased cost of labor due to performance of the work at a
> period when higher wage rates were in effect; (2) increased
> cost of materials due to higher prices at the later
> time; (3) increased labor costs due to inefficient performance
> stemming from the piecemeal, disjointed method of work
> caused by the delay; (4) increased cost of field operations due
> to the longer time of actual job performance resulting from the
> delay; (5) increased indirect expenses, composed of home
> office overhead and general and administrative (G&A)
> expenses.

As another example, in  <u>U.S. v. Millers Mutual Fire Insurance</u>, 942 F.2d 946, 950 (5th Cir.

1991) (National Br. p. 16) the court reversed and remanded the trial court's denial of the

subcontractor's "Delay Claim" which included the following components of increased

"direct and indirect project overhead":

> 1) direct project overhead, including overhead labor (salaries
> for supervisory personnel, laborers, and a secretary, plus 40%
> of the salary expense for "decreased efficiency for
> demobilization and remobilization" and 28.76% of the salary
> amount for "labor burden") and expenses (offices, buildings,
> trailers, vans, trucks, equipment, tools, utilities, housing rental,
> fuel, subsistence, insurance, postage, pulmonary tests on
> employees, and copy charges from increased paperwork); and,
> 2) indirect project overhead, including accounting and attorney
> fees, amounts paid to settle sub-subcontractors' delay claims,
> general project overhead figured at 21.19% of all items listed
> above . . .

At most, the only portion of Steward's storage damage claim which would be subject

to attack under the various cases cited by National is the reasonable profit margin of

$172,447 included under the category of Economic Costs incurred by the Fabrication and

Machine Shops. Significantly, however, is the fact that, unlike the present case, all of the

various federal decisions cited by the defendant for the proposition that the surety cannot he held liable for the subcontractor's lost profits involve interpretation of the "floor" of coverage set by the Miller Act, not the additional coverage which the language of the particular bond at issue can afford.

Even, for the sake of argument, setting aside the coverage afforded by the language of National's bond, the "floor" of coverage afforded by Sec. 49-41 does not exclude profits on labor consumed by the project. While Connecticut courts will look to Miller Act decisions for guidance, if the Connecticut Supreme Court has ruled on the issue, as it has on the issue of the recovery from the surety of lost profits, that ruling is controlling. In Blakeslee Arpaia Chapman, Inc. v. EI Const., Inc., 239 Conn. 708. 720-724 (1997), 687 A.2d 506 the Court specifically addressed the issue of "Earned and Unearned Profits", and greatly limited the type of profits for which a surety would be shielded from liability. The key differentiation established by the Blakeslee decision is whether the profits are related to work actually performed, or are related to future work that the plaintiff never performed. The court found that the surety is liable under the statute for profits on all work actually performed whether pursuant to or "outside" the subcontract:

> The trial court allowed recovery of the earned profits of $17,654 under the provisions of § 49-42. We agree that the plaintiff is entitled to recover lost profits for work actually performed. As the Fifth Circuit Court of Appeals noted, "[i]f such a contractor cannot include a profit, he would not be in business." [Citations omitted]
>
> Conceding that federal jurisdictions allow for lost profits on work performed, Aetna attempts to distinguish profits on work performed pursuant to the provisions of the subcontract from profits on additional work performed outside the subcontract. Aetna claims that the plaintiff was improperly allowed profits for work performed outside the subcontract. . . [I]t argues that recovery is measured by the contract sum and, therefore, the

24

> surety is liable only for that profit included in the contract sum.
> We reject this distinction.
>
>     *        *        *        *        *        *
>
> Furthermore, the distinction that Aetna espouses would be
> contrary to the liberal interpretation that we must afford the act
> in order to protect the intended beneficiary, in this case the
> plaintiff. Accordingly, we reject the distinction and conclude
> that the trial court correctly awarded the plaintiff earned profits
> of $17,654 against Aetna under count seven.

(Id at p. 722-723). The only profits disallowed by the court were those related to work that

had never been performed:

> . . . [T]he plaintiff seeks lost profits for work not performed
> that it would have earned had it been able to complete its
> subcontract. The trial court correctly held that "[f]uture loss of
> profits are not recoverable from a Miller Act surety." [Citation
> omitted]

(Id at p. 723). In the present case it is clear that Steward is not claiming profits on labor that

was never performed. Therefore the profit element of its storage damage claim is clearly an

item of damage for which National is liable.

    Moreover, the Blakeslee court agreed that if there was language in the bond which

would impose liability for profits on work not performed, then under <u>Newman</u> the surety

would be liable for those profits.[12] Noting that the trial court had failed to perform the review

---

[12] Relying on <u>Newman</u>, supra The "principles" which the <u>Blakeslee</u> court stated must be
kept "in mind", when reviewing the surety's liability, are:

> Although the surety's liability on the bond must be "at
> least coextensive with the obligation imposed by the [Miller]
> Act"; the "statutory requirements establish only a floor of
> protection beneath which the coverage of a payment bond
> cannot fall, rather than an upper limit upon the scope of a
> bond's coverage". In other words, the provisions of the
> payment bond may create more extensive liability for the
> surety than that required by the act. Because the payment bond
> was furnished by the surety, if there is any ambiguity, "it must
> be interpreted against [the surety]./[Internal citations omitted]

(id at p.714)

25

of the bond language required under Newman, and that the plaintiff " failed to "point to any language in the bond to support [its] proposition" that the surety "assumed responsibility under the payment bond for damages caused by EI's breach of contract, including profits the plaintiff would have earned had it performed under the subcontract;  the court stated that "after conducting an independent analysis of the bond", in that case it could not find "any language that supports the plaintiff's argument. In direct opposition to the situation in Blakeslee, National's bond in this case contains clear language that it assumed responsibility for "any liability resulting in any manner from the presence of such materials wherever they may be stored or kept".

In light of the clear holdings in Blakeslee, it is an inescapable conclusion that neither Connecticut's payment bond statutes nor the language of the bond afford any basis whatsoever to shield National from liability for Steward's storage damages.

## 2.    National Cannot Avoid Liability For Steward's Storage Damages Based On Its Theory of Limited "Incidental Damages" Available Under The Commercial Code

As stated above under the discussion of Steward's alternate theory of recovery, if, for the sake of argument, it is assumed that there was no storage agreement, then Steward is not claiming as damages the total it invoiced pursuant to that non-existing agreement. Rather, it is claiming the entire storage damage claim of $2,327,250 as damages for nonacceptance under § 42a-2-708 and incidental damages under § 42a-2-710. Although National acknowledges at page 25 of its brief that if there is no storage agreement then Steward must be seeking damages for "White Oak's failure to take delivery of the machinery"; astonishingly National never mentions § 42a-2-708, which covers the primary damages to which a seller is entitled for a buyer's failure to accept delivery. Moreover, in its myriad

discussions of the drastically limited damages which it claims are all that are available to Steward under Connecticut's commercial code, National never mentions the directly controlling decision rendered by the Connecticut Supreme Court in <u>Bead Chain v. Saxton Products, Inc.</u>, 183 Conn. 266(1981), supra. (See National's Brief pp. 22-27 and 32-35).

In a decision written by Chief Justice Ellen Peters, whose knowledge and familiarity with the U.C.C. was and is well-known,[13] the court directly addressed the issue of the types of damages available to a seller of "specially manufactured goods" when the Buyer has refused to accept delivery, as well as the related issue of the level of proof necessary to establish those damages.

> Several provisions of the Uniform Commercial Code relate directly to the measurement of damages here. In the case of breach by a buyer while the goods are still unfinished, the seller may, "in the exercise of reasonable commercial judgment cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner." 42a-2-704(2) (2). <u>After manufacture has ceased, such a seller's damages are measured by "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 42a-2-710," but less expenses saved in consequence of the buyer's breach. 42a-2-7-8 (2)</u>. Although other classes of aggrieved sellers may also be entitled to measure their damages in accordance with this latter section, it is enough for this case to note that a seller of uncompleted components whose market is composed solely of the buyer in breach cannot adequately measure his damages in any other Way. [Citations omitted]

> Under 2-708 (2), then, Bead was entitled to recover from Saxton its anticipated net profit, plus those fixed costs which could be regarded as overhead.

---

[13] Prior to being appointed to the Connecticut Supreme Court, Justice Peters was a Professor of Law at Yale Law School for 22 years, where "her primary scholarly interests at the time were the law of contracts and The Uniform Commercial Code". (University of Connecticut School of Law – Profile on Visiting Professor of Law Ellen Ash Peters, www.law.uconn.edu/faculty/epeters).

(Id, at p. 277), emphasis added).

Moreover, in the decision Justice Peters specifically identified the commercial code sections "governing a seller's right to damages for nonacceptance or repudiation" as including § 42a-1-106. (Id at p. 276). That section provides in relevant part:

> (1) The remedies provided by this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . .

As further set forth in that decision, the most important role played by this section is in determining the adequacy of the evidence submitted by the seller in support of its claims for damages:

> . . . we must bear in mind the Code's admonition that remedies should be liberally administered to approximate the benefits that would have flowed from full performance. 42a-1-106 (1). <u>In recognition of the fact that the plaintiff's difficulty in quantifying his damages often flows directly from the defendant's breach, the philosophy of the Code is to require that degree of proof of damages which the facts permit, but no more</u>. See also Restatement (Second), Contracts 366 (Tent. Draft No. 14, 1979).

In the present case, Steward is seeking those damages which would make it whole; that is, reimbursement of all the economic costs incurred as a result of the storage of the White Oak machinery. As in <u>Bead Chain</u>, the difficulty Steward experienced in trying to quantify those damages is directly attributable to White Oak, and hence National is liable for those damages. There is no basis, particularly under the philosophy of the commercial code, to determine, as a matter of law, that the method utilized by Mr. Alexander in determining those damages with 'reasonable certainty' is insufficient under the code.

## STEWARD HAS NOT WAIVED ITS RIGHT
## TO MANDATORY STATUTORY INTEREST

Paragraph one of the complaint in this action dated May 5, 2000, which National

refers to as the "Bond Action",contains the following allegation:

> The matter in controversy exceeds, <u>exclusive of interest and
> costs</u>, the sum of seventy five thousand dollars. (Emphasis
> added)

The prayer for relief in Steward's complaint is as follows:

> WHEREFORE, Steward demands judgment against White Oak
> and National in the amount of $5,000,000 on the payment bond
> and against White Oak in the amount of $5,000,000 on the
> Contract, <u>plus interest, costs, and attorneys' fees.</u> (Emphasis
> added)

The attorneys' fees claim is based on C.G.S. 49-41a, which on the facts of this case makes an

award of attorneys' fees mandatory.[14] The interest and costs claim is based on C.G.S. 49-42,

which also makes an award mandatory:

> [T]he court judgment shall award the prevailing party the cost
> of bringing such proceeding and allow interest . . . on the

---

[14] Section 49-41a provides in relevant part:

> [T]he general contractor upon written demand of the
> subcontractor . . . shall be required to place funds in the amount
> of the claim, plus interest of one percent, in an interest bearing
> escrow account in a bank in this state, provided the general
> contractor . . . may refuse to place the funds in escrow on the
> grounds that the subcontractor has not substantially performed
> the work according to the terms of his or its employment. In
> the event that such general contractor . . . refuses to place such
> funds in escrow, and the party making the claim against it
> under this section is found to have substantially performed its
> work in accordance with the terms of its employment in any
> arbitration or litigation to determine the validity of such claim
> then such general contractor . . . shall pay the attorneys' fees of
> such party.

Although Steward issued a written demand (Complaint paragraph 9), White Oak has
admitted that it did not place the funds in escrow. (Answer paragraph 20 )

> amount recovered computed from the date of service of the
> notice of claim . . .

National now claims that paragraph 12 of the parties August 24, 2000 agreement precludes

the award of interest after August 24, 2000. (Br. pp. 36-39) Paragraph 12 provides as

follows:

> Steward National and White each agrees that it will not seek to
> recover in the Bond Action any damages after the date of this
> Agreement.

Clearly the complaint in the Bond Action makes a distinction between $5,000,000 in

damages and interest, costs, and attorneys' fees.

National attempts to eliminate this distinction by arguing that that under C.G.S 37-3a,

which provides for discretionary interest, the interest is simply another element of damages.

Again National has chosen to misstate Steward's claim. Steward's claim is based on C.G. S.

49-42, which makes an award of interest mandatory on "the amount recovered," that is the

damages. Indeed, even the cases arising under C.G.S. 37-4 make a distinction between

damages and interest on those damages:

> Before awarding interest, the trial court must ascertain whether
> the defendant has wrongfully detained money damages due the
> plaintiff . . . . Interest on such damages ordinarily begins to run
> from the time that it is due and payable to the plaintiff.

Blakelee Arpaia Chapman, Inc. v. EI Constructors, 239 Conn. 708, 735 (1997) quoting from

West Have Sound Development Corp. v. West Haven, 207 Conn. 321, (1988)

National also attempts to eliminate the distinction between damages and interest by

asserting: "The 'service charge' provision that Steward seeks to enforce is, in essence, a

liquidated damages provision." (Br. p. 38) In seeking interest Steward is not attempting to

enforce the "service charge" provision of the purchase order contract, Steward is  seeking to

30

enforce its statutory right under 49-42 to interest. See Elgard v. Brennan Const. Co. Inc., 388

F.3d  30, 36 (2nd Cir. 2004)

## CONCLUSION

Based on the foregoing, Steward requests that the Court deny all of the claims

raised in National's motion in limine and/or motion for summary judgment.

Dated at New Haven, Connecticut, this 26th day of January, 2005 .

Steward Machine Co. Inc.

By _____
    Barbara E. Crowley
    Fed. Bar No. ct12669
    Egan & Crowley, P.C.
    234 Church Street
    New Haven, CT 06510


    _____
    William J. Egan, Esq.
    Egan & Crowley, P.C.
    234 Church Street
    New Haven, CT 06510
    Federal Bar No. ct04161
    (203) 498-8809

31

## **CERTIFICATION**

This is to certify that on this 26th day of January 2005, a copy of the foregoing was

mailed, postage prepaid, to:

Gary M. Case
Wolf, Horowitz, Etlinger, & Case, L.L.C.
99 Pratt Street
Hartford, CT 06103

Raymond Garcia
Jane Milas
Frederick Hedberg
Garcia & Milas
44 Trumbull Street
New Haven, CT 06510

Barbara E. Crowley