Code and relate to the application of arbitration clauses to subsequent agreements. The Plaintiff cites Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2d Cir. 1983), the full quote being:

> A "collateral" agreement is a separate, side agreement, connected with the principal contract which contains the arbitration clause. The burden is on the party resisting arbitration to demonstrate that the disputed issue is collateral.

A review of the facts in Prudential Lines, Inc. v. Exxon Corp. confirms that, to the extent that it is relevant, it actually undermines Steward's position. This case involved a contract for chartering a sea vessel, with Prudential attempting to recover for damage caused to its ship pursuant to the charter contract. The charter contract contained an arbitration clause. Upon delivery of the boat at the end of the charter, a Prudential inspector issued a "certificate of acceptance and redelivery," but subsequently damage was found on the vessel. Upon suit, the issue was whether the inspector's authority to issue the certificate was collateral to the charter contract. The trial court ruled that the issue was not collateral, that it was "inextricably tied up with the merits of the underlying dispute, and thus wholly derivative of issues that fall within the scope of the arbitration clause." Id. At 62. The Court of Appeals agreed. It stated, "[i]t is important to note the difference between a dispute arising under a collateral agreement and one which arises under the main agreement but requires determination of a sub-issue." Id. At 64. The Court held that the issues in the case, relating to acceptance of the vessel and who had authority to accept the vessel, were sub-issues and were "inextricably tied up with the merits of the underlying dispute."

Prudential Lines dealt with the application of an arbitration clause in a charter contract to a dispute one party claimed was collateral, while the instant situation involves a contract for the sale of goods under the UCC and a supposed separate agreement involving the exact same goods.

If this case is applicable here, it surely favors National Union's position that the issue of storage was not a "collateral agreement" but merely a sub-issue to the underlying Purchase Order. Indeed the Purchase Order contemplated the storage and care of the goods, by explicitly incorporating the Connecticut Department of Transportation specifications pertaining to this issue. See ConnDOT Specifications § 1.09.06.2 (relating to care and storage of goods on site) and § 1.06.03 (pertaining to storage of the machinery). Therefore, the later situation that arose involving the extended storage of the goods was simply a sub-issue that should be dealt with pursuant to the Purchase Order. And under the Purchaser Order and the UCC, a modification of the agreement is not valid and enforceable unless in writing and signed by both parties.

Cases in other jurisdictions construing the UCC recognize that agreements so closely connected to the underlying contract for the sale of goods are not considered collateral. In Foodtown v. Sigma Marketing Systems, Inc., 518 F.Supp. 485 (D.N.J. 1980), the parties entered into a contract for the sale of goods. The plaintiff later learned that it was overcharged on the customs duties, and brought an action for breach of contract after the four-year UCC statute of limitations, arguing that the overcharges were collateral and separate from the underlying contract. The Court held that the overcharge was not collateral, stating that "[t]he alleged overcharges on the contract are not so distinct from the actual contract for the sale of goods as to make the four-year statute of limitations inapplicable by virtue of [the New Jersey version of UCC § 2-701]." The Court used the definition of "contract" in the UCC to make the determination. This provision, the same as the comparable provision in Connecticut, states:

> [UCC § 1-201] defines contract as the total obligation which results from the parties' agreement as affected by this Act and any other applicable rules of law.

Foodtown, 518 F.Supp. at 487-88. Compare Conn. Gen. Stat. § 42a-1-201(11):

(11) "Contract" means the total legal obligation which results from the parties' agreement as affected by this title and any other applicable rules of law.

Here, the alleged "collateral agreement" was supposedly entered into well after the underlying Purchase Order, but there is no evidence of any negotiation or written or oral agreement. The Plaintiff's claims here are similar to those made in Foodtown, in that the "storage charges" are now being claimed as a separate agreement made between White Oak and Steward when the entire agreement between the parties was defined by the Purchase Order. Therefore, the claimed storage charges are not collateral to the Purchase Order but are really a claimed modification, which is precluded under the Purchase Order and the provisions of the Code.

Other cases hold that agreements contemporaneous to a contract for the sale of goods, such as promissory notes (O'Neill v. Steppat, 270 N.W.2d 375 (S.D. 1978)) and security agreements (U.S. Trust Co. v. Melchiono, 32 U.C.C. Rep. Serv. 2d 1013, 1997 Mass. App. Div. 60 (1997)), are collateral agreements. In both cases, there was a contract for the sale of goods. In Steppat, the Court found that the promissory note was a separate, express contract, and the plaintiff was free to sue on either that or the underlying contract. The note created an obligation separate from the underlying contract. In the instant situation, that is not the case, as the claimed charges for storage of the machinery do not contemplate a separate "collateral" agreement as the distinct contracts did in Steppat and Melchiono.

5.      **Conclusion**

Steward's Complaint does not allege the existence of a separate "collateral" contract to pay the storage fees. Steward's Complaint alleges only one contract between Steward and White

13

Oak – the Purchase Order Contract. Steward has never alleged the existence of any contract other than the Purchase Order. Steward cannot be allowed to present evidence of a contract or claim which was never alleged in its Complaint. Moreover, Steward's Opposition and Affidavits fail to show a genuine issue of material fact regarding the existence of any separate contract for the payment of these fees. Any attempt to enforce an oral modification of the Purchase Order is also barred by terms of the Purchase Order, signed by Steward, which requires a modification to the contract signed by both parties. Due to the foregoing, there is no issue of material fact that there was any separate or collateral agreement, or any valid modification to the Purchase Order, and National Union's Motion for Summary Judgment should be Granted.

II. **Even if Steward Can Pursue A Claim for Breach of this Alleged Collateral Contract against White Oak, National Union's Liability as Payment Bond Surety Does Not Extend to White Oak's Liability Under the Alleged Collateral Contract**

Assuming arguendo that Steward can proceed with a "collateral contract" claim against White Oak, National Union as payment bond surety is not liable for the damages flowing from this alleged agreement. As discussed in National Union's original brief, its liability as payment bond surety is not defined by the breach of contract damages which Steward has asserted against White Oak. Under the bond, National Union's liability is limited to the payment "for all materials and labor used or employed in the execution of such contract". Steward's alleged side agreement for the storage of the machinery does not encompass materials or labor employed in the execution of the contract. Indeed, the premise of Steward's claim is that the machinery was in "storage" during the applicable time period pursuant to the terms of the alleged agreement. While the machinery was in storage it was – by necessity – not being worked on, and was therefore not "materials or labor employed in the execution of the project."

The entire premise of the alleged "storage agreement" was that no work was to be performed while the machinery was kept at Steward. The only work which was performed on the machinery while in "storage" was the maintenance work which would present a cognizable claim under the bond. National Union's liability is limited to payment for work performed on the machinery. National Union is therefore not liable to compensate Steward for the non-performance of work reflected in the storage agreement. Indeed, Steward cites no cases in its brief which would extend the surety's payment bond liability to an alleged side agreement reached between the general contractor and the claimant, pursuant to which no work was performed on the goods while they remained in "storage".

While Steward cites Blakeslee Arpaia Chapman v. EI Constructors, 239 Conn. 708, 725 (1997), this case actually supports National Union's position. Here the Connecticut Supreme Court recognized that a party is entitled to compensation on a payment bond issued pursuant to General Statutes § 49-42 for equipment "available for use on the project site[.]" Blakeslee Arpaia Chapman v. EI Constructors, 239 Conn. 708, 725 (1997). During the so-called "storage period" the Machinery had not yet been completed, was not used or employed on the project, was not at the project site, and was not available for use by White Oak. Indeed, it is not accurate to characterize the period in question as a "storage" period, since the materials were not in fact being "stored". The term "storage" suggests that the machinery was being held for White Oak's benefit, and was available for White Oak, White Oak's successors, or CDOT, upon request. In fact the machinery was not available for use on the project for most of the so-called "storage period". Steward also refused to ship parts of the machinery to the Project when demanded by White Oak in 1999. Steward also refused to ship the machinery in 2000, when requested by

15

National Union. This forced National Union and White Oak to commence a replevin action against Steward in this Court. Steward still would not ship the machinery in response to the replevin action. This forced National Union and White Oak to proceed with an application for prejudgment remedy of replevin against Steward. This application was heard before Magistrate Garfinkel on August 1, 2000. Judge Garfinkel thereafter granted the prejudgment remedy of replevin, finding that the machinery had been wrongly detained by Steward. Steward <u>still</u> refused to ship the machinery, and filed an appeal. Only after National Union agreed to pay $1,025,429 from National Union in order to bring the machinery into compliance with the specifications did Steward agree to ship the materials to the project.

### III. Steward cannot recover its Alleged Business Disruption Damages Against Either National Union or White Oak

#### 1. The Incorporation of Specification § 1.08.9.06 into the Bond Does Not Expand National Union's Liability for Steward's Claims

Steward's argument is premised upon the claim that National Union expanded its liability under the bond by incorporating into the bond the Specifications of the Prime Contract between White Oak and the Connecticut Department of Transportation ("ConnDOT"). In particular, Steward cites the incorporation of ConnDOT's Standard Specification § 1.08.9.06 as evidence that National Union agreed to assume liability for the business disruption damages claimed by Steward. However, even a cursory reading of this Specification, viewed in its entirety, demonstrates that Steward's interpretation of § 1.08.9.06 is tortured and its claim is patently absurd.

Specification § 1.08.9.06 must be read in its entirety and in context. This Specification addresses ConnDOT's right to make partial payment to the contractor (i.e.. White Oak) for

16

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, CT 06103  *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

materials purchased by White Oak for the project, but not yet incorporated into the project. The Specification provides that when ConnDOT makes partial payment, the materials become the property of ConnDOT, but such payment "shall in no way release the Contractor from his responsibilities for the condition, protection and, in case of loss, replacement of such materials or from any liability resulting in any manner from the presence of such materials wherever they may be stored or kept."

 Steward mischaracterizes the language and the intent of this provision. This is evident from page 20 of Steward's Brief, where – after quoting Specification § 1.08.9.06 – Steward asserts that "[u]nder the express terms of the contract White Oak is responsible <u>to Steward</u> for any liability resulting in any manner from the presence of such materials whereby they may be stored or kept." (emphasis added). However Specification § 1.08.9.06 does not say that White Oak is liable "to Steward." Indeed, this Specification has nothing to do with the claims of Steward or any third party. Nothing in § 1.08.9.06 addresses, discusses or even remotely mentions White Oak's liability to any third party for consequential damages caused by the storage of the machinery. Rather, § 1.08.9.06 addresses the contractual relationship <u>between White Oak and ConnDOT</u>. Plainly, the "liability" discussed in § 1.08.9.06 refers to White Oak's liability to <u>ConnDOT</u> for the machinery, not to third parties such as Steward. This is obvious because the Specification addresses the non-release of White Oak following a payment <u>by ConnDOT</u>. It is plain that the intent of this section is to confirm that any partial payment for machinery by ConnDOT does not relieve the contractor (i.e. White Oak) of its liability to the owner (i.e. ConnDOT) for the care and ultimate delivery of the purchased to the Project site. It is equally plain that this section was intended to memorialize ConnDOT's view that the

contractor remains liable to ConnDOT under the Prime Contract to deliver the machinery to the Project, even thought ConnDOT has made partial payment and is the owner of the machinery. Nothing in this Specification addresses White Oak's liability to third parties.

The Specification also does not <u>create</u> liability to White Oak to any party for stored machinery. It merely confirms that any liability which may exist is not deemed to be released by virtue of the partial payment from ConnDOT. The Specification makes no attempt to define what that "liability" is, or to whom the "liability" may be owed. Most significantly, this Specification does not attempt to define or codify White Oak's "liability" to any third party, including any subcontractor or supplier such as Steward, for damages caused by the stored machinery. Instead it simply states that any liability which may exist is not affected by ConnDOT's partial payment. Steward is plainly wrong when it suggests that this Specification somehow imposes liability upon White Oak for the storage damages claimed by Steward. This Specification makes no attempt to do this. As such, the incorporation of this Specification by reference cannot be deemed to expand National Union's liability to Steward or any other third party for the consequential damages allegedly caused by the stored machinery.

    2.    **Steward's Cannot Change The True Nature of Its Claim by Characterizing it as "Labor Consumed By Storage"**

Steward attempts to re-characterize its business disruption claim as a claim for "extra labor and plant facilities that were consumed by the storage of" the machinery. <u>See</u> Steward's Brief at p. 18. This characterization is at odds with the undisputed facts and belies common sense. During the storage period Steward's laborers were not "consumed" by the storage of the machinery. During the storage of the machinery, Steward's laborers were not performing the work on this project at all. Since the machinery was in "storage", there was no labor to perform

on the machinery. The machinery was stored and Steward's employees were working on other projects.

However Steward wishes to describe its claim, this does not change the basic nature of this claim, nor does it change the method by which it was calculated. Steward is claiming that its laborers incurred more hours to complete other projects due to the interference caused by the stored machinery. Steward has quantified its damages by calculating its alleged labor cost overruns incurred on these other projects. No amount of word play or semantics can change this.

Steward's claim in this case is not analogous to labor inefficiency claims allowed against other payment bond sureties. Steward does not cite a single case in which a payment bond surety has been found liable for the claimant's "labor consumed by storage" of equipment. Steward also does not cite a single case in which the claimant's delay damages were calculated by reference to labor charges incurred to complete other, non-bonded projects. In fact, the cases cited by Steward support National Union's contention that its liability is limited to Steward's additional labor and material costs for work actually performed on the bonded project. In <u>United States ex rel Mariana v. Piracci Construction</u>, 405 F.Supp. 904 (D.C. 1975), the Court noted that the proper test for determining the surety's liability is "whether the claim for relief is based on actual expenditures for labor or materials <u>utilized in the performance of the subcontract</u>." <u>Id.</u> at 907. Thus the delay costs allowed against the surety in <u>United States ex rel Mariana v. Piracci Construction</u> consisted of labor charges for work performed <u>on the bonded project</u>. Steward's business disruption claim is based on labor charges for work performed on other projects. These charges are simply not covered by the bond.

19

Similarly, in U.S.v. Millers Mutual Fire Insurance Company, 942 F.2d 946, 950 (5th Cir. 1991) the Court noted that the payment bond surety's liability for delay damages is limited to the "additional or increased costs actually expended in furnishing the labor or material in the prosecution of the work provided for in the contract and attributable to the delay." Id. at 952. The Court noted that the surety would not be liable for a claim which "resembled one for damages for breach of contract[.]" Id. Indeed, the Court further held that it would not allow recovery against the surety for certain of the delay claims asserted by the claimant, because these claims were not for "labor or material furnished in the prosecution of the work provided for in the contract." Id. at 953.

There is a basic and fundamental difference between the delay damages sought by Steward and the delay damages allowed by the Courts in these cases. In this case, Steward's claim for business disruption damages is calculated based on labor hours incurred in the performance of work on other, non-bonded projects. In both of the cases cited above, the claimants sought damages based on the inefficiencies for labor hours incurred by laborers performing the work of the bonded project.

To the extent that Steward is seeking additional compensation for delay against National Union, the proper measure of its recovery under the bond consists of the additional labor hours incurred by its employees while working on the bonded project, plus appropriate overhead. Steward has asserted such a claim – this claim is the $431,669 in additional labor and material costs, together with overhead, which Steward claims reflect the additional labor hours incurred by laborers performing work on the bonded project during the "storage period". The balance of Steward's delay claim consists of consequential damages reflecting labor charges incurred to