**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STEWARD MACHINE CO, INC. | : | CIVIL ACTION NO. |
| | : | |
| | : | 3:00CV00834(SRU) |
| V. | : | |
| | : | |
| WHITE OAK CORPORATION | : | |
| | : | |
| AND | : | |
| | : | |
| NATIONAL UNION FIRE INSURANCE | : | |
| COMPANY OF PITTSBURGH, PA. | : | FEBRUARY 22, 2005 |

**PRE-TRIAL MEMORANDUM OF LAW
OF STEWARD MACHINE CO., INC.**

**Foreword**

    This memorandum is submitted by Steward Machine Co. Inc. ("Steward") in support of its claims against White Oak Corporation ("White Oak") and National Union Fire Insurance Company of Pittsburgh, PA. ("National")  Steward's makes its claims under a payment bond (the "Bond") furnished by White Oak, as principal, and National, as surety, to the State of Connecticut Department of Transportation ("DOT") pursuant to § 49-41 of the Connecticut General Statutes. The material facts are set forth in Steward's proposed findings of fact dated February 22, 2005 and submitted herewith.

    In this Memorandum of Law Steward will address the law applicable to its claims: (1) liability under the Bond; (2) scope of liability under the Bond; (3) damages recoverable under the Bond; (4) interest recoverable under the Bond; and (5) attorneys' fees recoverable under the Bond.

# I
## Liability Under The Bond

The purpose of the statutory payment bond is "to protect and benefit those who furnish materials and labor to the contractor on public work, in that they may be sure of payment of their just claims, without defeat or unjust delay." American Masons' Supply Co. v. F. W. Brown Co., 174 Conn. 219, 227 (1974) Accordingly, a claimant under the payment bond need only prove four elements to be entitled to recovery:

> (1)  that it supplied labor or materials in the prosecution of the work described in the contract between DOT and the general contractor;

> (2)  that it was not paid for the labor or materials within ninety days after it supplied the last of the materials for which claim is made;

> (3)  that it provided the surety with and the general contractor with notice of its claim within one hundred and eighty days after the date it supplied the last of the labor and materials for which claim is made;

> (4)  that it commenced suit on the bond within one year after the date it supplied the last of the materials for which claim is made.

§ 49-42 C.G.S. In this case, the facts relevant to these four elements are not in dispute: (1) Steward supplied labor and materials in the prosecution of the work described in the Contract ; (2) Steward still has not been paid for the labor and materials it supplied; (3) Steward provided National and White Oak with its notice of claim on December 20, 1999, which is les than ninety days after it supplied labor and materials; and (4) Steward commenced this suit on the bond on May 5, 2000 which is less than one hundred and

2

eighty days after it supplied labor and materials. White Oak and National are liable to Steward under the payment bond.

## II
## Scope of Liability Under The Bond

The starting point for the discussion is § 49-41 which provides in relevant part:

> Every person who has furnished labor or materials in the prosecution of the work provided for in such contract in respect of which a payment bond is furnished under the provisions of section 49-41 and who has not been paid in full therefore. . . may bring an action upon the payment bond . . .

National concedes that the machinery is "labor or materials" but claims that the coverage of the Bond is limited to "labor or materials" and does not extend to the storage and maintenance of the machinery or the other costs and damages Steward sustained as a result of White Oak's inability to accept delivery of the materials in accordance with the terms the Purchase Order. National is mistaken.

The quoted language defines "who" can recover on the bond not "what" a proper claimant can recover:

> Clearly, the "who" is limited to those supplying "labor and material." The what is not so limited and is described simply as "sums justly due." "Sums justly due" refers back to back to the term "paid in full" contained in the earlier pat of that same sentence. Thus a provider of labor or materials is entitled to be paid in full for all sums justly due, meaning that the provider is entitled to be paid in full under the subcontract. Only that reading makes sense of the entirety of the Act

Taylor Construction Inc. v. ABT Service Corporation, 363 F. 3d 119, 122 (9th Cir. 1998)

Although, Taylor speaks in terms of the claimant being "entitled to be paid in full under

the subcontract" the subcontract is not the bonded contract. The subcontract merely

defines the payment terms between the sub-contractor and the general contractor.

Blakeslee Arpaia Chapman, Inc. v. EI Construction, Inc., 239 Conn. 708, XXX  (1997)

The bonded contract is the contract between the general contractor and the owner; in this

case, the contract between the general contractor, White Oak,  and the owner, DOT:

> [T]he "Contract" to which the bond refers is the prime
> contract between [the general contractor] and the [owner],
> not the subcontract between the [claimant] and the [general
> contractor].

CAM-FUL Industries v. Fidelity & Deposit Co., 922 F. 2d 1992 (2nd Cir. 1991).

   The facts and rationale of the CAM-FUL decision are particularly applicable to

the case at bar. In CAM-FUL the Second Circuit overturned a district's court ruling

relieving a surety of liability under a payment bond for the claim of a subcontractor who,

at the request of the prime contractor, performed extra work that was required by the

prime contract, but was beyond the scope of its subcontract. Focusing on the "prime

contract" the Court stated:

> . . . the prime contract permitted the city's engineer to
> require [the extra work]. Under the prime contract, [the
> general contractor] was, therefore, bound to provide [the
> extra work]. [The subcontractor], however, was not bound
> to do the work. . .
>
> [The] payment bond guaranteed payment for all work
> required by the prime contract, and this included a
> guarantee of [the extra work]. To the extent that [the
> general contractor] may owe [the subcontractor] additional
> money over and above the subcontract price, and if that
> additional amount is not "paid" . . .  [the surety] will be
> liable to [the subcontractor] under the payment bond. (Id. at
> p. 161)

4

In the present case, the Bond expressly incorporated the prime contract between White Oak and DOT "together with all plans and specifications therefore."[1] Among the specifications included in the contract was DOT's "Standard Specifications for Roads Bridges and Incidental Construction" ("DOT's Standard Specifications") Section 1.08.9.06 of DOT's Standard Specifications provides in relevant part:

> Non-perishable materials which meet specification requirements, specifically produced or purchased for incorporation into contract items of work, and delivered at the site <u>or at such location as the Engineer may approve</u>, but not incorporated in the work, may be included in current estimates at such fraction of the contract unit price as he may consider to represent fair value for the material when such materials have been paid for by the Contractor as shown by receipted bills, or in lieu of such receipted bill or bills, a duly executed Certification of Title executed by the Contractor and the Vendor. When partial payment is made for delivered materials, such materials shall become the property of the State and <u>such payment shall in no way release the Contractor from his responsibilities for the condition, protection and, in case of loss, replacement of such materials or from any liability resulting in any manner from the presence of such materials wherever they may be stored or kept.</u> (Emphasis added)

DOT paid White Oak for the machinery pursuant to § 1.08.9.06 and the machinery remained at Steward's premises in Birmingham, Alabama. Pursuant to § 1.08.9.06 White Oak remained "responsib[le] for the condition, protection and, in case of loss, replacement of such materials or from any liability resulting in any manner from the presence of such materials". In storing and maintaining the machinery Steward was

---

[1]    See <u>Choctaw Generation Ltd. v. American Home A.</u>, 271 F.3d 403, 405, 409 (2nd Cir. 2001); when payment bond provides that the Construction Contract is "referred to" "and made a part" of the Bond "as if fully set forth" therein, "the Bond incorporates the Construction Contract by reference".

performing work required of White Oak under its contract with DOT.  Under the express

terms of the Bond, National is liable to Steward for the storage and maintenance costs

and "any liability resulting in any manner from the presence of such materials."  CAM-

FUL Industries v. Fidelity & Deposit Co., supra.

     The CAM-FUL Industries case is just one case in a line of case going back over a

hundred years that makes clear that the coverage of a payment bond is not limited to

labor and materials directly incorporated into the public work. Let us start with Brogan v.

National Surety Company, 246 US 257, 261, (1918). Brogan involved a project located in

a remote area with no hotels or boarding houses and the general contractor was required

to provide board and lodging for its workers. Brogan furnished groceries and provisions

that were used by the contractor in its boarding houses. In holding that Brogan was

entitled to recover for the groceries and provisions under the payment bond furnished by

the general contractor the court first explained the parameters of the issue:

> The supplies furnished by Brogan under these
> circumstances were clearly used in the prosecution of the
> work, just as supplies furnished for the soldiers' mess are
> used in the prosecution of war. In each case the relation of
> food to the work in hand is proximate. But the surety
> contends that the words "in the prosecution of" the work
> are not used in the bond and the act in their natural sense,
> but should be given a conventional meaning so as to
> exclude labor and materials which contribute to
> construction only indirectly, as do the supplies consumed
> by a contractor in operating his plant.

(Id. at p.  260). The court then went on to state:

> This court has repeatedly refused to limit the application of
> the act to labor and materials directly incorporated in to the
> work. . . In *United States Fidelity Co.* v. *Bartlett,* 231 U.S.
> 237, where the work contracted for was building a

6

> breakwater, recovery was allowed for all the labor at a
> quarry opened fifty miles away. This included, as the
> record shows, the labor not only of men who stripped the
> earth to get at the stone and who removed the debris, but
> carpenters and blacksmiths who repaired the cars in which
> the stone was carried to the quarry dock for shipment; and
> who repaired the tracks upon which the cars moved. And
> the claims allowed included also the wages of stablemen
> who fed and drove the horses which moved the cars on
> those tracks.

The essential analysis, according to the Brogan court, in establishing "the conditions

essential to liability on the bond" was consideration of "the special circumstances under

which the supplies were furnished" and "findings of fact . . . that they were necessary to

and wholly consumed in the prosecution of the work provided for in the contract and the

bond". (Id. p. 262).  Applying that analysis the court concluded:

> The furnishing of board by the contractor was an integral
> part of the work and necessarily involved in it. Like the
> supplying of coal to operate engines on the dredges, it was
> indispensable in the performance of the work. Groceries
> furnished to a contractor under such circumstances and
> consumed by the laborers, are materials supplied and used
> in the prosecution of the public work.

Id. at 263. The Brogan rationale remains the law in the Second Circuit, the State of

Connecticut, and this case.

In J.P. Byrne v. Fire Associates of Philadelphia, 260 F.2d 541 (2nd Circuit 1958)

J. P. Bryne sought payment under the bond for the sales price of new and recapped tries

sold to the general contractor for its heavy earth movers, where "conditions at the

excavation site subjected these tires to unusual wear" and "from the inception of the

contract the repair and replacement of tires was expected to be a constantly recurring

item". (Id, p. 543). The surety argued that the tires were additions to the contractor's

7

capital equipment and "that even if the tires are held to be materials, not capital

equipment, plaintiff must show that they were in fact substantially consumed by the

work; and that it is not liable as surety for tires which were diverted by the contractor for

use on non-bonded jobs". The Second Circuit rejected the surety's arguments, stating:

> Although none of these contentions are completely
> foreclosed by existing case law, in our view they each run
> counter to the expressed Congressional policy embodied in
> the Miller Act.
>
> . . . Both the bond and the statute obligate the surety for the
> payment of persons furnishing "material in the prosecution
> of the work provided for in [the] contract." The courts have
> refrained from attempting an all-inclusive definition of
> material furnished in the prosecution of the work.
> [Citations omitted]. We make no attempt to do so here, for
> the facts and circumstances of each case are the sole
> determinants of the definition. Any inquiry must begin,
> however, with the repeatedly noted principle that the Miller
> Act should be liberally construed to effect Congress'
> remedial purpose. [Citations omitted]

(Emphasis added; Id. at p. 543-544)  Instead of adopting the surety's argument that the

plaintiff must prove that the materials were in fact consumed on the job, the court held:

> A more recent view, which we here adopt, focuses on the
> degree of expected consumption of the items on the
> particular job for which they were furnished. [Citation
> omitted]. See Brogan v. National Surety Co., 246 U.S. 257,
> 38 S.Ct. 250, 62 L.Ed. 703, reversing National Surety Co.
> v. United States, for Use of Pittsburgh & Buffalo Co., 6
> Cir., 228 F. 577, L.R.A. 1917A, 336.

The Connecticut Supreme Court explicitly adopted the rationales and holdings

of J.P. Byrne in its decision in International Harvester Co. v. DeFelice And Son, Inc. 152

Conn. 325, 334-336 (1964); and held

> We conclude that it is not possible to state a comprehensive definition of what labor and materials used in making repairs are allowable under the statute. Little difficulty is presented in the class of minor items which are uniformly allowed. It is in the area of major items where the difficulty is encountered. Although the generally accepted legal and tax accounting principles which are applicable to expenses of operation and capital improvements are persuasive, they can have no conclusive force. We are in accord with the reported decisions which hold that the most significant single factor in distinguishing materials contemplated by the statute from capital equipment is the element of substantial consumption on the job. Recognition must be given to the fact that the present statute . . . does not require that the materials be used in the work but, as in the Miller Act, specifies that they be furnished in the prosecution of the work.

The "prosecution of the work" in this case clearly and expressly included the "protection and, in case of loss, replacement of such materials or from any liability resulting in any manner from the presence of such materials wherever they may be stored or kept".

### III
### Damages Recoverable under the Bond

The damages recoverable under the bond fall into three categories: (1) unpaid balance for machinery; (2) unpaid balance for storage and maintenance; and (3) lost efficiency and actual recorded costs.

### 1.    Unpaid Balance For Machinery

The original Purchase Order price was $7,553,000 which included delivery of the machinery, including wire ropes, from Birmingham to New Haven. Subsequently the parties modified the Purchase Order to delete certain of the wire ropes and the delivery,

which reduced the Purchase Order price to $7,013,000.[2] The Purchase Order required White Oak to pay Steward's invoices, less 2.5% retention, within 10 days after DOT paid White Oak for the machinery or within 60 days of the date of Steward's invoice, whichever was sooner, and required White Oak to pay the retention no later than 180 days after the final shipment. The Purchase Order also provided for a service charge of 1% per month on all amounts not paid in accordance with the payment terms of the Purchase Order.

Steward's first invoice is dated November 30, 1994 and is in the amount of $792,000. The amount of the invoice was determined by a DOT inspector who was present at Steward's plant 40 hours per week all during the time that Steward was manufacturing the machinery. The DOT inspector's job was to determine whether the machinery was being manufactured in accordance with the requirements of the contract documents and to determine the percentage complete of each bid item at the end of each month. The $792,000 in the November 30, 1994 invoice represents 18% of Bid Item 6010116A, "Main & Aux. Counterweight Ropes & Accessories," which was in the amount of $4,400,000.  The payment methodology is set forth in a "Recap" which is attached to the invoice. At the same time, pursuant to § 1.08.9.06 of DOT's Standard Specifications Steward and White Oak executed a Certification of Title in which they described the materials being invoiced for and which by its terms transferred title to the materials to DOT upon DOT's payment to White Oak.

---

[2] Settlement Agreement

Under the terms of the Purchase Order White Oak was required to pay Steward the sum of $772,200.00 ($792,000.00-2.5% retention) no later than January 30, 1995. Steward did not receive a payment from White Oak until February 15, 1995 and that payment was in the amount of only $501,930.00, or $277,477.20 than the amount due.[3] After November 30, 1994 and continuing to September 21, 1998, Steward sent White Oak a total of X invoices for the machinery. The amount of each of these invoices was established by the DOT inspector in the same manner as the November 30, 1994 invoice, that is, the amount the invoice was totally and exclusively function of the percentage complete determined by DOT as the ultimate purchaser of the machinery. Each invoice was also accompanied by a "Recap" and a Certification of Title.

There is no dispute as to the date of any of these Steward invoices, the date of any payment, or the amount of any payment. Given these undisputed facts and the provision in the Purchase Order for a service charge of 1% per month after sixty days, it is a very simple matter to determine the unpaid balance on the Purchase Order as of any date after November 30, 1994. As of December 20, 1999, the date of Steward's Notice of Claim, the unpaid balance, including interest, was $1,115,764.83, exclusive of retainage of $172,594.64.

## 2.  Retainage

The Purchase Order provides:

> Any portion of the purchase price Buyer may be entitled to maintain shall become due and payable upon acceptance of all goods purchased under this agreement or within 180

---

[3] The amount due was $776,061.00, $772,200.00 plus $3,861,00 in interest.

> days after final shipment, whichever event occurs first in
> time.

But for White Oak's inability to accept delivery of the machinery, Steward would have

made the final shipment no later than April 1, 1997. If White Oak had not prevented

Steward from shopping the machinery, Steward would have been entitled to payment of

the retainage on October 1, 1998, 180 days after the final shipment. Beginning October 1,

1998 the White Oak became liable for a service charge of 1% per month on the unpaid

retainage. As of December 20, 1999, the date of Steward's Notice of Claim, the unpaid

balance on the retainage was $172,594.64.

As of December 20, 1999, the total unpaid balance for the machinery, including

retainage, was $1,324,359.47.

### 3.    Unpaid Balance For Storage and Maintenance

The facts with respect to the agreement between Steward and White Oak under

the terms of which Steward agreed to provide inside storage and maintenance of the

machinery for $8.00 per square foot per month and to provide outside storage and

maintenance for $5.00 per square foot per month will be established at trial. On these

facts and under the applicable law the contract between Steward and White Oak was

modified to provide for monthly storage at the agreed upon rates.

The applicable law appears in Article 2 of the Uniform Commercial Code. Bead

Chain Manufacturing Co. v. Saxton Products, Inc., 183 Conn. 266, 270 (1981). Section

42a-2-209 provides in relevant part:

> (1)    An agreement modifying a contract within this
> article needs no consideration to be binding.

12

> (3)    The requirements of section 42a-2-201 must be
> satisfied if the contract as modified is within its provisions.

Section 42a-2-201 provides in relevant part:

> (1)    Except as otherwise provided in this section a
> contract for the sale of goods for the price of five hundred
> dollars or more is not enforceable by way of action or
> defense unless there is some writing sufficient to indicate
> that a contract for the sale of goods has been made between
> the parties and signed by the party against whom
> enforcement is sought . . . A writing is not insufficient
> because it omits or incorrectly sates a term agreed upon but
> the contract is not enforceable under this paragraph beyond
> the quantity of goods shown in such writing.

> (2)    Between merchants if within a reasonable time a
> writing in confirmation of the contract and sufficient
> against the sender is received and the party receiving it has
> reason to know its contents, it satisfies the requirements of
> subsection (1) against such party unless written notice of
> objection to its contents is given within ten days after it is
> received.

In view of the fact that White Oak did not timely object to the rates proposed by Steward

the contract was modified to incorporate the storage at the rate of $8.00 per square foot

per month for inside storage and $5.00 per square per month for outside storage.

Pursuant to this modification of the Purchase Order, Steward sent White Oak an

invoice for the storage and maintenance charges for each of the 47 months between

September 1996 and August 2000. White Oak failed to pay a single invoice. The

Purchase Order provides in relevant part:

> Invoices will be paid within 10 days of receipt of payment
> by Buyer from Owner for said items of work or 60 days

13

> from invoice date, which ever is sooner. (Pl. Ex. 3, Par. 4)[4]
>
> In the event Buyer fails to make payment in accordance with the terms of this agreement, the account will be deemed delinquent and a service charge of one percent per month will be added to the unpaid balance. (Pl. Ex. 3, Par. 6)

As of December 20, 1999, the date of Steward's Notice of Claim, the unpaid balance for storage and maintenance under the Purchase Order was $2,008,893.58.[5]

In addition, National and White Oak are liable for the storage charges from December 20, 1999 to August 20, 2000 because Steward's efforts benefited National and White Oak in that the machinery was preserved for incorporation in the Tomlinson Bridge as originally intended. Blakeslee Arpaia Chapman, Inc. v. EI Construction, Inc., 239 Conn. 708, (1997)  The unpaid storage charges for the period December 20, 1999 to August 20, 2000 total $386,978.13, exclusive of interest.[6]

## 4.    Loss of Efficiency

National appears not to seriously dispute that there was an agreement between Steward and White Oak under the terms of which Steward would store and maintain the machinery. National's position appears to be that there was no agreement as to the price

---

[4] It is irrelevant what the value of the machinery was as between White Oak and DOT. If DOT "disallowed some of the value for the work performed it is the subcontractual value that the plaintiff and [White Oak] placed on the work that controls." Blakeslee Arpaia Chapman, Inc. v. EI Construction, Inc., 239 Conn. 708, 720 (1997) In Blakeslee, like here, the schedule of values between the general contractor and the owner was different than the schedule of values between the general contractor and the subcontractor. Ibid.

[5] This total includes principal of $1,708,497.81 and interest of $300,395.77.

[6] The interest on these post notice-of-claim charges is calculated along with the other post-notice-of-claim interest in section IV of this memorandum.

and therefore Steward is not entitled to any damages it sustained during the four year

storage period unless the damages are what National claims are "incidental" damages

within the meaning of § 42- 2-410. That section provides in relevant part:

> Incidental damages to an aggrieved seller include any
> <u>commercially reasonable charges</u>, expenses or commissions
> incurred in stopping delivery, in the transportation, <u>care and</u>
> <u>custody of goods</u> after the buyer's breach, in connection
> with return or resale of the goods or otherwise. (Emphasis
> added)

The problem with National's position is twofold

First, National overlooks § 42a-2-701, which provides:

> Remedies for breach of any obligation or promise collateral
> or ancillary to a contract for sale are not impaired by the
> provisions of this article.

The agreement between Steward and White Oak with respect to the storage and

maintenance of the machinery is an obligation or promise collateral or ancillary to the

contract of sale. § 42a-2-106(1) Second, National overlooks § 42a-1-106, which provides:

> The remedies provided in this title shall be liberally
> administered to the end that the aggrieved party may be put
> in as good a position as if the other party had fully
> performed but neither consequential or special nor penal
> damages may be had except as specifically provided in this
> title or by other rule of law.

Let us now return to § 42a-2-710 and the official comments thereto, which provide:

> The section sets forth the principal normal and necessary
> additional elements of damage flowing from a breach but
> intends to allow all commercially reasonable expenditures
> made by the seller.

15

It cannot be seriously argued that the Commercial Code or any other body of law bars Steward from being put in as good a position as if White Oak had fully performed. Bead Chain Manufacturing Co. v. Saxton Products, Inc., 183 Conn. 266, 270 (1981).

This brings us to the costs and damages sustained by Steward as a result of White Oak's refusal to accept delivery of the machinery in accordance with the terms of the Purchase Order. It is not hard to understand that the presence of the White Oak machinery in the midst of ongoing manufacturing operations adversely impacted the efficiency of those operations, but it is not a simple matter to quantify that impact. However, in a contract action a defendant is not precluded from recovery simply because the damages may be difficult to prove:

> It is incumbent on a plaintiff in a contract action to prove his damages with all the precision that is reasonably possible, but where exactness is not possible he is not therefore to be precluded from recovery, and the best approximation to certainty is all that is required.

The Southern New England Contracting Company v. State of Connecticut, 165 Conn. 644, 661 (1964) As the court held in Beckman v. Jalick Homes, Inc. 190 Conn. at 309, the purpose of an award of damages in a breach of contract case is to "place the injured party, so far as can be done by money, in the same position as that he would have been in had the contract been performed."

Steward's expert witness will establish that a reasonable method for measuring loss of efficiency is to: (1) measure the efficiency, or productivity, of an activity during the time that activity was impacted by the defendant's breach; (2) measure the efficiency, or productivity, of the same activity during a time the activity was not impacted by the

16

defendant's breach; and (3) if the result of (1) is less than the result of (2) the loss of efficiency can be explained only as the result of the defendant's breach assuming, of course, that the defendant's breach is the only factor in (1) that is not also present in (2). In addition, the plaintiff is also entitled to recover the actual costs incurred in storing the White Oak machinery. These damages total $2,327,250.

Since White Oak breached both the Purchase Order and the ancillary agreement the only way to put Steward in the same position as it would have been had the breaches not occurred is to award Steward the difference between the storage and maintenance charges and the loss of efficiency and actual recorded costs. This sum equals $231,774.06. ($2,327,250 - $2,095,475.94)

### IV
### Interest Recoverable Under The Bond

Interest on the "amount recovered" is mandatory pursuant to 49-42 which provides in relevant part:

> [T]he court judgment shall award the prevailing party the costs for bring such proceeding and allow interest at the rate of interest specified in the labor or materials contract under which the claim arises . . . computed from the date of service of the notice of claim, provided, for any portion of the which the court finds was due and payable after the date of service of the notice of claim action, such interest shall be computed from the date such portion became due and payable.

### 1.    Interest On Unpaid Balance on Machinery Including Retainage

As of December 20, 1999, the date of Steward's notice of claim, the unpaid balance for machinery was $1,134,294.38. This entire sum, including the interest

17

component, bears interest at the rate of 12% per annum from December 20, 1999 to the date of judgment. Elgard Corporation v. Brennan Construction, et al , 388 F3d 30 (2nd Cir. 2004) As of April 20, 2005 the interest will total $465,060.70.[7]

## 2.    Interest On Unpaid Balance on Storage and Maintenance

The interest due on the storage has to be computed in two steps. The first is the interest on the storage and maintenance due on December 20, 1999. As of December 20, 1999, the date of Steward's notice of claim, the unpaid balance for storage and maintenance was $2,008,893.58. This entire sum, including the interest component, bears interest at the rate of 12% per annum from December 20, 1999 to the date of judgment. Elgard Corporation v. Brennan Construction, et al, 380 F3d 30 (2nd Cir. 2004) As of April 20, 2005 the interest will total $1,285,251.59.

The storage and maintenance charges for the 8 months between December 20, 1999 and August 24, 2000 total $386,978.13, as appears from the 8 invoices from Steward to White Oak. Each was due and payable no later 60 days from the date of the invoice, that is, after December 20, 1999. None have been paid. Each of the invoices bears interest from a date 60 days after the date of the invoice to the date of judgment.

## 3.    Interest on Loss of Efficiency

The manner to compute interest on the balance of actual costs over the agreed upon storage and maintenance charges is not free from doubt. However there appears to be a very simple way to deal with the issue. The total costs were incurred over a 47 month period, September 1996 through August 2000.  Clearly at least 83% of the costs

---

[7] The interest is accruing at a daily rate of $372.9187.

were incurred during the 39 months between September 1996 and December 20, 1999, the date of Steward's notice of claim. Since these costs were incurred prior to December 20, 1999 and are part of the "amount recovered" within the meaning of 49-42, they should bear interest at the rate of 12% per annum from December 20, 1999 to the date of judgment.

### IV.
### Attorneys' Fees

There are two grounds on which Steward is entitled to attorneys' fees. First is the Purchase Order itself, which provides in relevant part:

> In the event that Buyer is required to engage the services of an attorney-at-law to enforce its rights under this contract prevailing party shall be liable for reasonable attorneys' fees and costs.

The second is 49-41a which provides in relevant part:

> [T]he general contractor upon written demand of the subcontractor . . . shall be required to place funds in the amount of the claim, plus interest of one percent, in an interest bearing escrow account in a bank in this state, provided the general contractor . . . may refuse to place the funds in escrow on the grounds that the subcontractor has not substantially performed the work according to the terms of his or its employment. In the event that such general contractor . . . refuses to place such funds in escrow, and the party making the claim against it under this section is found to have substantially performed its work in accordance with the terms of its employment in any arbitration or litigation to determine the validity of such claim then such general contractor . . . shall pay the attorneys' fees of such party.

On December 20, 199 Steward made written demand on White Oak to place in escrow funds which it received form DOT on Steward's behalf but White Oak refused to do so

and has admitted it refused to do so. (White Oak Answer paragraph 20). Moreover, even after December 20, 1999 DOT paid White Oak for work performed by Steward and White Oak paid none of this money over to Steward.

Dated at New Haven, Connecticut, this 22nd of February, 2005.


                                        STEWARD MACHINE CO, INC.

                                        By _____
                                            William J. Egan
                                            Federal Bar No. ct04161
                                            Egan & Crowley, P.C.
                                            234 Church Street
                                            New Haven, CT 065510
                                            Tel. (203) 498-8809
                                            Fax (203) 498-8769

## CERTIFICATION

This is to certify that on this 22nd day of February 2005, a copy of the foregoing was

mailed, postage prepaid, to:

Gary M. Case
Wolf, Horowitz, Etlinger, & Case, L.L.C.
99 Pratt Street
Hartford, CT 06103

Raymond Garcia
Jane Milas
Frederick Hedberg
Garcia & Milas
44 Trumbull Street
New Haven, CT 06510

William J. Egan