FILED
2005 FEB 22 P 5:40
U.S. DISTRICT COURT
BRIDGEPORT, CONN.

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEWARD MACHINE CO, INC. | : | CIVIL ACTION NO. |
| | : | 3:00CV00834(SRU) |
| V. | : | |
| WHITE OAK CORPORATION | : | |
| AND | : | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. | : | February 22, 2005 |

PROPOSED FINDING OF FACT OF
STEWARD MACHINE CO. INC.

I.  **Jurisdiction And Venue**

1.  The plaintiff, Steward Machine Co. Inc. ("Steward") is a corporation incorporated under the laws of the State of Alabama with its principal place of business in the State of Alabama.

2.  The defendant White Oak Corporation ("White Oak") is a corporation incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

3.  The defendant National Union Fire Insurance Company of Pittsburgh, PA. ("National") is a corporation incorporated under the laws of a state other than the State of Connecticut with its principal place of business in a State other than the State of Connecticut.

4.  The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy five thousand dollars.

5.  This case arises out of a public works project involving the replacement of the Tomlinson Bridge over the Quinnipiac River in New Haven, Connecticut (the "Project").

6.  There is federal diversity jurisdiction of the case pursuant to 28 USC 1332.

7.  Venue is proper in the United States District Court for the District of Connecticut pursuant 28 USC 1391.

## II.  Contractual Background

8.  On or about June 6, 1994, the State of Connecticut Department of Transportation ("DOT") entered into a contract (the "Contract") with White Oak under the terms of which White Oak agreed to remove and replace the Tomlinson Bridge over the Quinipiac River in New Haven in accordance with the plans and specifications included in the Contract for the contract price of $87,868,378.10.

9.  The Contract was what is known as a "unit price" price contract which meant that the contract price of $87,868,378.10 was determined by multiplying the number of units of each type of work by the unit price that White Oak bid for that work.

10. One of the uses of the unit prices, or schedule of values, was to provide a mechanism to determine the amount of monthly progress payments due White Oak from DOT. For example, if a particular unit of work was 20% percent complete at the end of a

particular month, White Oak would be entitled to a "gross" progress payment equal to 20% of the scheduled price for that item.

11.     The term gross progress payment is used because the Contract provided 2.5% of each progress payment ("retainage") would be withheld from each progress payment.

12.     Pursuant to § 49-41 of the Connecticut General Statutes, White Oak furnished to the State a payment bond (the "Payment Bond") in the amount of $87,868,378.10 with White Oak as principal and National, as surety, for the protection of persons supplying labor or materials in the prosecution of the work provided for in the Contract.

13.     The condition of the Payment Bond is as follows:

> NOW, THEREFORE, if said principal shall well and faithfully make payment for all materials and labor used or employed in the execution of such contract, to the extent <u>as required by the General Statutes of Connecticut, as revised</u>, then the obligation shall be null and void, otherwise it shall remain and be in full force and effect. (Emphasis added)

14.     In addition the Payment Bond incorporated the contract between White Oak and DOT "together with all plans and specifications therefore."

15.     Among the specifications incorporated in the Payment Bond were DOT's "Standard Specifications for Roads Bridges and Incidental Construction" ("DOT's Standard Specifications")

16.     Section 1.08.9.06 of DOT's Standard Specifications provides, in relevant part, as follows:

> Non-perishable materials which meet specification requirements, specifically produced or purchased for incorporation into contract items of work, and delivered at the site or at such location as the Engineer may approve, but not incorporated in the work, may be included in current estimates at such fraction of the contract unit price as he may consider to represent fair value for the material when such materials have been paid for by the Contractor as shown by receipted bills, or in lieu of such receipted bill or bills, a duly executed Certification of Title executed by the Contractor and the Vendor. When partial payment is made for delivered materials, such materials shall become the property of the State and <u>such payment shall in no way release the Contractor from his responsibilities for the condition, protection and, in case of loss, replacement of such materials or from any liability resulting in any manner from the presence of such materials wherever they may be stored or kept.</u> (Emphasis Added)

17. The work required by the Contract included the furnishing and erecting of certain specially designed machinery (the "Machinery") to raise and lower the bridge.

18. On August 8, 1994, White Oak entered into a purchase order contract ("the Purchase Order") with Steward under the terms of which Steward agreed to specially manufacture the Machinery required for the Project and to deliver it to White Oak in New Haven for the contract price of $7,553,000.

19. The Purchase Order required White Oak to pay Steward's invoices within 10 days after the State paid White Oak for the Machinery or within 60 days of Steward's invoice, whichever was sooner.

20. The Purchase Order also provided for a service charge of 1% per month on all amounts not paid in accordance with the payment terms of the Purchase Order and

further provided for attorneys' fees and costs if Steward was required to engage an attorney to enforce its rights under the Purchases Order.

### III. Steward's Performance of the Purchase Order

21. In September 1994 Steward commenced manufacturing the machinery, after DOT's approval of shop drawings prepared by Steward.

22. All during the manufacturing process DOT had an inspector at Steward's plant in Birmingham, Alabama, to inspect the machinery being manufactured for conformance with the approved shop drawings.

23. Each month the DOT inspector would inspect each piece of machinery in the process of being manufactured not only to determine conformity with the shop drawings and plans and specifications, but also to determine the percentage of completion of each piece of machinery.

24. The purpose of DOT's inspector determining the percentage of completion was to enable White Oak to receive progress payments for the machinery pursuant to §1.08.9.06 of DOT's Standard Specifications.

25. Once the DOT inspector determined the percentage complete at the end of any given month for any piece or pieces of machinery, White Oak and Steward would execute a Certification of Title describing the piece or pieces of machinery, the percentage complete, and conveying title to DOT of the machinery described in the Certification of Title upon DOT's payment of White Oak for the machinery.

26. The amount of payment due White Oak from DOT each month was determined by applying the percentage DOT determined to be complete to the schedule of values contained in DOT's contract with White Oak.

27. The amount of payment due Steward from White Oak each month was determined by applying the percentage DOT determined to be complete to the schedule of values contained in Steward's purchase order with White Oak., which was different than the schedule of values between White Oak and DOT.

28. Steward's first invoice to White Oak is dated November 30, 1994 and is in the amount of $792,000.

29. Under the terms of the Purchase Order, $772,200.00 ($792,000.00-2.5% retention) was due no later than January 30, 1995.

30. Steward did not receive a payment from White Oak until February 15, 1995 and that payment was in the amount of only $501,930.00, or $277,477.20 less than the amount due.

31. White Oak's inability or unwillingness to make the required payment when due to Steward in January 1995 was caused in part by its different schedule of values with DOT and in part by delays field work in New Haven which adversely impacted White Oak's cash flow from the Project.

32. After January 1995 the delays in White Oak's field operations lengthened which further adversely impacted White Oak's cash flow and White Oak fell further and further behind in its payments to Steward.

33. As of August 1, 1996 the past due balance on White Oak's account with Steward was in excess of $1,000,000.

34. Steward was scheduled to begin shipping the major pieces of machinery in September and in August 1996 was on schedule to do so.

35. By August 1996 the delays at the Project site in New Haven had grown so severe that White Oak directed Steward not to ship any of the completed machinery to New Haven.

36. White Oak also told Steward that the delay problems would be resolved within three months, and requested Steward to store and maintain the Machinery until that time.

37. Seward agreed to do so, albeit very reluctantly due to the status of White Oak's account and the problems that storing and maintaining the machinery would create for Steward's on-going operations.

38. White Oak agreed to pay Steward $8.00 per square foot per month for inside storage and $5.00 per square foot per month for outside storage.

39. As the three month storage anniversary approached White Oak informed Steward that the storage period had to be extended by an additional three months.

40. In April 1997 Steward learned that DOT had paid White Oak for machinery furnished by Steward, but White Oak did not pay Steward within 30 days after its receipt of payment from the State as required by C. G. S. § 49-41a.

41. When confronted with this fact, White Oak admitted that it had used the funds due Steward to pay other vendors on the Project

7

42. Section 49-41a provides in relevant part;

> If payment is not made by the general contractor . . . in accordance with such requirements, the subcontractor shall set forth his claim against the general contractor . . . through notice by registered or certified mail. . . . In addition, the general contractor upon written demand of the subcontractor . . . shall be required to place funds in the amount of the claim, plus interest of one percent, in an interest bearing escrow account in a bank in this state, provided the general contractor . . . may refuse to place the funds in escrow on the grounds that the subcontractor has not substantially performed the work according to the terms of his or its employment. In the event that such general contractor . . . refuses to place such funds in escrow, and the party making the claim against it under this section is found to have substantially performed its work in accordance with the terms of its employment in any arbitration or litigation to determine the validity of such claim then such general contractor . . . shall pay the attorneys' fees of such party.

43. On April 16, 1997, Steward set forth its claim against White Oak, and demanded that White Oak place the funds that DOT had paid White Oak for machinery furnished by Steward, but that White Oak had not paid to Steward be placed in escrow.

44. White Oak did not place the funds in escrow as required by the statute

45. Later in April 1997 Steward met with White Oak met in New Haven to discuss the progress of the Project in New Haven and the status of White Oak's account with Steward.

46. With respect to the status of the Project in New Haven, White Oak informed Steward that work on the site had been completely halted, but it was hopeful that work would soon resume, that it expected to be in a position to accept delivery of the

machinery in six months, and informed Steward that the machinery would have to be stored for another six months.

47. With respect to the status of White Oak's account with Steward, things had gone from bad to worse since August 1, 1996.

48. As of April 1, 1997 the amount due Steward for the machinery had grown to over $1,500,000.

49. In addition, although Steward invoiced White Oak for the storage and maintenance charges each month beginning with September 1996, White Oak had yet to pay a single invoice.

50. As of April 1, 1997 the amount due Steward for storage and maintenance was in excess of $200,000.

51. White Oak stated that it had no money, and would not have any money, to deal with the principal balance on the machinery account or any of the storage and maintenance account until the delay problems were solved and it received some money from DOT.

52. However, White Oak did agree to pay Steward $25,000 per week to be applied against the accrued interest on the machinery account until the interest was brought up to date.

53. White Oak began making the agreed upon payments on April 30, 1997 and continued so doing until the interest account was brought up to date

54. As May 1, 1997, the balance on White Oak's machinery account was $1,391,023, all of which consisted of past due principal.

9

55. Steward kept in contact with White Oak on almost a monthly basis throughout the remainder of 1997 concerning the status of the project and the status of White Oak's accounts with Steward.

56. With respect to the status of the project, White Oak finally advised Steward that it had been suspended indefinitely due to a breakdown of negotiations between White Oak and DOT.

57. By letter dated January 8, 1998, Steward advised White Oak, National, and DOT that Steward would not ship any machinery until all past due amounts were paid.

58. In the spring of 1998 Steward anticipated some open time on its manufacturing line and asked White Oak if it wanted Steward to finish up some of the Machinery for the Project that had been taken off line in September 1996.

59. White Oak told Steward to proceed and Steward manufactured the machinery.

60. On June 8, 1998 Steward sent White Oak an invoice in the net amount of $194,995.00.

61. White Oak paid the invoice on September 21, 1998, 43 days after payment was due.

62. That was the last payment Steward received from White Oak prior to the commencement of this litigation.

63. Steward continued to store and to maintain the Machinery through 1998 and 1999 and White Oak kept assuring Steward the White Oak would soon resolve its

issues with the DOT, that work on the Project would resume, and that White Oak would bring its account with Steward's account up to date.

64. By December 1999 Steward concluded that it could not wait any longer for White Oak and DOT to resolve their differences because it was continuing to perform storage and maintenance work and White Oak was continuing to ignore its payment obligations.

65. By letter dated December 20, 1999, Steward served a notice of claim on White Oak and National pursuant to § 49-42 of the Connecticut General Statutes.

66. Section 49-42 provides in relevant part:

> Within ninety days after service of the notice of claim, the surety shall make payment under the bond and satisfy the claim, or any portion of the claim which is not subject to a good faith dispute, and shall serve notice on the claimant denying liability for any unpaid portion of the claim.

67. After receipt of the notice of claim, a representative of National traveled to Steward's offices in Birmingham, Alabama to inspect the stored machinery and to discuss Steward's claim with representatives of Steward.

68. By March 22, 2000, 90 days after December 20, 1999, National had not satisfied any portion of Steward's claim and had not served any notice on Steward denying liability for any portion of the claim.

69. On April 28, 2000, unbeknownst to Steward, White Oak, National, and DOT entered into an agreement with Cianbro, Corp. under the terms of which, inter alia, Cianbro agreed to complete White Oak's contract with DOT.

70. By May 5, 2000, National still had not provided Steward with a response to Steward's notice of claim.

71. On May 5, 2000, Steward commenced this action against White Oak and National Union on the Bond and against White Oak on the Purchase Order claiming $5,000,000 in damages for White Oak's breach of its obligations under the Purchase Order.

72. On July 24, 2000, National Union and White Oak commenced an action against Steward in this Court (Civil Action 300CV1389) claiming, inter alia, that Steward's continued possession of the machinery was wrongful and that White Oak and National were entitled to the immediate possession of the machinery and seeking a Prejudgment Remedy Of Replevin (the "Replevin Action).

73. On August 7, 2000 this court issued an order entitled "Order Granting Prejudgment Remedy Of Replevin".

74. On August 11, 2000, Steward filed a Notice of Appeal from the Order in the Replevin Action.

75. On August 24, 2000, Steward, National and White Oak entered into an agreement (the "Agreement") under the terms of which, inter alia, they agreed that Steward would refurbish the machinery for the project and that National would assume the responsibility for shipping the machinery from Birmingham, Alabama to New Haven Connecticut and Steward would withdraw its appeal from the order in the Replevin Action..

76.     Steward refurbished the machinery pursuant to the terms of the Agreement.

77.     In December 2000 and January 2001 the refurbished machinery was shipped to New Haven.

78.     Thereafter the machinery was installed in the bridge and the project was completed.

79.     DOT fully met its obligations to White Oak under the Contract including fully paying White Oak for the machinery specially manufactured by Steward pursuant requisitions submitted after January 1, 2000.

80.     White Oak still has not fully met its obligations under its purchase order contract with Steward.

**IV.     Impact of Storage and Maintenance on Steward**

81.     In August 1996, when White Oak informed Steward that it would be unable to accept delivery of the machinery in September as scheduled, Steward had no interest in storing the machinery at its plant.

82.     Steward's manufacturing operation is predicated on it being able to ship the machinery as soon as it is completed.

83.     Almost literally the raw materials come in one end of the plant and leave through the other end where there is a railroad spur and loading dock.

84.     If completed machinery is not shipped on schedule, Steward has no place to store the machinery that is not also space needed for the manufacturing of the machinery for the next job scheduled to move through Steward's plant.

85. For example, the White Oak job included eight sheaves each of which were almost 20 feet in diameter and 4 wide and weighed 63 tons.

87. In August 1996 these sheaves were at the shipping end of the plant and being prepared for shipment to White Oak.

88. If the sheaves were not shipped Steward had no place to put them that would not interfere with the next scheduled job.

89. For this reason Steward had no interest in storing the machinery at its plant when requested to do so by White Oak in August 1996.

90. Another reason for Steward's lack of interest in storing the machinery at its plant was White Oak's past due account; if the machinery was not shipped White Oak would nor receive any further payments from DOT for the machinery further decreasing the likelihood of White Oak bring its account up to date while at the same time Steward would be incurring additional unanticipated expenses because of the continued presence of the machinery.

91. For these reasons Steward advised White Oak that it was not interested in storing and maintaining the machinery and requested that White Oak arrange for the storage of the Machinery someplace other than Steward's plant

92. The storage of the Machinery involved a great deal more than simply placing it in a warehouse or outside and protecting it from the weather.

93. Each piece of Machinery was manufactured to precise tolerances and was designed to function with other pieces of Machinery. In order to preserve the precise

tolerances during storage it was necessary to periodically lubricate and rotate the moving parts of each piece of machinery.

94. These maintenance activities involved large pieces of equipment, including a 250-ton overhead crane, and personnel with experience and expertise in the maintenance of precision equipment.

95. White Oak did not have the facilities, personnel, or equipment to store and maintain the machinery.

96. Since there was no practical alternative, Steward and White Oak agreed that Steward would store and maintain the machinery at its plant at the rate of $8.00 per square foot per month for inside storage and the rate $5.00 per square foot per month for outside storage.

97. Throughout the continually expanding storage period, Steward advised White Oak that Steward did not want to store the machinery, and that the presence of the machinery was greatly interfering with operations of Steward's facilities, and causing Steward to incur economic costs significantly in excess of the amount of the storage fees White Oak had agreed to pay.

98. The presence of the White Oak machinery interfered with Steward's operations in a number of ways, including but not limited to:

    (a) It hampered the lay out of other jobs by taking up space needed for the layouts of the pieces for those jobs; thereby resulting in the jobs having to be done in a more piece meal fashion.;

    (b) At various times different pieces of the machinery would have to be moved around to different locations within Steward's facilities so that Steward's employees

could access various machines, tools and work stations necessary for other jobs; which required Steward's employees to spend time and utilize overhead cranes and other equipment to move the machinery;

(c)  It reduced the assembly work areas requiring assembling on other jobs to be done in a piece meal fashion; and

(d)  The machinery required regular maintenance by Steward's employees.

99.  The methodology Steward used to determine the economic losses caused by the presence of White Oak machinery was to establish a benchmark of normal operating efficiencies of Steward when not affected by the presence of the White Oak machinery.

105.  This benchmark was used to determine the number of excess labor hours required of Steward while storing the White Oak machinery.

106.  Excess labor hours are those hours in excess of the labor hours contained in estimate prepared by Steward when bidding or pricing a particular job.

107.  Steward's accounting records were used to determine the actual cost associated with the excess labor hours.

108.  Steward investigated the causes of excess labor hours and eliminated or mitigated the excess labor hours that could be attributable to causes other than White Oak. Examples of causes that are not attributable to White Oak are jobs whose scope materially increased (more than 15%) and jobs or portions of jobs that were fabricated elsewhere. These items were removed from the damage calculation because they would have skewed the results.

109. Using this method, the total costs incurred by Steward as a result of the presence of the White Oak machinery are $2,347,250, computed as follows:

    A. <u>Economic Costs incurred by the Fabrication and Machine Shops;</u>

| | | |
|---|---|---|
| (1) | Variable costs based on labor hours | $1,160,202 |
| (2) | Fixed shop cost | $ 262,656 |
| (3) | Overhead cost | $ 300,246 |
| | Total costs | $1,723,104 |
| 4) | Reasonable Profit margin | $ 172,447 |
| | Total costs and profit | $1,895,551 |

    B. <u>Economic Costs from Steward's Storage Job Record;</u>

| | | |
|---|---|---|
| (1) | Direct Material Cost | $ 13,580 |
| (2) | Direct Subcontractor Cost | $ 6,405 |
| | Total Materials & Subcontract | $ 19,985 |
| (3) | Labor costs | $ 119,580 |
| (4) | Variable costs based on labor hours | $ 292,134 |
| | Total | $ 431,699 |

110. There is no other material approximate cause for these damages other than the presence of the White Oak machinery.

17

STEWARD MACHINE CO, INC.

By _____
William J. Egan
Federal Bar No. ct04161

Egan & Crowley, P.C.
234 Church Street
New Haven, CT 065510
Tel. (203) 498-8809
Fax (203) 498-8769

## CERTIFICATION

This is to certify that on this 22nd day of February 2005, a copy of the foregoing was hand delivered to:

Gary M. Case
Wolf, Horowitz, Etlinger, & Case, L.L.C.
99 Pratt Street
Hartford, CT 06103

Jane Milas
Garcia & Milas
44 Trumbull Street
New Haven, CT 06510