UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEWARD MACHINE COMPANY : | 3:00 CV 00834 (SRU) |
| PLAINTIFF : | |
| : | |
| VS. : | |
| : | |
| WHITE OAK CORPORATION et al : | |
| DEFENDANT : | February 28, 2005 |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
MOTION IN LIMINE TO PRECLUDE
EXPERT TESTIMONY OF J. LESTER ALEXANDER III**

The Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") hereby submits this Supplemental Memorandum of Law in support of its Motion in Limine to preclude any expert testimony by J. Lester Alexander, III.

On September 2, 2004 Mr. Alexander submitted a revised expert report. While the revised report reflects certain changes to the time study that Mr. Alexander performed, the problems with his methodology remain. In fact, several of the revisions made by Mr. Alexander are themselves indicative of additional methodology problems. The purpose of this Supplemental Memorandum is to provide a summary of the grounds for his preclusion as an expert under <u>Daubert v. Merrell Dow Pharmaceuticals Inc.</u>, 509 U.S. 579 (1993), and its progeny. Some of these grounds are discussed in detail in the supplemental report of National Union's Expert, Frank Zito, attached as Exhibit 1.

1. **Use of Estimates To Establish a "Benchmark" of Efficiency**

The fundamental assumption underlying Alexander's method is that a "benchmark" of efficiency for Steward's operations can be established by reference to estimates. The estimates

1

relate to certain of the sampled projects during the various periods. He purported to compare Steward's estimated hours for the sampled jobs with their actual hours. From this an efficiency "benchmark" was determined, and then compared between the two periods.

Reliance upon Steward's job estimates is neither a reliable nor an objectively reasonable method. Estimates are not a reliable indicator of efficiency. The estimates themselves are merely best guesses as to the hours which will be required of Steward for a particular job. They are subjective and subject to error. An estimate cannot anticipate all of the problems that may arise in the course of a project. This is especially so given the nature of Steward's operations. Steward was not mass producing a single commodity. Steward's operation was not an assembly line. To the contrary, Steward was a specialty fabricator. Each of Steward's projects was unique, with unique requirements relating to design, fabrication, machining and delivery. The demands put on Steward for each of these projects was a function of many variables, including (1) disputes with customers (2) late delivery of raw materials (3) unanticipated design issues; (4) machining problems (5) and flow of work on the project and other projects on Steward's shop floor.

Deviations between estimates and actual labor hours can be caused by any number of circumstances or causes which are unique to a particular job or particular flow of work, which are not subject to predictable outcomes. Indeed, Steward had inefficient jobs (i.e., jobs in which its actual hours exceeded its estimated hours) in all three periods (construction, holding and lookback). Many of these variances are attributable to factors having nothing to do with White Oak, including the fact that estimates are subject to error and are not a reliable or predictable indicator of the actual labor which will be required on a given job.

2

2. **Assumption that Estimating Errors and Variances Unrelated to White Oak Would Remain Constant or "Even Out" Between the Two Periods**

Because Alexander's method relies upon estimates, he must account for errors and variances in the estimates which have nothing to do with White Oak. He contends that he has done so by allowing a comparison of efficiencies between the storage period and the lookback period. His assumption appears to be that Steward's estimating procedures were the same for both periods. He therefore assumes that any errors or variances in one period would be off-set by errors or variances in another period.

This is another unreasonable, unverifiable and unreliable assumption. Estimating is too subjective of a process to assume that mistakes of one magnitude during one period would equal the mistakes in the second period. Each Steward job was unique and there is no way to reliably verify that estimating errors and variances across periods would magically remain constant or "even out". Reliable expert testimony must be based on objectively verifiable information or principles. Instead, Alexander's assumption is based on his own subjective determination that the Steward's estimating processes remained constant and that any estimating errors in the storage period would be off set on a one-to-one basis by errors of the same magnitude in the lookback period. This is a subjective determination that cannot be verified objectively, and is inconsistent with the overall approach, which is a time study based on actual performance on jobs. Alexander is not an efficiency, production or fabrication expert. He is an accountant who lacks expertise to make this conclusion.

3. **Assumption that Other Causes of Inefficiencies Would Remain Constant or "Even Out" over the Two Periods**

3

There were many inefficiencies in Steward's projects. Many of these have no possible connection with White Oak. We know this because there were inefficient projects during the lookback period which are specifically identified in Mr. Alexander's study. See, e.g. Gilbert Southern, G7938, -33.4%, Flowserve, F8112, -42.1%, Centry, C7890, -6.4% AK Steel, A7964, -10.1%, Flowserve, F8200, -7.3%, Flowserve F8201, -8.6%, Johnson Brothers, J7884, -15.9%, Massman, M8178, -74.2%. These inefficiencies could not have been caused by White Oak because White Oak had already been shipped when these projects were fabricated.

Any reliable methodology must take into account these other causes. Alexander purports to do this but does not. His view is that other causes of inefficiency are accounted for because he is comparing relative efficiencies between the two periods, and any change in efficiency over the two periods must be the responsibility of White Oak. He also claims that he has accounted for other causes by removing certain jobs from the study based on his own subjective determinations regarding whether the job experienced inefficiencies caused by something other than White Oak.

Alexander assumes that other causes of inefficiencies unrelated to White Oak would remain constant or the same over the two periods – in effect, the same degree of "background" inefficiency during one period would be present during the other period. This is a fundamental flaw in the approach. Each Steward project was unique. Steward faced unique problems on every project, including shop flow of work, delays in material procurement, errors in workmanship, and disputes with customers. It is not possible to verify or confirm on an objective basis that there is a certain "constant" level of efficiency or inefficiency which remains exactly the same over the two periods and over the course of hundreds of jobs

4

There is no objectively verifiable way for any expert to determine or assume that all other causes or efficiency "even out" as between the two periods. This is true especially of Mr. Alexander, who is a CPA and is not qualified to opine regarding the reasonableness of estimates for specialty manufacturing. When pressed, Alexander claims that he saw nothing in the project documents or got no information from Steward suggesting that other causes of inefficiency could explain the variances between Steward's estimate-to-actual results. This is a subjective assumption that Mr. Alexander is not qualified to make, and is inconsistent with any objectively verifiable approach

4.  **Use of an Incomplete Time Study and Sampling of Only A Portion of the Jobs.**

Mr. Alexander's methodology is unreliable because it is incomplete. The efficiency "benchmark" which he found was derived from a sampling of only a small portion of all of Steward's actual labor hours. While his time study purports to be an analysis of damage incurred by all of Steward's operations, it in fact only considers a small number of the actual labor hours comprising these operations. The study fails to include or measure a substantial number of labor hours which Steward incurred on their projects during each of the relevant time periods.

Attached as Exhibit 2 are Appendices H and I of Mr. Alexander's time study report. As these indicate, Steward's total labor hours during all three periods were 1,068,718. However, only 286,003 hours (27% of available hours) are actually used in the study. Of the rest, 46% of the available hours (496,318) are not even considered, and 27% of the available hours (286,397) were considered but then not used. In the machine shop, only 17% of the holding period hours are used; only 21% of the lookback period are used. In the fabrication shop, only 23% of the holding period hours are used; and only 57% of the lookback period hours are used.

5

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

The sheer incompleteness of the study renders it unreliable on its face. Moreover, the failure to consider and study all available hours has a profound impact on the reliability of Alexander's conclusions in several respects. First, the "benchmark" of efficiency which he determined is clearly based on a limited and incomplete sampling of projects and labor hours. To determine a true "benchmark" of efficiency (if one exists) all projects and hours must at least be considered. Second, the incompleteness of the study deprives National Union and White Oak of the benefit of the consideration of additional hours in the storage and lookback period that could meaningfully change the "benchmark" and lower the damages. Any labor hour or project in the storage period which was <u>efficient</u> would affect the benchmark in favor of White Oak/National Union (and reduce the damages). Similarly, any labor hour or project in the lookback period which was <u>inefficient</u> would likewise affect the benchmark in favor of White Oak/National Union (and reduce the damages). Because of the incompleteness of Alexander's study, White Oak and National Union have been deprived of the benefit of the consideration of these non-sampled jobs and hours.

Alexander attempts to justify his sample size by claiming that the non-sampled hours and jobs were smaller jobs which would not have been affected by the presence of White Oak. This assumption is again his own subjective conclusion and is not a proper assumption for him to make. Moreover, this assumption directly undermines his claim that the efficiency "benchmark" is in fact a reliable indicator of the efficiency of Steward's operations over the relevant time periods. The alleged smaller projects left out from the study are just as much a part of the efficiency story as the large jobs. Steward most certainly had smaller jobs with positive

6

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

outcomes, which should have been measured as part of the efficiency benchmark. All must be considered to determine a true and reliable "benchmark".

5.  **Disregarding Steward's Own Determination of Jobs Which Were Impacted**

Alexander's time study fails to even consider or include a substantial number of projects which were identified by Steward as the larger impacted jobs. Steward's Jerry Shivers wrote to White Oak on June 14, 1999. In this letter Shivers identified 50 projects as being larger jobs which were impacted by the storage of the White Oak machinery. He highlighted these jobs in completed jobs list which was attached to the letter.

Of the 50 jobs identified, only 5 were actually considered and included by Alexander's study. Of the rest, 23 were considered but then excluded, and 22 were simply not even mentioned or referenced at all in Alexander's study. Mr. Alexander disregarded this and went off to do a study of other jobs. Any reliable study must account for and include the jobs which Steward itself claims were impacted.

6.  **Assigning $757,287 in Damages to "Other Jobs", Jobs which are Unknown, Unidentified, Not Studied and Not Associated with any Estimate**

There were 29,686 fabrication hours during the storage period which Alexander never considered as part of the sampled jobs. These were hours tied to no particular job and no particular estimate. He cannot identify the names of these jobs. They are not identified or listed anywhere in his report.

Nonetheless, these mystery hours account for $757,287 of the damages claimed against White Oak and National. Mr. Alexander took these "other job" hours and assumed that they suffered from the same exact inefficiency rate of 65.40% as he found to exist on the sampled projects. This "methodology" is "explained" in Appendix J to his study (see Exhibit 3). As a

7

result of this one page, which does not identify a single job name or estimate, Steward claims that National Union and White Oak are liable for an additional $757,287

He reaches this conclusion without seeing a single estimate for these jobs, without identifying what the jobs are, without determining whether any other potential causes of inefficiencies occurred with respect to these jobs. This is pure speculation. It is also inconsistent with the entire premise of Mr. Alexander's methodology on several levels. First, his methodology assumes that efficiency is measured by comparison of estimates to actual performance on jobs. However, he jettisons this assumption with respect to the "other jobs" in the storage period, since these jobs have no estimates attached to them. Second, Mr. Alexander claims that he has accounted for other causes of inefficiency by reviewing each job and eliminating those jobs which had inefficiencies which were clearly not caused by White Oak. Again he deviates from this approach with respect to these "other jobs", since these jobs are not identified or known and cannot be measured or evaluated. Third, Mr. Alexander's sampling methods excluded the "smaller" projects, apparently based on his assumption that these jobs would not have been affected by White Oak, and therefore do not present a reliable way to establish a benchmark. However, the "other jobs" in the storage period apparently are derived from these very same "smaller" projects which have already been excluded from the sample. If the "smaller" projects are not considered for purposes of the benchmark, how can they be later considered as part of the population of jobs damaged by White Oak? Expert testimony should be excluded if it is "speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1441

(S.D.N.Y.1997) (internal citations omitted) (quoting Boucher v. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir.1996)).

7. **Disregarding the Construction Period**

Mr. Alexander sampled the construction period jobs but then disregarded these results entirely. He now claims that the construction period was not a proper benchmark or measure of Steward's damages caused by White Oak. It is likely that Alexander disregarded the construction period results because these results show that Steward's efficiencies were not impacted by White Oak to the degree claimed by Steward. Indeed, these studies show that in the fabrication shop, Steward actually became <u>more efficient</u> once White Oak was put into storage than before. According to Appendix H of Alexander's study (Exhibit 4), Steward's inefficiencies in the fabrication shop went from –24.4% in the construction period to –26.3% in the storage period. Thus Steward actually became <u>more</u> efficient once White Oak went into storage than before. Instead of considering this he simply disregards the results, presumably because it dramatically reduce Steward's damages.

8. **Use of Subjective Sampling Methods, Reliance on Unreliable Records and Data**

There are a number of specific errors and problems with Mr. Alexander's study which illustrate the unreliability of the study and the method:

**A. Inside/Outside Storage Period Jobs**

Mr. Alexander issued an initial report in September, 2003 finding damages of $2,483,824. This was based on assumption that sheaves had been stored inside, and caused interference, from April 1998 through August 2000. He claims that someone at Steward had told him that the sheaves were stored inside during this entire time period. In fact, they were not.

The sheaves were stored outside from at least November, 1999 through August, 2000. Somehow this finally came to Mr. Alexander's attention in September 2004. Up until this time Mr. Alexander apparently had not read Steward's own project records which reflected that the sheaves were stored outside during this time period.

To his credit, Mr. Alexander realized that his study had assumed inside storage during this time period. In September, 2004 he issued a new report and new study. Under this new report and study, the damages were reduced by $778,108 because Mr. Alexander had to remove all of the jobs that had been fabricated while White Oak had been moved outside. This dramatic change in damages, based on a change in a single fact, demonstrates the unreliability of Mr. Alexander's entire approach.

### B. Zenith Tech (Z7161)

In Mr. Alexander's first study, this storage-period job is shown as having 13,700 estimated hours. This was based on data obtained by Alexander from Steward's own records (a "POC" schedule) and based on information provided to Alexander by the project manager, James Allison.

However, in his supplemental report, the job is changed to reflect only 8,370 estimated hours. The result is that this job is shown as a substantially more inefficient job than it was before. The net result is that the job is changed from a slightly inefficient job in the first study to a profoundly inefficient job in the second study (negative 70.8% efficiency). As a result the damages are increase by $139,815 in the second study and report.

Apparently this change is based on Steward's after-the-fact re-estimation of the job, and its reexamination of the "estimate" which it claims to have prepared on the job. This "estimate"

10

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

is attached as Exhibit 5. The Court will note that the word "guess" is included twice on the first page of the "estimate", and again on the seventh page. In addition, the document is replete with question marks. The circumstances surrounding this job, and the machinations relating to this dubious "estimate", demonstrate the unreliability of the entire method.

### C. Atkinson Dillingham (A7643)

This is a large job performed by Steward during the lookback period. Mr. Alexander's study states that this was an efficient job with a positive 25% variance. The trouble is that none of the actual work on this job was performed at Steward. According to Alexander's report, the fabrication work on this job was subcontracted to another facility. Since none of the labor hours were in fact performed at Steward, this job cannot properly be considered as part of the study. To compound the problem, Mr. Alexander assumes that the job would have been efficient at 25%. He does so by assuming that the efficiency on this project would match the efficiency of other jobs of similar size. This assumption is patently absurd since, according to note 2 of his Appendix X, this job was subject to "gross inefficiency" at the subcontractor's facility (Mt. Vernon).

### D. Unreliable Data and Records

Many of Steward's project records are unreliable. Conclusions set forth in Mr. Alexander's time study cannot be verified or confirmed through project records. In some instances he attempts to justify conclusions based on "conversations with project managers". Some of Steward's project records were apparently damaged or destroyed as a result of a flood at its facilities. These documents fail to provide a sufficiently reliable basis to verify or corroborate Mr. Alexander's conclusions.

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

9. **Failure to Account for Changes In Steward's Operations Between the Storage Period and the Lookback Period**

Mr. Alexander's method also fails to account for changes in Steward's operations between the storage period and the lookback period. These changes included the fact that Steward was bidding larger jobs during the lookback period, and had opened a new plant facility. Both of these events would serve to explain why Steward's efficiencies may have improved in the lookback period, irrespective of any interference by White Oak.

## Conclusion

For the above reasons, together with those which may be offered at a hearing hereon, National Union hereby asks that this Court preclude Mr. Alexander's testimony.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

BY _____
Gary M. Case
Wolf, Horowitz, Etlinger & Case, LLC
99 Pratt Street – Suite 401
Hartford, CT 06103
(860) 724-6667
ct09610

### **CERTIFICATION**

This is to certify that a true copy of the foregoing document was mailed via first class postage, prepaid, this 28th day of February, 2004 to all counsel of record.

William Egan
Barbara Crowley
Egan & Crowley
234 Church Street
New Haven, CT  06510

Jane Milas
Garcia & Milas
44 Trumbull Street
New Haven, CT  06510

BY  _____
Gary M. Case

56373

WOLF, HOROWITZ, ETLINGER, & CASE L. L. C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488