United States District Court
District of Connecticut
FILED AT BRIDGEPORT
February 28, 2005
Kevin F. Rowe, Clerk
By: _____
Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEWARD MACHINE CO, INC. | : | CIVIL ACTION NO. |
| | : | |
| V. | : | 3:00CV00834(SRU) |
| | : | |
| WHITE OAK CORPORATION | : | |
| | : | |
| AND | : | |
| | : | |
| NATIONAL UNION FIRE INSURANCE | : | |
| COMPANY OF PITTSBURGH, PA. | : | February 28, 2005 |

## MEMORANDUM IN OPPOSITION TO MOTION TO EXCLUDE EVIDENCE AND/OR MOTION IN LIMINE

The plaintiff Steward Machine Co., Inc. ("Steward") submits this memorandum in opposition to motion to exclude evidence and/or motion in limine, dated February 9, 2005, filed by the defendants White Oak Corporation ("White Oak") and National Union Fire Insurance Company of Pittsburgh, PA. ("National Union").

### RELEVENT FACTS

1.  Paragraph 9 of the complaint states:

    Prior to December 1995 White Oak directed Steward not to deliver the Machinery to the Project and to store the completed Machinery at it facilities in Birmingham, Alabama.

2.  Paragraph 10 of the complaint states:

    Subsequent to January 1996, White Oak directed Steward to suspend manufacturing the Machinery because the delays at the Project were of an uncertain duration and

                White Oak was unable to ascertain when it would be in a position to receive the Machinery.

3.      Paragraph 11 of the complaint states:

                Steward continues to store the Machinery as directed by White Oak.

4.      Paragraph 22 of the complaint states:

                On December 20, 1999 Steward provided White Oak and National with notice of its claim, then in the amount of $2,732,955.40, as required by § 49-42 of the Connecticut General Statutes.

5.      The notice of claim states in relevant part:

                White Oak is, and has been for a long time, seriously in default of its payment obligations under its subcontract with Steward. As of the date of this notice the principal past due is $780,796.68 and the accrued interest thereon is $181,533.26. <u>In addition, at White Oak's request Steward continues to store equipment and materials specially fabricated for the subcontract. To date the unpaid storage costs are $1,593,191.23.</u> In addition, Steward is due retainage of $177,434.32. The total due is $2,732,955.40. (Emphasis added).

6.      The parties filed a joint status report on May 18, 2001. Paragraph 2 of that report states in relevant part:

                Steward was a subcontractor to White Oak on a bridge construction project in New Haven. White Oak was the general contractor. National Union issued a payment bond for the project. <u>Steward's claims include failure of payment in accordance with the terms of the contract, interest on the payments not made in accordance with the contract, charges for storage, increased costs of performance and attorney's fees</u>. (Emphasis added)

7.      Paragraph 4 of the joint status report states:

                The parties dispute the following legal and factual issues:

- Whether Steward or White Oak performed their respective obligations under the subcontract;
- Whether Steward gave timely notice of claim and commenced an action within the time period required by Conn. Gen. Stat. § 49-42;
- <u>Whether Steward is entitled to storage charges and interest</u>,
- Whether Steward is claiming entitlement to damages which are not recoverable under the payment bond;
- Whether White Oak and/or National Union are entitled to damages as result of Steward's alleged breach of contract. (Emphasis added).

8. On June 3, June 4, and June 5, 2003, National Union took the depositions of Whitney DeBardeleben and Jerry Shivers; and counsel for White Oak was present and also asked questions of the deponents.

9. The vast majority of both depositions were devoted to questions regarding the storage of the White Oak equipment[1], including but not limited to, questions on the issues of:

   a) Any communications between Steward and White Oak regarding White Oak's agreement to pay for the storage[2];

---

[1] Volume I, pages 110-113 and 115-181, and Volume 2, pages 190-299, 303-322, and 373-391 of the deposition transcript of Mr. DeBardeleben, and pages 48-157 of Mr. Shivers deposition transcript.

[2] See, for example:
  Q    All right. And during any of the discussions that you personally had with White Oak, did the issue of payment for storage arise?
(DeBardeleben, Vol. I p. 139.)
  Q    Did you have any meeting or discussion with anyone from White Oak in which a representative of White Oak indicated that White Oak was agreeing to pay storage costs to Steward in connection with this machinery?
(DeBardeleben, Vol. I pp. 141-142.)

b) Steward's invoices for the storage and maintenance of the equipment, and the basis for the invoiced amounts;

c) The nature and locations of the pieces of equipment which were stored;

d) The nature of any maintenance that had to be done on the machinery;

c) The costs that Steward was claiming it incurred as a result of storing and maintaining the equipment; and

d) Steward's claim for business interruption damages resulting from the storage and maintenance of the equipment.

10. On June 20, 2003, November 17, 2004 and December 30, 2004 National Union and White Oak took the deposition of Mr. Alexander, Steward's expert witness on the issue of damages incurred by Steward as a result of the storage of the White Oak machinery.

11. On September 17, 2003, Steward filed its amended damages analysis which identified four categories of damages; "<u>Original</u> Contract", including "Contractual Interest"; "Storage Charges", including "<u>Contractual Interest</u>"; "Damages from Storage" (which was defined as the excess of the total of the business disruption damages and the costs of storage less the storage charges and, including "Interest"; and "Attorney's Fees". (Emphasis added)

---

Copies of pages 137-142 of the transcript of the DeBardeleben deposition are attached to this memorandum as Exhibit A.

12. In its memorandum in support of its motion for summary judgment and/or motion in limine, dated December 16, 2004, at page 29, National Union set forth its argument as to why

> Steward cannot rely upon any alleged modification or oral agreement by White Oak as a basis to recover these fictitious "storage charges"

13. In its responsive memorandum, at page 8, Steward stated:

> There was a base contract for the specially manufactured bridge parts; which, since it was a contract for the sale of goods is controlled by the Uniform Commercial Code. (Connecticut General Statutes 42a-1-101 et seq.) Subsequently Steward modified the original agreement by making a collateral agreement for the storage of the parts at Steward's facility for a short-term period. Since the latter is a collateral or ancillary agreement not involving the sale of goods, damages for breach of that collateral agreement are governed by general contract law and not the U.C.C. (footnotes omitted).

14. Connecticut General Statutes 42a-2-701, entitled <u>Remedies for breach of collateral contracts not impaired</u>, provides:

> Remedies for breech of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of this article.

15. The defendants filed their motion to exclude "any evidence relating to the existence of a "collateral storage agreement". (Motion, dated Feb. 9, 2005, p.2).

## ARGUMENT

It is clear that the issue, of whether there was an agreement between Steward and White Oak regarding payment of the storage charges and whether that agreement was a modification of the original base contract, has been in this case since the initial filing of the complaint. Moreover, it is also clear that extensive discovery on this issue has

occurred. Lastly, it is clear that the defendants are not claiming that this issue is new; rather they are objecting to Steward's legal theory that the agreement regarding payment of the storage charges constitutes a "collateral" obligation or promise such that Sec. 42a-2-701 of Connecticut's Commercial Code applies.[3]

In addressing the defendants' objection to Steward's "new" legal theory, the starting point necessarily must be Rule 15(b) of the Federal Rules of Civil Procedure, which provides in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. <u>If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits</u>.

(Emphasis added). Under Rule 15(b) Steward has the right to amend the pleadings, if the court deems it necessary, unless the defendants can establish that they would be prejudiced in the presentation of their defense.

In support of their motion to exclude evidence, the defendants' only claim of prejudice is their unsupported statement that "allowing Steward to present evidence on

---

[3] It is important to note that that Steward's damages claims have been well known to the defendants, discovery has been conducted with respect to those damage claims, and there is no claim by the defendants that Steward is attempting to introduce evidence of any new or different damage claims.

the alleged collateral storage contract not only unfairly raises new factual issues but also raises new legal theories concerning the respective obligations of the parties and potential damages". The problems with this claim are legion. Firstly, they give no hint of what possible new factual issues could be raised regarding Steward's claim that the storage agreement should be deemed a collateral promise or obligation within the meaning of 42a-2-701. And the obvious reason for that is that there are no new factual issues. The facts with respect to Steward's claim that White Oak is contractually bound to pay the storage charges invoiced to White Oak remain the same. The issue of whether such a contractual agreement exists, and if it does, whether it should be deemed "collateral" for the purposes of the Code, is an issue for the trier of fact; it is not an evidentiary issue. See Nora Beverages v. Perrier Group of America, 164 F.3d 736, 749 (2nd Cir. 1998), citing Presidential Capital Corp. v. Reale, 652 A.2d 489, 492 (1994) ("the trier of fact determines whether an agreement has been made and what the terms of the agreement are.) See also Specht v. Netscape Communications Corp., 306 F.3d 17, 26 (2nd Cir. 2002) citing Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., Ltd., 189 F.3d 289, 295 (2d Cir. 1999); ("The central issue - whether, based on the factual findings, a binding contract existed - is a question of law . . .").

Secondly, the Second Circuit has expressly held that the mere introduction of a new legal theory does not constitute prejudice to the opposing party under Rule 15(b). In N.Y. Elec. & Gas v. Sec. of Labor, 88 F.3d 98, 104-105 (2nd Cir. 1996), the Court held:

> . . . However, a party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory. Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case. See D. Federico Co. v. New Bedford Redevelopment Auth., 723 F.2d 122, 126 (1st Cir. 1983)

> ("<u>The fact that [a Rule 15(b) amendment] involves a change in the nature of the cause of action, or the legal theory of the action, is immaterial so long as the opposing party has not been prejudiced in presenting its case.</u>"). Here, NYSEG does not dispute that the material fact issues to be tried would have been exactly the same regardless of whether or not the general duty clause was invoked. [Citation omitted] Hence, NYSEG was not prejudiced by the change in the theory of the safety infraction alleged against it. Nor is it helpful to the employer that the Secretary failed to move to amend because Rule 15(b) requires no motion or formal amendment of the pleadings. [Citation omitted]

(Emphasis added). See also <u>Jund v. Town of Hempstead</u>, 941 F.2d 1271 (2nd Cir. 1991) (Holding under Rule 15(b) plaintiff not "precluded from presenting evidence relating to claims not contained in the pleadings" when "the claims arise out of the scheme that was the focus of the pleadings, the claims are directly related to the earlier violation, and there was no undue prejudice to the defendants").

Instead of addressing Rule 15(b), and the need to establish prejudice, the defendants cite <u>Lee v. City of Hartford/Hartford Public Schools</u>, 289 F. Supp.2d 25 (D. Conn. 2003) as its sole authority for the defendants' claim that F.R.C.P. 8(a)(2) "imposes a requirement that the plaintiff identify in its complaint the specific contract from which the plaintiff claims the obligations of the defendants flow. However, an examination of the holding in <u>Lee</u> reveals that that case provides no such authority for the defendant's assertion.

> Although plaintiff alleges that defendants breached an employment contract, plaintiff nowhere alludes to the source of the employment... Although a complaint filed in federal court need only conform to a liberal notice pleading standard, [Citation omitted], notice requires that plaintiff provide sufficient factual allegations from which defendants may discern the nature of the claim against them. Such is not possible with the present allegations.

> Counsel is well aware of the source of contractual obligations that provide a basis for the breach of contract claim and as such is obligated to identify the same.

The court's concern in <u>Lee</u> was with factual allegations regarding the source of contractual obligations, not with specifically identifying the contract. In the present there is no doubt from the pleadings of what Steward is claiming as the factual basis for its claim that White Oak is contractually obligated to pay the invoiced storage charges.

For all of the foregoing reasons, the plaintiff respectfully requests that the Court deny the defendants' motion to exclude.

Dated at New Haven, Connecticut this 28th day of February, 2005.

*Barbara E. Crowley* (signature)
Barbara E. Crowley
William J. Egan
Egan & Crowley, P.C.
234 Church Street
New Haven, CT 065510
Tel. (203) 498-8809
Fax (203) 498-8769

137

1              to spread the load across several axles.
2      Q       You would have had to move these sheaves
3              whether or not there was a delay, correct?
4      A       Just once, when shipped from plant one after
5              the assembly.
6      Q       When was the determination made that the
7              sheaves had to be moved to plant two?
8      A       Once again, per Exhibit 4, I'm going to say
9              September we started storing.
10     Q       Of 1996?
11     A       Yes.
12     Q       Did you ever have any discussions with anyone
13             at White Oak regarding storage of the
14             equipment?
15     A       Yes, we did.
16     Q       Did you, in particular?
17     A       Yes, I did.
18     Q       With whom did you speak?
19     A       Mr. Jack Morrissey, Mr. George Hurd, several
20             individuals in the state.
21     Q       When was your first discussion with anyone from
22             White Oak?
23     A       In the spring. My first discussion?
24     Q       Yes.
25     A       In '94, when I bid the job.

Exhibit A

138

1  Q  When was your first discussion about the issue
2     of storage of the materials?
3  A  In the spring or summer of '96.
4  Q  Who initiated that discussion?
5  A  I probably did.
6  Q  Why did you do that?
7  A  For payment of the shipping out of the shop.
8  Q  And with whom did you speak?
9  A  My contact was usually with Jack Morrissey or
10    George Hurd, these two individuals.
11 Q  And in your first discussion, who did you speak
12    with?
13 A  I don't remember the first individual.
14 Q  What did you say to that person that you spoke
15    to at White Oak?
16 A  I don't remember the exact words I said, but we
17    were ready to ship them.
18 Q  You were ready to ship?
19 A  Ready to ship, make sure the dates were good
20    because we had to get permits and everything
21    out.
22 Q  What, if anything, was the response from the
23    person at White Oak?
24 A  I didn't get a response.  Mr. Shivers got a
25    response that the job was temporarily delayed.

```
 1   Q   Did anyone from White Oak speak to you
 2       personally about delays in the project and a
 3       delay in shipment?
 4   A   Yes.
 5   Q   And who at White Oak spoke with you?
 6   A   Mr. Morrissey and Mr. Hurd.
 7   Q   And what, if anything, did they say?
 8   A   That it would be a temporary delay, that they
 9       would be getting them up shortly.  They wanted
10       us to store them temporarily.
11   Q   Someone from White Oak asked you to store the
12       materials?
13   A   Yes.
14   Q   Who?
15   A   Jack Morrisey or George Hurd, my two contacts.
16   Q   And you recall a specific discussion in which
17       they asked you to store these materials?
18   A   Do I recall a specific discussion?  Yes.  There
19       were so many discussions about that.
20       Specifically asking me to store the materials?
21       Yes, I do.  I do remember specifically.
22   Q   All right.  And during any of the discussions
23       that you personally had with White Oak, did the
24       issue of payment for storage arise?
25   A   Yes, it did.
```

```
1   Q    And when did that issue first arise?
2   A    It probably first arose in the spring or summer
3        of '96.
4   Q    And who raised the issue?
5   A    I did.
6   Q    And what did you say?
7   A    I said there would be a cost associated with
8        these if we had to store them, because we had
9        to ship them.
10  Q    Who did you speak to when this issue first came
11       up?
12  A    Either Mr. Hurd or Mr. Morrissey.
13  Q    Was anyone else on the line?
14  A    I flew up to Connecticut and met with the state
15       and with those two gentlemen in the state's
16       presence and I advised the state to accept
17       them.
18  Q    The issue first came up in a face-to-face
19       meeting with them?
20  A    No, not first.  You asked me a specific
21       conversation that I remember.  I remember the
22       specific conversation in Connecticut's office,
23       the DOT office after the jobsite meeting.  I
24       believe Mr. Shiver was with me.
25  Q    Who else was in the meeting?
```

141

```
 1   A    The state representatives.
 2   Q    And who were they?
 3   A    I don't remember the names.  We have it.  We
 4        have some report from the state on the meetings
 5        I attended.
 6   Q    Who from White Oak was at the meeting?
 7   A    Mr. Hurd, and I believe Mr. Morrisey was there,
 8        too.  My main purpose was to meet with him when
 9        I came up.
10   Q    And did you maintain any -- take any notes?
11   A    No.
12   Q    Mr. Shivers?
13   A    I don't believe so.  I'm not for certain.
14   Q    Did the issue of compensation for cost of the
15        storage come up in that meeting?
16   A    Yes, it did.
17   Q    And how did that come up?
18   A    The state said it was from White Oak's account.
19   Q    I'm sorry?
20   A    The State of Connecticut advised that it was
21        from White Oak's account.
22   Q    And what, if anything, did White Oak say at
23        that meeting?
24   A    Very little.  They couldn't accept them.
25   Q    Did you have any meeting or discussion with
```

142

```
 1            anyone from White Oak in which a representative
 2            of White Oak indicated that White Oak was
 3            agreeing to pay storage costs to Steward in
 4            connection with this machinery?
 5     A      No, I don't specifically remember.  It was
 6            implied that we would be reimbursed, but it was
 7            never specifically said, "Yes, Whitney, you
 8            will be paid."
 9     Q      Are you aware of any discussions between any
10            representative of White Oak and any
11            representative of Steward other than yourself
12            in which the White Oak representative indicated
13            that they were agreeing to reimburse Steward
14            for their storage-related costs?
15     A      (Witness consults with Mr. Shivers.)
16     Q      For the record, you just --
17     A      You whisper all the time over there.
18     Q      I'm not the person testifying.  For the record,
19            you did speak with Mr. Shivers?
20     A      Mr. Shivers advised me that we were informed
21            that when they were paid by the state, we would
22            be paid.
23     Q      And who informed Mr. Shivers?
24     A      Can I talk to Mr. Shivers?  I'm not being
25            facetious.
```

**CERTIFICATION**

This is to certify that on this 28th day of February, 2005, a copy of the foregoing was hand delivered to:

Gary M. Case
Wolf, Horowitz, Etlinger, & Case, L.L.C.
99 Pratt Street
Hartford, CT 06103

Raymond Garcia
Jane Milas
Frederick Hedberg
Garcia & Milas
44 Trumbull Street
New Haven, CT 06510

Barbara E. Crowley