**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STEWARD MACHINE COMPANY | : | 3:00 CV 00834 (SRU) |
|     PLAINTIFF | : | |
| | : | |
| | : | |
| VS. | : | |
| | | |
| WHITE OAK CORPORATION et al | : | |
|     DEFENDANT | : | APRIL 4, 2005 |

**POST-TRIAL SUBMISSION OF THE DEFENDANTS NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA AND WHITE OAK CORPORATION REGARDING CALCULATION OF STEWARD MACHINE COMPANY'S INVOICES**

The Defendants National Union Fire Insurance Company of Pittsburgh PA and White Oak Corporation (hereinafter collectively "the Defendants") hereby submit their recalculations of Steward Machine Company's invoices, as directed by the Court on March 14, 2005. The Court has asked the parties to recreate Steward's billing record by assigning new adjusted contract values to each of Steward's four bid items and then, following the methodology used by Steward in preparing Steward's Trail Exhibit 53, by recalculating the amounts billed and balances due. The Defendants have undertaken such an analysis and the results and methodology are described herein. A summary of assumptions is attached as Exhibit A. A summary of the balance due Steward, based on the recalculated invoices, is attached as Exhibit B. The recalculations are set forth in schedules attached as Exhibits C1, C2, and C3. These schedules follow the format of Steward's Trial Exhibit 53.

*Summary of Conclusions*

As will be discussed in greater detail below, the Defendants have prepared recalculations based on three scenarios. The methodology and assumptions for each scenario are identical with

1

one exception – the completion percentage achieved by Steward with respect to bid item 610115A, Counterweight Sheaves, Shafts and Bearings (hereinafter "Counterweight Sheaves"). Scenario One assumes that Steward completed and earned 95% on the Counterweight Sheaves. See Exhibit C1. Scenario Two assumes that Steward completed and earned 98% on the Counterweight Sheaves. See Exhibit C2. Scenario Three assumes that Steward completed and earned 100% on the Counterweight Sheaves. See Exhibit C3.

Under each scenario, the Defendants recalculated Steward's invoices based on adjusted contract values. Using these adjusted values, the Defendants calculated a running principal and interest balance, using the format set forth in Steward's Trial Exhibit 53 and assuming the application of payments as set forth in Steward's schedule. With the exception of the invoice amounts, which the Defendants have recalculated based on the adjusted contract values (as described more fully below), and the corresponding dollar values which are based on those adjusted contract values, the Defendants have used the information from Steward's Trial Exhibit 53 (such as payment date, due date, days late) for purposes of this analysis. The Defendants then calculated a principal and interest balance due through August 24, 2000. The Defendants selected this date because, pursuant to the parties' agreement of that date, Steward's entitlement to damages and interest ended as of August 24, 2000. For comparison purposes the Defendants also calculated interest through April 15, 2005.

The results of these recalculations can be summarized as follows:

**1. Scenario One (Counterweight Sheaves at 95% Complete)**

Assuming that Steward achieved 95% completion on the Counterweight Sheaves, the unpaid principal and interest balance, as of August 24, 2000, was $89,415. The unpaid principal

2

and interest balance as of April 15, 2005, would be $130,296. See Exhibits B & C1. The Defendants submit that this scenario is the most accurate and appropriate recalculation of Steward's invoices, because the evidence at trial demonstrates that Steward in fact achieved only 95% completion on the Sheaves as of August 24, 2000. See discussion infra at pp. 10-12. This scenario fully substantiates the Defendants' position that Steward had grossly overbilled the contract and – through August 24, 2000 – was fully compensated based on its level of completion, save for a relatively small amount of interest owed due to some late payments by White Oak.

### 2. Scenario Two (Counterweight Sheaves at 98% Complete)

Assuming that Steward achieved 98% completion on the Counterweight Sheaves, the unpaid principal and interest balance, as of August 24, 2000, was $304,867. The unpaid principal and interest balance as of April 15, 2005, would be $444,252. See Exhibits B & C2. The Defendants offer this as an alternative calculation assuming that the Court finds that Steward achieved greater than 95% completion – but less than 100% completion – on the Sheaves prior to August 24, 2000. The Defendants believe that the evidence does not support a finding of completion of greater than 95%. Assuming that this Court disagrees, there is at least some evidence in the record which could support a finding of 98% completion. See discussion infra at pp. 12-13. Assuming that in fact Steward achieved 98% completion, it still grossly overbilled the contract. Under this scenario, Steward's claim through August 24, 2000 is only $304,867.

### 3. Scenario Three (Counterweight Sheaves at 100% Complete)

Assuming that Steward achieved 100% completion on the Counterweight Sheaves, the unpaid principal and interest balance, as of August 24, 2000, was $448,502. The unpaid

3

WOLF, HOROWITZ, EILINGER, & CASE L.L.C. Counselors At Law
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

principal and interest balance as of April 15, 2005, would be $653,555. See Exhibits B & C3. There is no evidence from which the Court could conclude that Steward had achieved 100% completion on the Sheaves as of August 24, 2000. See discussion infra at p.13. Therefore, this scenario does not present a reliable indicator of Steward's entitlement to recover on its claim. Nonetheless, this calculation is instructive because it demonstrates the magnitude of the overbilling which took place. Even assuming a completion of 100%, Steward still had only earned $448,502 on its principal and interest claim through August 24, 2000, and $653,555 through April15, 2005. This must be compared to Steward's calculation set forth in Trial Exhibit 53. According to these calculations (which are also premised upon a 100% completion rate on the Sheaves) Steward claimed a balance due of in excess of $1,000,000 through August 24, 2000[1], and $1,786,940.67 as of March 15, 2005. In sum, Steward's overbilling on the contract was profound and cannot be attributed only to a dispute regarding the completion of the Sheaves. Steward's overbilling was caused by the submission of invoices on all bid items reflecting a substantially greater value than reflected in their contract with White Oak, and Steward's failure to compensate for the overbilling by issuing the proper credit or adjustment.

*Methodology and Assumptions*

In calculating each scenario, the Defendants employed the following methodology suggested by the Court. First, the Defendants calculated "Adjusted Contract Values" for the entire Purchase Order contract, as well as for each of the four bid items set forth in the Purchase Order. See Exhibit A. These "Adjusted Contract Values" were determined by comparing the values in the Purchase Order with the values in the White Oak/ConnDOT prime contract:

---

[1] Steward's Exhibit 53 fails to calculate interest through August 24, 2000. As of September 21, 1998, the claimed

4

WOLF, HOROWITZ, EILINGER, & CASE L L C *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No 402488

| Bid Item | Purchase Order Values | White Oak/ConnDOT Values |
|---|---|---|
| Operating Machinery | $1,215,000 | $1,700,000 |
| Counterweight Ropes | $1,465,000 | $ 600,000 |
| Counterweight Sheaves | $4,400,000 | $5,000,000 |
| Lock Machinery | $ 253,000 | $ 400,000 |
| *Total* | *$7,333,000* | *$7,700,000* |

The total Purchase Order value of $7,333,000 represents 95.23% of the total White Oak/ConnDOT value of $7,700,000. This percentage was then applied to each of the White Oak/ConnDOT bid item values to determine "Adjusted Contract Values" for each bid item separately, and for the contract in total:

| Bid Item | White Oak/ConnDOT Values | Adjustment | Adjusted Contract Values |
|---|---|---|---|
| Operating Machinery | $1,700,000 | 95.23% | $1,618,974 |
| Counterweight Ropes | $ 600,000 | 95.23% | $ 571,403 |
| Counterweight Sheaves | $5,000,000 | 95.23% | $4,761,688 |
| Lock Machinery | $ 400,000 | 95.23% | $ 380,935 |
| *Total* | *$7,700,000* | | *$7,333,000* |

See Exhibit A.

As the chart below demonstrates, the Total Purchase Order Values and the Total Adjusted Contract Values both equal $7,333,000:

| Bid Item | Purchase Order Values | Adjusted Contract Values |
|---|---|---|
| Operating Machinery | $1,215,000 | $1,618,974 |
| Counterweight Ropes | $1,465,000 | $ 571,403 |
| Counterweight Sheaves | $4,400,000 | $4,761,688 |
| Lock Machinery | $ 253,000 | $ 380,935 |
| *Total* | *$7,333,000* | *$7,333,000* |

amount due was $997,658.38.

5

WOLF, HOROWITZ, ETLINGER, & CASE L.L.C. *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

The Defendants thereafter recalculated Steward's invoices, based on the Adjusted Contract Values set forth above. In recalculating these invoices, the Defendants made several assumptions. Virtually all of these assumptions (with the exception of the percentage completion for the Sheaves) are either undisputed, or cannot be disputed, by Steward:

**1. Assumptions Regarding Invoices for Operating Machinery**

The Defendants assumed that all of Steward's invoices for the Operating Machinery reflected an appropriate and correct percentage complete, and recalculated each invoice based on the percentage complete reflected in the original invoices. For example, Steward's first invoice for the Operating Machinery was invoice 8775, dated May 15, 1996, in the amount of $407,564.42 (not including retention). This invoice reflected 34% completion of the original Purchase Order contract amount. To recalculate this, the Defendants applied the 34% completion rate to the Adjusted Contract Value of $1,618,974. As a result, this invoice was recalculated from $407,564.42 (Steward's original invoice amount) to $543,075. See Exhibits C1, C2 & C3. In like manner, all subsequent invoices were recalculated based on the percentage complete reflected in Steward's actual invoice.

Notably, this recalculation produced an <u>increase</u> in the invoice amount of $135,510.58. The increase in the invoice amount has an element of unfairness to White Oak. The increased invoice amount generates "phantom interest" accruing on White Oak's account. The accrual of this "phantom interest" is unfair to White Oak, since White Oak was never served with an invoice in the amount reflected in the recalculated invoice, and should not be penalized for

failing to pay interest on an invoice amount which it never in fact received.[2]  However, it must be noted that subsequent invoices for the Operating Machinery were <u>reduced</u> as a result of the recalculation. For example, Invoice 5343-2[3] was in the original amount of $372,727.87, and as a result of the recalculation this invoice was decreased to $354,963. Therefore, to some extent the "phantom interest" generated by the increase in the early invoices is offset by the reduction in the later invoices.

The Defendants further assumed that Steward had achieved 68% completion for this item through August 24, 2000, and the sum of the recalculated invoices could not exceed 68% of the Adjusted Contract Value, or $1,100,902 (68% complete x $1,618,974 = $1,100,902). This assumption is irrefutable. Through August 24, 2000, Steward had invoiced White Oak for 68% of this item. Steward's last invoice to White Oak for this item was invoice 5343-3, dated April 16, 1997. <u>See</u> Defendants' Trial Exhibit 457. This invoice, prepared by Steward, states that Steward had achieved 68% completion for this item. Steward submitted no further invoices to White Oak for this item. Steward offered no evidence at trial that it had achieved a greater percentage completion on this item.

2. **Assumptions Regarding Invoices for Lock Machinery**

The Defendants assumed that all of Steward's invoices for the Lock Machinery reflected an appropriate and correct percentage complete, and recalculated each invoice based on the percentage complete reflected in the original invoices. For example, Steward's first invoice for the Lock Machinery was invoice 5346-1[4], dated November 15, 1996, in the amount of

---

[2] This analysis also applies to the invoices for the Sheaves, since the result of the recalculation is that all of Steward's Sheave invoices up to and including Invoice 8837 (dated June 17, 1996) are increased.
[3] This invoice is erroneously described in Steward's Exhibit 53 as "Invoice 5346."
[4] This invoice is erroneously described in Steward's Exhibit 53 as "Invoice 5346-2."

7

$40,901.25 (not including retention). This invoice reflected 10% completion of the ConnDOT/ White Oak contract amount. To recalculate this, the Defendants applied the 10% completion rate to the Adjusted Contract Value of $380,935. As a result, this invoice was recalculated from $40,901.25 (Steward's original invoice amount) to $38,952. See Exhibits C1, C2 & C3. In like manner, all subsequent invoices were recalculated based on the percentage complete reflected in Steward's actual invoice.

The Defendants further assumed that Steward had achieved 85% completion for this item through August 24, 2000, and the sum of the recalculated invoices could not exceed 85% of the Adjusted Contract Value, or $323,795 (85% complete x $380,935 = $323,795). This assumption is irrefutable. Through August 24, 2000, Steward had invoiced White Oak for 85% of this item. Steward's last invoice to White Oak for this item was invoice 5346-3, dated June 8, 1998. See Defendants' Trial Exhibit 532. This invoice, prepared by Steward, states that Steward had achieved 85% completion for this item. Steward submitted no further invoices to White Oak for this item. Steward offered no evidence at trial that it had achieved a greater percentage completion on this item.

### 3. Assumptions Regarding Invoices for Counterweight Ropes

The Defendants assumed that all of Steward's invoices for the Counterweight Ropes reflected an appropriate and correct percentage complete, and recalculated each invoice based on the percentage complete reflected in the original invoices. For example, Steward's first invoice for the Counterweight Ropes was invoice 8256, dated August 22, 1995, in the amount of $133,100 (not including retention). This invoice reflected 9% completion of the Purchase Order contract amount. To recalculate this, the Defendants applied the 9% completion rate to the

Adjusted Contract Value of $ 571,403. As a result, this invoice was recalculated from $133,100 (Steward's original invoice amount) to $51,914. See Exhibits C1, C2 & C3. In like manner, all subsequent invoices were recalculated based on the percentage complete reflected in Steward's actual invoice. The "Credit Memo" which Steward had applied to this item was eliminated from consideration.

The Defendants further assumed that Steward had achieved 65% completion for this item, through August 24, 2000. This evidence is irrefutable. Steward had invoiced White Oak for only 65% of this item, prior to issuance of the "Credit Memo" on December 31, 1996.[5] After issuing the Credit Memo, Steward performed no further work on this item. Steward never supplied the following required items: 128 Main Counter Weight Ropes, 256 Main Counter Weight Rope Sockets and Pins; 8 Auxiliary Counter Weight Ropes; and 16 Auxiliary Counterweigh Rope Sockets. Each of these items was removed from Steward's contract by virtue of the August 24, 2000 Agreement, and was provided by others at National Union's expense. See Defendants' Trial Exhibit 565.

Steward's Invoice 8256, dated August 22, 1995, and admitted as Defendants' Trial Exhibit 335, sets forth the following values for these unfurnished items:

| | |
|---|---|
| 128 Main CW Ropes | $380,500 |
| 256 Main CW Rope Sockets | $ 67,200 |
| 8 Auxiliary CW Ropes | $ 11,000 |
| 16 Auxiliary CW Rope Sockets | $ 2,900 |
| **Total** | **$461,600** |

See Defendants' Trial Exhibit 335. By Steward's own schedule of values, these incomplete and unfinished items accounted for 31% of the original Purchase Order value ($1,465,000 x 31% =

9

WOLF, HOROWITZ, EILINGER, & CASE L.L.C. *Counselors At Law*
Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No. 402488

$461,600). This does not take into account the other components of this item which were unfinished as of August 24, 2000.

### 4. Assumptions Regarding Invoices for Counterweight Sheaves

As noted previously, the Defendants did not assume that all of Steward's original invoices for the Sheaves reflected an accurate or correct percentage complete. Such an assumption would be unwarranted and unsupported by the evidence. While Steward had invoiced White Oak based on a completion rate of 100% for this item, Steward failed at trial to sustain its burden of proving that it had in fact completed 100% of this item as of August 24, 2000. To the contrary, the evidence plainly established that Steward had, at most, achieved only 95% completion as of that date:

- ConnDOT's Audit dated February 5, 1999 stated that the Sheaves were only 95% complete (See ConnDOT Audit, Defendants' Trial Exhibit 611). Steward offered no evidence that any additional work was performed on the Sheaves from the date of this Audit through August 24, 2000;

- Steward never painted the Sheaves, a requirement for completion of this item (See Defendants' Trial Exhibit 611; Defendants' Trial Exhibit 563 [Pennoni Associates Report dated July 14, 2000]; Testimony of Robert Pellerin and George Rettig; Photographs of Sheaves unpainted as of July, 2000 [Defendants' Trial Exhibit 673]). This work was eventually taken out of Steward's contract and done by others at National Union's expense. See Testimony of George Rettig; Testimony of Robert Pellerin; Defendant's Trial Exhibit 565 [August 24, 2000 Agreement]); ConnDOT

---

[5] Steward had invoiced White Oak for $947,210 on this item, prior to the issuance of the Credit Memo. This

determined that the painting of the Sheaves constituted 5% of the total contract work for this item; See Defendant's Trial Exhibit 611.

- Steward had not drilled all bolt holes on the Sheaves as of August 24, 2000, a prerequisite for installing the ring gears on the Sheaves, and a requirement for completion of this item (See Testimony of Robert Pellerin; Photographs of Sheaves showing undrilled holes as of July, 2000 [Defendant's Trial Exhibit 673]);

- Steward had not assembled all of the ring gears on to the Sheaves as of August 24, 2000, a requirement for completion of this item; (See Testimony of Robert Pellerin; Photographs of Sheaves showing undrilled holes as of July, 2000 [Defendants' Trial Exhibit 673]);

- Steward had not assembled the shafts into the Sheaves, a requirement for completion of this item; (See Testimony of Robert Pellerin; Photographs of Sheaves showing them unassembled as of July, 2000 [Defendants' Trial Exhibit 673]);

- Steward demanded an additional $1,125,429 from National Union to complete the work remaining on the contract as of August 24, 2000; See August 24, 2000 Agreement, Defendants' Trial Exhibit 565). If Steward had in fact achieved 100% completion on the Sheaves, it would have been in a position to complete the contract for substantially less than it demanded from National Union.

Based on the above, and the other evidence offered at trial, the Defendants' Scenario One assumes that Steward had completed – and was entitled to invoice White Oak – for 95% of the Adjusted Contract Value for work on the Sheaves. The Adjusted Contract Value for the Sheaves

---

reflected 65% of the Purchase Order value of $1,465,000.

11

is $4,761,688. Therefore, under Scenario One, the maximum amount which Steward should have invoiced White Oak for the Sheaves was $4,523,604 (95% x $4,761,688 = $4,523,604). Any amounts invoiced for the Sheaves in excess of $4,523,604 exceeded the maximum allowed, and were adjusted by either decreasing the invoices or reducing them to 0. This required that the following invoices be adjusted:

| Invoice Number | Invoice Date | Original Amount | Adjusted Amount |
|---|---|---|---|
| 5345-1 | 8/16/96 | $471,190 | $163,618 |
| 5345-2 | 9/18/96 | $250,000 | $0 |
| 5345-3 | 11/14/96 | $250,000 | $0 |

See Scenario One Summary, Exhibit C1.

The Defendants' Scenario Two presents similar calculations, with the assumption that Steward had achieved 98% completion on the Sheaves as of August 24, 2000. While the Defendants contend that Steward did not achieve this level of completion, there is at last some evidence which could support such a finding. Steward offered at trial a three-page inspection report, dated October 12, 1997, with the heading "Sheaves and Accessories". See Defendants' Trial Exhibit 499. This report states that the "approximate percent of work finished" was "98". This report has limited relevance for the following reasons. First, the report does not state in any detail the condition of the items, nor does it describe the work remaining. For example, the report makes no mention of the fact that the Sheaves had not been completely drilled, assembled or painted, all requirements of the contract. Second, this report has limited value when compared to ConnDOT's Audit of February 5, 1999. The ConnDOT Audit is the better evidence because (1) it was prepared by the owner of the project, the entity which was the final authority on the amounts earned on the Purchase Order; (2) it is a more comprehensive and thorough report; and

12

(3) Steward offered no evidence substantiating the conclusion that it had achieved 98% completion on the Sheaves.[6]

Notwithstanding the above, assuming arguendo that Steward achieved 98% completion, Scenario Two required the following adjustments to the invoices:

| Invoice Number | Invoice Date | Original Amount | Adjusted Amount |
|---|---|---|---|
| 5345-1 | 8/16/96 | $471,190 | $306,469 |
| 5345-2 | 9/18/96 | $250,000 | $0 |
| 5345-3 | 11/14/96 | $250,000 | $0 |

See Scenario Two Summary, Exhibit C2.

The Defendants' Scenario Three assumes that Steward achieved 100% completion of the Sheaves as of August 24, 2000. There is no evidence from which the Court could conclude that Steward had fully completed this item. It is undisputed that Steward had not completed some of the most basic requirements for completing the Sheaves – drilling holes, attaching the gears, painting them, and assembling them into the shafts. While Mr. Debardeleben testified that the Sheaves were "99.99%" complete, this fanciful assertion belies common sense and is contradicted by the undisputed documentary and photographic evidence.

Notwithstanding the above, a finding of 100% completion for the Sheaves still requires that Steward invoices be adjusted and reduced as follows:

| Invoice Number | Invoice Date | Original Amount | Adjusted Amount |
|---|---|---|---|
| 5345-1 | 8/16/96 | $471,190 | $401,703 |
| 5345-2 | 9/18/96 | $250,000 | $0 |
| 5345-3 | 11/14/96 | $250,000 | $0 |

See Scenario Three Summary, Exhibit C3.

---

[6] Most certainly, the October 12, 1997 Inspection Report should not be considered as reliable evidence that Steward had achieved 98% completion on the entire contract. The Report does not purport to be an inspection of all work required by the contract. For example, the Report makes no reference to the Counterweight Ropes and Sockets, a significant component of Steward's scope of work under the Purchase Order.

13

*Conclusion*

The recalculation ordered by the Court merely confirms the contention made by the Defendants since the inception of this case. Steward's contract balance claim is a product of inflated invoices, overbillings, and a failure to properly adjust its invoices to compensate for the overbilling. By invoicing White Oak based on the higher values set forth in the White Oak/ConnDOT contract, and then failing to properly credit the account, Steward laid the groundwork for the overbilling reflected in its contract balance claim.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

BY _____
Jason W. Glasgow
Wolf, Horowitz, Etlinger & Case, LLC
99 Pratt Street – Suite 401
Hartford, CT 06103
(860) 724-6667
ct24888

WHITE OAK CORPORATION

BY _____
Jane I. Milas
Garcia & Milas, P.C.
44 Trumbull Street
New Haven, CT 06510
(203) 773-3824
ct01271

## **CERTIFICATION**

This is to certify that a true copy of the foregoing document was mailed via first class postage, prepaid, this 4th day of April , 2005 to all counsel of record.

William Egan
Barbara Crowley
Egan & Crowley
234 Church Street
New Haven, CT  06510

Jane Milas
Garcia & Milas
44 Trumbull Street
New Haven, CT  06510

BY _____
Jason W  Glasgow

57042

WOLF, HOROWITZ, EILINGER, & CASE L L C *Counselors At Law*
99 Pratt Street, Hartford, Connecticut 06103 *(860) 724-6667 * Fax (860) 293-1979 * Juris No 402488