# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEWARD MACHINE CO., INC.,
    Plaintiff,

v.

WHITE OAK CORP. and NATIONAL
UNION FIRE INSURANCE CO. OF
PITTSBURGH, PA,
    Defendants.

CIVIL ACTION NO.
3:00cv834 (SRU)

## <u>MEMORANDUM OF DECISION</u>

Steward Machine Co., Inc. ("Steward") has sued White Oak Corp. ("White Oak") and

White Oak's surety, National Union Fire Insurance Co. of Pittsburgh, PA ("National Union").

The action arises out of the construction of the Tomlinson Bridge in New Haven, Connecticut.

In 1994, the Connecticut Department of Transportation ("ConnDOT" or "the State") engaged

White Oak to be the project's general contractor. White Oak then procured a payment bond, with

National Union as surety, and sub-contracted with Steward for the latter to furnish certain

machinery for the project.

Steward filed suit against the defendants seeking damages for White Oak's failure to pay

Steward in full on a timely basis, White Oak's failure to accept delivery of the machinery, and

the lengthy, ensuing storage of the Tomlinson Bridge machinery at Steward's plants.

The parties tried the case to the court over six days. My findings of fact and conclusions

of law are set forth below. *See* Fed. R. Civ. P. 52.

## I.     Background

The parties presented conflicting testimony regarding the effect of their contracts. My

findings of fact are largely based on the written purchase order contract, documents relating to

the contracts at issue, the parties' written correspondence, and the testimony of Steward's President Whitney DeBardeleben, whom I find credible.

A.    Parties' Involvement with the Tomlinson Bridge Project

Steward is a family-owned, specialized job shop located in Birmingham, Alabama. Among other large-scale items, Steward manufactures mechanical equipment, including sheaves and counterweight ropes, for moveable bridges.

During the design phase of the Tomlinson Bridge project, the engineering firm Hardesty & Hanover, the project's design engineers, contacted Steward to inquire about the feasibility of the bridge design plans. As a result of that contact, Steward became interested in the project. Once the engineers submitted their design to the State, ConnDOT solicited bids from general contractors. Steward submitted its bids to the general contractors that were bidding on the project, including White Oak. ConnDOT eventually awarded White Oak the contract for State Project 92-435, the construction of the Tomlinson Bridge in New Haven, Connecticut.

As required by Conn. Gen. Stat. § 49-41, White Oak secured a payment bond to guarantee the public work project. On June 6, 1994, National Union issued that payment bond, guaranteeing the project in the amount of $87,868,378.10. Pl. Ex. 1.

B.    Purchase Order Contract

White Oak subcontracted with Steward for the latter to furnish large-scale equipment for the Tomlinson Bridge. On August 8, 1994, Steward and White Oak executed a written purchase order contract setting forth the details of the parties' subcontract. Pl. Ex. 3.

1.    *ConnDOT Approval*

The introductory paragraph of the purchase order specifies that the bid items "shall be in accordance with the plans and specifications prepared by" ConnDOT, the project owner.  Pl. Ex. 3 at 1.

2.    *Bid Items and Prices*

The purchase order contract included four items and a delivery allowance.  *Id.*  The four items were identified by ConnDOT bid item numbers, corresponding to the items as listed on White Oak's prime contract with the State.  With their corresponding values, the items were:

| | |
|---|---|
| Operating machinery | $1,215,000 |
| Main and auxiliary counterweight ropes and accessories | 1,465,000 |
| Counterweight sheaves, shafts and bearings | 4,400,000 |
| Lock machinery | 253,000 |
| Total for bid items | $7,333,000 |

3.    *Delivery*

In addition to the four bid items, the purchase order included a delivery allowance in the amount of $220,000.  Thus, the value of the purchase order contract totaled $7,553,000.

The purchase order contract included the following provision regarding delivery:

> Delivery will commence within 12 months from approval of drawings and be complete within 18 months from approval of drawings.  Seller shall make all deliveries in accordance with the Buyer's schedule.

Pl. Ex. 3 at 6.

White Oak and National Union have argued, in essence, that the second sentence of the delivery provision ("Seller shall make all deliveries in accordance with the Buyer's schedule.") overrides the first sentence. Accordingly, the defendants argue that Steward (the Seller) agreed to abide by White Oak's (the Buyer's) delivery schedule even if that schedule included a delay of several years after the approval of drawings. In other words, they argue that Steward – not White Oak – bore any risk of delay.

Based on the language of the purchase order's delivery provision and the testimony of DeBardeleben, however, I find that the parties did not agree to an indefinite delivery date or one that could extend several years beyond the twelve- to eighteen-month window set forth in the contract's delivery provision. The parties' contract provided that Steward would make deliveries in accordance with White Oak's schedule, with respect to each bid item, but that schedule was limited to the six-month period commencing twelve months after the approval of Steward's drawings.

The approval of drawings for each bid item spanned several years. The last approval of drawings for the lock machinery was May 15, 1998; the last approval of drawings for the sheaves was January 29, 1996; the last approval of drawings for the counterweight ropes and accessories was March 19, 1996; and the last approval of drawings for the operating machinery was January 6, 2000. Def. Ex. 785.

White Oak had until eighteen months after each of those dates to request and accept delivery of the respective bid item. Thus, under the purchase order contract, delivery of the lock machinery was to occur by November 16, 1999; delivery of the sheaves was to occur by July 30, 1997; delivery of the counterweight ropes was to occur by September 20, 1997; and delivery of

the operating machinery was to occur by July 7, 2001.

    4.    *Terms and Conditions*

    a.    Terms of Payment and Effect of Payment from ConnDOT

The purchase order contract included the following terms of payment:

> Buyer [White Oak] will cooperate with Seller [Steward] to submit requests
> for payment on a timely basis to Owner [ConnDOT] for all items of work
> incorporated herein or a portion thereof. Invoices will be paid within 10 days
> of receipt of payment by Buyer from Owner for said items of work or 60 days
> from invoice date, which ever [*sic*] is sooner. Any portion of the purchase
> price Buyer may be entitled to retain shall become due and payable upon
> acceptance of all goods purchased under this agreement or within 180 days
> after final shipment, whichever event occurs first in time.

Pl. Ex. 3 at 7, ¶ 3.

At trial, there was conflicting testimony regarding White Oak's responsibility for

payment under the contract. Defense witnesses testified that White Oak was merely a conduit

that forwarded invoices from Steward to ConnDOT and paid Steward only what it received from

ConnDOT as payment for Steward's work. They testified that White Oak was not responsible

for any amounts beyond what ConnDOT paid.

Paul Mayotte, former Chief Financial Officer of White Oak, testified that the sixty-day

term, described in the purchase order, was "academic," and that he understood that if ConnDOT

did not pay for Steward's work, White Oak was not required to pay Steward.

Robert Hackling, a White Oak project manager, testified that White Oak would pass

payment to Steward from ConnDOT, but that the State would not pay Steward for work unless

the equipment was fully fabricated. He testified that White Oak complied with the purchase

order because it made payment in full for all the money received from ConnDOT for Steward

equipment.

The defendants also offered many letters from White Oak to ConnDOT, requesting payments for Steward's work, as well as responses from ConnDOT, in order to show White Oak's compliance with the contract.

DeBardeleben testified, however, that White Oak was responsible for payment within ten days from receipt of payment by ConnDOT or sixty days from the invoice date, whichever occurred first. DeBardeleben disputed the claim that White Oak was not responsible for invoiced amounts not covered by the State. He testified that payment by ConnDOT was not a prerequisite to White Oak's obligation even though Steward understood that White Oak would invoice ConnDOT for Steward's work and Steward cooperated with White Oak's billing.

I credit the testimony of DeBardeleben, which is consistent with the language of the contractual provision regarding terms of payment. I find that White Oak agreed to pay properly invoiced amounts within sixty days after the invoicing or within ten days of receiving payment by ConnDOT, whichever occurred first. Action or inaction on the part of ConnDOT did not affect the later, sixty-day deadline.

Finally, I find that White Oak did, in fact, invoice ConnDOT for Steward's work, but that some of the funds received from the State for the subcontractor's work were not passed on to Steward within ten days.

b.    "Work in Progress" Payments and Percentages Complete

During contract negotiations, Steward provided White Oak with a quotation that included provisions concerning "progress payments." Pl. Ex. 56. The final purchase order did not include a specific provision regarding progress payments. It did, however, include the following terms,

which imply that the parties agreed to interim payments:

> Terms of payment – Buyer will cooperate with Seller to submit *requests* for payment on a timely basis to Owner for all items of work incorporated herein or *a portion thereof. Invoices* will be paid . . . .

Pl. Ex. 3 at 7 ¶ 3 (emphasis added).

> Performance Of Work – No payment, *final or otherwise*, made under or in connection with this contract shall be conclusive evidence of the satisfactory performance under this contract either in whole or *in part* . . . .

*Id.* at 8 ¶ 10 (emphasis added).

Steward invoiced White Oak before completion and delivery of the items, and White Oak made partial, or progress, payments. Certificates of title included with each invoice transferred title of the specified percentage complete to White Oak. *E.g.*, Pl. Ex. 51 at 3, ¶¶ 1-2.

The invoices and payments were based on the individual bid item's "percentage complete," that is, the estimated degree of completion of the fabrication, stated in percentage terms. A ConnDOT representative was present at Steward's plants throughout the fabrication and machining of the Tomlinson Bridge equipment. That inspector confirmed and recorded the bid items' percentages complete. The percentages complete on the final invoices of three of the bid items were: operating machinery, 68% complete, Def. Ex. 457; sheaves, 100% complete, Def. Ex. 420; and lock machinery, 85% complete, Pl. Ex. 51.[1]

When Steward and White Oak's disputes regarding delay and non-payment had reached an impasse, ConnDOT contracted with Cianbro Corp. to complete the fabrication of the machinery held at Steward's plants. After May 2000, Robert Pellerin, then a project superintendent at Cianbro, visited Steward's plants on behalf of ConnDOT. The purpose of

---

[1] The final invoice for the counterweight ropes did not specify a percentage complete.

Pellerin's visit was to determine the amount of work necessary for Cianbro to complete the fabrication of the equipment.  Pellerin took photos of the equipment.  Def. Ex. 673.  He also noted his determinations of the percentages complete for purposes of calculating the remaining work that Cianbro would perform.  Def. Ex. 620 (Pellerin's notations in dark pen).

Pellerin revised the percentages complete as follows:

| | |
|---|---|
| sheaves | 70% |
| primary speed reducers | 90% |
| secondary speed reducers | 90% |
| main pinions | 95% |
| ring gears | 85% |
| pinion bearings | 100% |
| couplings | 100% |

Pellerin did not note any percentages complete with respect to the other items or components.

Pellerin testified at trial regarding the completion percentages.  When asked if there was any reason for Cianbro to disagree with the percentages complete previously determined by the State, Pellerin testified that his notations represented what he thought it would take Cianbro to complete the project.  He also stated that manufacturers receive higher completion percentages because of the high cost of raw materials.

In other words, Pellerin did not testify that the percentages complete that had been calculated by the ConnDOT representative – and which were the basis of Steward's invoices – were inaccurate.  Rather, he testified that manufacturers, such as Steward, are awarded higher completion percentages, thereby permitting the earlier release of payment to them, because of the high cost of raw materials that they must purchase up front for the project.  Furthermore, the

purpose of Pellerin's calculations was not to determine the cost to Steward or the amount of fabrication that Steward had completed; rather, his numbers reflected an estimation of the cost for Cianbro to complete the project. Cianbro's incentive to over-estimate the work remaining on the equipment in order to maximize its revenue suggests that Pellerin's later determinations are less accurate.

National Union also relies on a ConnDOT audit, dated February 5, 1999, in which a state representative evaluated the completion percentages of the bid items, to argue that Steward inflated the completion percentages when billing White Oak. Def. Ex. 620 (typed percentages). That audit was conducted after the parties' dispute was full blown.

I credit the percentages complete originally determined by the state inspector. Steward's invoices were not based on inflated completion percentages, and the percentages invoiced were authorized by the project owner's representative on site at Steward's plants.

c.     Retainage

Although the details were absent from the purchase order, the terms of payment referred to "[a]ny portion of the purchase price [White Oak] may be entitled to retain," and all parties agreed that White Oak was entitled to retain 2.5% of invoiced amounts. Pl. Ex. 3 at 7, ¶ 3. That retainage became payable to Steward "upon acceptance of all goods purchased under this agreement or within 180 days after final shipment whichever event occurs first in time." *Id.*

d.     Service Charge

The purchase order included the following provision in case of delinquent payment:

> In the event Buyer fails to make payment in accordance with the terms of this agreement, the account shall be deemed to be delinquent and a service charge of one percent (1%) per month will be added to the unpaid balance. Where a

-9-

> service charge of one percent per month exceeds the maximum allowed by
> law, the service charge shall be the maximum allowed.

*Id.* at 7, ¶ 6.

Witnesses provided varying testimony regarding the meaning of "one percent (1%) per month." Mayotte, White Oak's former CFO, testified that he understood the one-percent charge to be a "one-time charge," not running interest. Witnesses from Steward testified that the purchase order provided for one-percent interest on unpaid balances.

Steward's invoices reflected interest compounded monthly. In addition, in a letter dated September 16, 1997, Mayotte wrote to Steward's Jerry Shivers:

> To the extent that White Oak has failed to pay these amounts in accordance
> with Par. 3 of the [purchase order] agreement, we have an obligation for
> service *charges* for the unpaid amount(s) at 1% per month as per Par. 6.

Def. Ex. 494A (emphasis added). The schedule attached to that letter included a column that itemized the amount of "interest" due. *Id.*

Based on the language of the purchase order, the testimony of Steward witnesses, and the language of Mayotte's letter, I find that, in case of partial payment or non-payment, the purchase order contract provided for one-percent interest (dubbed "a service charge"), compounded monthly and added to the unpaid balance.

C.    <u>Prime Contract</u>

White Oak's contract with ConnDOT – the prime contract – included, among other items, the four bid items listed in the Steward purchase order contract. The prices set forth in the prime contract, however, did not correspond to the prices in the purchase order. In the prime contract, the items were priced:

| | |
|---|---|
| Operating machinery | $1,700,000 |
| Counterweight ropes | $600,000 |
| Sheaves | $5,000,000 |
| Lock machinery | $400,000 |

Def. Ex. 494 (attached schedule).

The sheaves, operating machinery, and lock machinery were priced higher in the prime contract; the counterweight ropes were priced higher in the purchase order contract. The differences between the two contracts' schedules of values were as follows:

| | |
|---|---|
| Operating machinery | $485,000 |
| Counterweight ropes | ($865,000) |
| Sheaves | $600,000 |
| Lock machinery | $147,000 |

D.    <u>Invoices and Percentages Complete</u>

Steward's first invoice, dated November 30, 1994, listed the sheaves as 18% complete. Pl. Ex. 52. Accordingly, Steward billed White Oak $792,000, *i.e.*, 18% of the sheaves' $4.4 million purchase order value. *Id.* The invoices from January 18, 1995 through June 17, 1996 did not specify the completion percentages.

Invoices issued from August 18, 1996, through June 8, 1998, did specify the items' percentages complete based on the inspectors' reports. Those invoices followed a "reallocation" of bid item values, discussed below.

The final invoices for the lock machinery, sheaves, and operating machinery used the reallocation and reflected the following percentages complete: operating machinery, 68%

complete, Def. Ex. 457; sheaves, 100% complete, Def. Ex. 420; and lock machinery, 85%

complete, Pl. Ex. 51.[2]

Plaintiff's Exhibit 53, attached to this decision as Appendix A, summarized Steward's

invoices, amounts due, payments, and accumulated interest. That summary did not list the

completion percentages.[3]

E.    Certificates of Title

DeBardeleben testified that each invoice included a certificate of title, and that those

certificates transferred title of the specified percentage complete to the State. The certificate of

title enclosed with the lock machinery invoice dated June 8, 1998, however, transfers to transfer

title to White Oak:

> The Vendor has executed this document for the purpose of acknowledging
> that the Vendor has made an outright sale and transfer of title of the above
> described materials lawfully owned by the Vendor to the Contractor . . . .

Pl. Ex. 51 at 3, ¶ 1.

> The Contractor certifies and represents that he is the lawful holder of the
> absolute legal title to the above described materials and has the full legal
> right, power and authority to sell and transfer title to the same . . . .

*Id.* at ¶ 2.

Defense exhibits also show that the certificates of title transferred title from Steward to

White Oak. *E.g.*, Def. Exs. 281, 292 & 320.

---

[2] The last invoice for the counterweight ropes was issued June 17, 1996, prior to the reallocation, and did not specify a percentage complete.

[3] In connection with a post-trial submission, requested by the court, Steward submitted a revised Exhibit 53. In that revised submission, Steward made corrections to the exhibit. All citations to Exhibit 53 refer to the revised exhibit.

F.    April 1997 Meeting

Prior to April 11, 1997, Steward learned that ConnDOT had paid to White Oak

$675,470.91 "for materials furnished by Steward."  Pl. Ex. 34.  White Oak had not, in turn, paid

Steward the sum due Steward under the purchase order due to a "cash flow problem."  Later that

month, Whitney DeBardeleben, Charles DeBardeleben, and Shivers met in New Haven with

representatives of White Oak, including White Oak's former President, Jack Morrissey, to

discuss White Oak's payments to Steward.

At that meeting, Morrissey agreed that White Oak would pay $25,000 per week toward

past due interest in order to bring the account up to date.

G.    Reallocation

As discussed above, Steward understood that White Oak would receive payment from

ConnDOT for work performed by Steward.  The language of the contract reflects the parties'

anticipation that White Oak would receive payment for Steward machinery from ConnDOT and

forward that payment to Steward: "Buyer will cooperate with Seller to submit requests for

payment on a timely basis to Owner for all items of work incorporated herein or a portion

thereof."  Pl. Ex. 3 at 7, ¶ 3.

During the project, difficulties arose with respect to payment from ConnDOT.  White

Oak forwarded Steward's invoices to ConnDOT for payment, but ConnDOT issued payments

based on the prices listed in the prime contract, not the prices from White Oak and Steward's

purchase order.

White Oak did not have sufficient funds to pay Steward's invoices in full.  In response,

the parties sought to match amounts payable to Steward with amounts receivable from ConnDOT

in an effort to permit White Oak to collect more money from the State and to facilitate White

Oak's payments to Steward. Without amending the purchase order, the parties adjusted the

itemized prices in the purchase order to match the prices listed in White Oak and ConnDOT's

prime contract. For example, a post-reallocation invoice billed for work on the sheaves based on

a total price of $5,000,000 – the prime contract's price for the sheaves – even though the

purchase order priced the sheaves at only $4,400,000. Def. Ex. 420. The so-called reallocation

was memorialized in a letter from Steward to White Oak, dated January 8, 1998. Pl. Ex. 41.

The reallocation did not affect the purchase order contract's total price, which remained

$7,333,000 (excluding the $220,000 the delivery allowance). A discrepancy arose, however,

because the total of the adjusted purchase order prices for the bid items was $7,700,000. Pl. Ex.

41. The plaintiff referred to this discrepancy as an "overage." In other words, the parties'

reallocation failed to account for the overall difference between the total value of the items in the

purchase order and the total value in the prime contract, a difference of $367,000.

Steward issued a credit (denoted "CM") in an effort to compensate for the difference

between the prime contract and purchase order values. Pl. Ex. 52; Def. Ex. 780. The credit was

in the amount of $338,529.74 and was associated with job number 5344, the counterweight

ropes. There were no further invoices submitted with respect to the counterweight ropes

following the credit.

H.    Alleged Overbilling

There was some testimony regarding alleged overbilling by Steward. Mayotte testified

that Steward was only entitled to receive payment in the amount that ConnDOT would pay to

White Oak, and he classified invoices in amounts greater than what ConnDOT paid as

overbilling. The witness acknowledged, however, that Steward's billing was not fraudulent; it was merely higher than what ConnDOT paid to White Oak. The defendants also introduced as evidence a letter dated December 11, 1997, in which Morrissey disputed the amount claimed by Steward and accused Steward of overbilling in the amount of $580,243.30, charging interest on the overbilling, and applying "material" payments to interest. Def. Ex. 509.

The so-called overbilling was a result of the parties' effort to collect more money from the State to pay Steward's invoices. Steward did not bill for work that was not completed, although it did charge amounts that were greater than the purchase order values associated with the bid items. As a result, Steward also charged interest on unpaid balances that were based on invoice amounts in excess of the prices in the parties' purchase order contract.

I.    Manufacture and Delay

Steward began manufacturing the Tomlinson Bridge equipment in 1994. By September 1996, the sheaves – the first items required at the job site and those that required the most work by Steward – were principally ready for shipment to the job site. White Oak, however, was not prepared to receive the sheaves. Therefore, Shivers, the White Oak project manager charged with overseeing the project, and Morrissey, White Oak's President, discussed with DeBardeleben the possibility of storing the machinery at Steward. When it became "inevitable" that Steward would store the machinery, Morrissey told DeBardeleben that Steward would be paid for storage costs.

J.     Storage

1.     *Ancillary Storage Agreement*

In October and November of 1996, Shivers wrote several letters to White Oak's George Hird addressing the options for storage and the associated costs.

In a letter dated September 12, 1996, Shivers wrote Hird to request any "special storage requirements" from the State and indicated that the stored machinery, including the eight counterweight sheaves, would be moved from inside to outside Steward's shop. Pl. Ex. 14. In a letter dated October 30, 1996, Hird wrote Shivers, requesting Steward's "recommendations for long term storage (one year approx.)." Def. Ex. 415. In a letter dated October 31, 1996, and in response to a letter from ConnDOT, Shivers listed three options for maintaining the counterweight sheaves while they were stored outside: (1) to do nothing and sandblast surfaces prior to painting; (2) to coat the unmachined surfaces with petroleum-based oil and to monitor them throughout the duration of the storage; or (3) to sandblast and primer coat the sheaves, requiring re-painting of the sheaves after installation. Pl. Ex. 16.

ConnDOT's Paul H. Breen wrote to White Oak, indicated that the State preferred the second option, and noted that costs for the temporary storage and protection were "assumed by the Contractor until such time that it can be clearly shown that the associated delays resulted from the action or inaction" of ConnDOT. Pl. Ex. 18. In a memorandum dated November 18, 1996, Hird wrote to Shivers to instruct him to pursue the storage with petroleum-based coating protection (*i.e.*, "option no. 2") and "acknowledge[d] that the sheaves must be stored at [Steward] beyond the original delivery date and that there are certain additional costs associated with the storage which could not have been anticipated by Steward Machine." Pl. Ex. 20.

In a letter dated November 15, 1996, Shivers described the machinery being stored, the square footage required for storage (6,577 square feet), and quoted a rate of $8/square foot for indoor storage.  Pl. Ex. 19.  In a letter dated December 12, 1996, a Steward representative[4] listed parts associated with the counterweight ropes and accessories and the square footage required for their storage (302 square feet), as well as rates of $8/square foot for indoor storage and $5/square foot for outdoor storage.  Pl. Ex. 21.  The second page to that exhibit (titled "Tomlinson Bridge Storage Charges Recap"), which appears to have been included as an attachment to the letter, listed the square footage required for the lock machinery (192 square feet).  *Id.*  White Oak never negotiated or protested the quoted prices despite receiving Steward's storage invoices from September 1996 through mid-2000.  White Oak forwarded the storage invoices to ConnDOT for payment.

Steward charged White Oak interest on unpaid storage charges at one-percent, compounded monthly, based on the interest rate of the purchase order contract.  White Oak never paid any of Steward's storage invoices or otherwise compensated Steward for any storage costs.

2. *Storage at Steward*

Steward based the storage charges on over 7,900 square feet, the "footprint" of the Tomlinson Bridge machinery, which equaled approximately four to five percent of the floor space at Steward's facilities.

The sheaves were by far the largest items that Steward stored for White Oak.  At different points during the storage period, the sheaves were moved outside, stored in the parking lot, and

---

[4] The plaintiff introduced only a portion of the letter, and that portion did not include the author's name.

then returned inside Steward's plants. The sheaves were held inside Plant One in September and October 1996, then moved two miles across town and stored outside Plant Two beginning in December 1996. While outside, the sheaves were jacked off the ground, anti-rust was applied, and wooden frames with tarps were constructed to protect the sheaves from moisture and debris. The sheaves were moved back inside prior to being shipped to Connecticut.

The trunions – a component of the fully assembled sheaves – were over eight feet in length and 34.4 inches in diameter and weighed approximately twelve tons each. Because storage and transportation would be difficult once the trunions were placed into the sheaves, Steward chose not to complete their final assembly until just prior to shipment. Prior to the final assembly, the trunions were stored in Plant One. The reducers – a component of the operating machinery – were also ready to be assembled and shipped, but were stored inside. The gear boxes – some assembled, some unassembled – were scattered throughout the shop, awaiting final assembly and shipment.

Eventually, Steward refused to ship the Tomlinson Bridge machinery despite the fact that the presence of the Tomlinson Bridge equipment, as discussed below, interfered with Steward's other manufacturing projects. In July 1999, Steward refused to release certain pieces of the machinery in response to requests for delivery. Shivers wrote that the items would not be shipped until the storage costs and interest were paid. Def. Ex. 612. In the summer of 2000, a representative of National Union visited Steward, seeking the release of the machinery. In May 2000, White Oak and National Union filed suit against Steward, seeking immediate possession of the Tomlinson Bridge machinery ("the Replevin Action"). In August 2000, the parties settled the Replevin Action and the machinery was shipped to Connecticut. Def. Ex. 565.

Steward regularly invoiced White Oak for the cost of storage from September 1996 through August 2000. Steward did not invoice the maintenance and storage costs separately; in other words, any maintenance charges were subsumed within the $8 and $5 per square foot storage charges. Although there was testimony that the $8 and $5 rates were used for indoor and outdoor storage respectively, all of the invoices appear to have used the $5 rate or a blended rate. Pl. Ex. 54 (summary of storage invoices).

### 3. *Impact of Storage on Steward*

Steward's plants did not have space available for long-term storage of massive machinery, and the storage of the Tomlinson Bridge machinery caused inconvenience and disruption at Steward's plants, affecting its performance on other jobs.

Discussion of the equipment and its problems occurred on a near-weekly basis at production meetings from October 1996 through 2000. Steward was forced to maneuver other projects around the Tomlinson Bridge equipment and "do upkeep" on the Tomlinson Bridge equipment, including applying anti-rust. The obstruction caused by the racks impeded the movement of other jobs throughout the shop, and Steward needed to keep track of the Tomlinson Bridge pieces over several years.

In a letter dated June 14, 1999, Shivers described the storage of the Tomlinson Bridge machinery and the difficulty of measuring the impact of that storage on Steward's production. Shivers enclosed a list of jobs completed in 1996, 1997, and 1998, on which he highlighted "the larger jobs that were impacted" by the Tomlinson Bridge equipment. Def. Ex. 663. The cost of each of those jobs was greater than the selling price, and Shivers posited that the inconvenience resulting from the presence of Tomlinson Bridge machinery caused some portion of the excess

cost.

The defendants presented evidence that tended to minimize the effect of the Tomlinson Bridge equipment on Steward's other jobs. Steward was not prevented from bidding on other projects due to the interference of the Tomlinson Bridge machinery. Several letters from Steward to other customers detailed manufacturing problems and delays that were not attributable to the presence of the Tomlinson Bridge machinery. *E.g.*, Def. Exs. 3, 9, 12. One letter referred to the "stand still" of the "entire shop" due to the interference of machinery from another customer's project, Def. Ex. 31, but the whole shop was not, in fact, at a stand still.

In an effort to quantify the cost of the Tomlinson Bridge machinery on its bottom line, Steward created a new work order number to which employees were instructed to charge their time while working on maintaining the Tomlinson Bridge equipment, moving the equipment bring stored, or otherwise navigating around it. Claimed costs associated with storage included $119,580.27 in labor; $13,579.49 in materials; and $6,405.35 for a subcontract for crane rental. Pl. Ex. 55 (job detail history report).[5] After Steward calculated overhead with a burden rate of over $5, the total claimed costs increased to over $750,000.[6] *Id.*

Defense expert Frank Zito, a Certified Public Accountant, testified regarding the maintenance costs charged to the work order number assigned to the storage of the Tomlinson Bridge machinery. Zito testified that most of the work tracked on the job history report appeared

---

[5] The materials cost of $14,634.90 erroneously includes an expense payment to Shivers in the amount of $1,055.41. The correct materials costs is, therefore, $13,579.49.

[6] There was testimony concerning the burden rate used in the job history report and the significantly lower burden rate used by the parties' accounting experts. As set forth in the discussion below, it is unnecessary for me to evaluate Steward's burden rate.

to be work due under the base contract, not maintenance or storage-related work.  Zito testified

that some of the timecards associated with the work order number had "storage" or

"refurbishment" notations, while others did not.  In response, DeBardeleben testified that some

descriptions, such as "welding," were automatically generated when certain classes of workers

punched their timecards.[7]

    K.    <u>Work Performed While Machinery Was in Storage</u>

After April 1997, when it was apparent that the machinery would not soon be shipped to

Connecticut, Steward essentially stopped work on it.  There was, however, some work completed

on the lock machinery in March or April 1998.  In addition, machining operations were

completed on the racks – components of the operating machinery – through 2000, though not

continuously.  Machining on the racks was never finished because, absent a shipping date, other

jobs took priority over the Tomlinson Bridge project.  Additionally, once the ring gears' legs and

teeth were cut, the individual pieces became increasingly delicate and difficult to store.

The defendants have acknowledged that Steward completed piece-meal work from

January 1997 through August 2000 that was not limited to storage or maintenance, but extended

---

[7] Additionally, I note that Steward sought to introduce the testimony of Les Alexander, an accounting expert, on the question of the effect of the Tomlinson Bridge equipment on Steward's productivity.  In an effort to quantify the damages suffered as a result of the impact on Steward's ongoing fabrication, Steward retained Alexander, who specializes in forensic accounting.

    On the defendants' *Daubert* motion, I excluded Alexander's testimony regarding business disruption and inefficiency on the ground that the methodology he used was not reliable.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The plaintiff was not prevented from introducing Alexander's testimony with respect to the maintenance costs incurred, and I permitted Alexander to testify about his methodology at the plaintiff's request.  Having heard Alexander's testimony at trial and having considered his report on the business disruption and inefficiency in its entirety, I concluded that the report did not meet the necessary standard of reliability under *Daubert*.  Additionally, as finder of fact, I found the report unpersuasive even if it were admitted into evidence.

to base contract work required by the purchase order.  National Union Trial Brief at 25.

L.    Notice of Claim

On April 16, 1997, Charles DeBardeleben wrote Morrissey, seeking payment of approximately $675,000.00 that White Oak had received from ConnDOT for Steward's work but that White Oak failed to pass on to Steward.  Pl. Ex. 34.  Charles DeBardelben specifically noted that the letter was "notice of Steward's claim for payment" pursuant to section 49-41a of the Connecticut General Statutes, and demanded that White Oak place the funds in an interest-bearing escrow account if payment were not made within ten days.  Steward continued to complete work on the Tomlinson Bridge machinery on a limited basis after April 1997.  Steward also stored the equipment at its plants – at White Oak's request – after April 1997.

On December 20, 1999, Steward filed a notice of claim with National Union because of White Oak's default under the purchase order contract and failure to pay Steward's storage costs.  Pl. Ex. 2.  At trial, Whitney DeBardeleben testified that it was that letter, rather than the April 1997 one, through which Steward terminated the purchase order contract.  Prior to the December 20, 1999 notice of claim, White Oak had not paid Steward for its work under the purchase order contract since June 1998.  White Oak had never paid any of Steward's invoices for storage costs.

In May 2000, Steward commenced the present action, filing suit against National Union on the payment bond and against White Oak on the purchase order ("the Bond Action").

M.    Settlement in Replevin Action

In July 2000, White Oak and National Union commenced the Replevin Action, seeking immediate possession of the machinery stored at Steward's plants.  White Oak and National Union moved for an expedited prejudgment remedy of replevin.  On August 7, 2000, Magistrate Judge William I. Garfinkel issued an order granting the motion for replevin, which Steward

appealed.  The parties eventually reached a settlement agreement in the Replevin Action.  Def. Ex. 565.

In that settlement agreement, National Union paid Steward $750,000 to be "applied first in reduction of any recovery by Steward against National in the Bond Action."  Def. Ex. 565 at 8, ¶ 10.  The parties agreed not to seek to recover in the Bond Action any damages accruing after the date of the agreement.  *Id.* at 9, ¶ 12 (dated Aug. 24, 2000).[8]  They also agreed to approach the court jointly to request a reasonably early trial.  *Id.* at 9, ¶ 14.

Under the settlement agreement, Steward was not required to furnish four components of the counterweight ropes and accessories.  Def. Ex. 565 at 4-5.  The settlement agreement did not associate any particular values to the scope of work that Steward was relieved from performing, and there was no effort to price the previously completed work in connection with the settlement agreement.  The settlement agreement did require National Union to pay Steward $1,025,429 in consideration of Steward's performance of refurbishment of the machinery. Def. Ex. 565 at 4-7, ¶¶ 1-5.

## II.    Discussion

Steward filed its suit in federal court, and this court has subject matter jurisdiction based on the parties' diverse citizenship.  28 U.S.C. § 1332.

---

[8] The defendants have argued that the settlement agreement precludes the recovery of contractual and statutory interest accruing after its execution, August 24, 2000.  There was no testimony regarding that contractual provision or whether the parties intended it to preclude statutory interest.  In their settlement agreement, the parties did, however, agree to approach the court to request a reasonably early trial.  I infer from that provision that the parties intended a prompt resolution to their dispute because interest on any outstanding balance had ceased accruing.  In other words, I find that the parties intended to cut off interest on any unpaid balances from the execution of the settlement agreement.  *See Paulus v. LaSala*, 56 Conn. App. 139, 147 (1999) ("if interest is due, it is an element of damages").

Steward has put forth several theories as bases for its claims that White Oak and National Union owe the plaintiff money damages.

First, Steward argues that, because White Oak breached the purchase order contract, White Oak and its surety, National Union, are liable for the unpaid balance of the purchase order, including principal and interest.

Second, Steward argues that White Oak and National Union are liable for storage fees. Steward submits that White Oak contracted with it to store and maintain the Tomlinson Bridge machinery when the general contractor was unable to receive the items at the job site. Steward claims the storage costs as damages under either a modification of the original purchase order contract or a collateral storage contract. Steward argues that both White Oak and National are liable for the unpaid storage fees, whether awarded for breach of the modified purchase order or the collateral agreement.

Alternatively, Steward argues that White Oak and National Union are liable for the storage fees under the Uniform Commercial Code, Conn. Gen. Stat. §§ 42a-2-708 and 42a-2-710, because the fees are incidental damages that were caused by White Oak's delay and refusal to accept delivery of the Tomlinson Bridge machinery.

Third, Steward claims damages under a theory of lost efficiency, alleging that, due to the delays on the project, Steward lost profits on other jobs that were disrupted because of the long-term presence of the Tomlinson Bridge machinery at Steward's plants.

Fourth, Steward makes claims for interest based on the purchase order contract or for costs and interest based on Conn. Gen. Stat. § 49-42.[9] Steward likewise claims that attorneys'

---

[9] Steward also makes a claim for offer-of-judgment interest pursuant to Conn. Gen. Stat. § 52-192a. Pursuant to the Local Rules of this District, I am not aware of the amount of the offer

fees are due either under the purchase order or pursuant to Conn. Gen. Stat. §§ 49-41a and 49-42.

     A.     <u>Unpaid Balance Under Purchase Order Contract</u>

          1.     *White Oak's Breach of the Purchase Order Contract*

The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. *E.g.*, *Rosato v. Mascardo*, 82 Conn. App. 396, 411 (2004) (internal quotation marks and citation omitted).

Steward and White Oak contracted for the construction of the equipment described in the parties' purchase order. Despite the absence in the purchase order of an explicit provision regarding progress payments, the provisions, quoted *infra*, that refer to "invoices" and requests for payment of a "portion" of the work, coupled with the parties' conduct, confirm that the parties' contract called for interim payments. *See Poole v. City of Waterbury*, 266 Conn. 68, 97 (2003) ("The intention of the parties manifested by their words and acts is essential to determine the meaning and terms of the contract and that intention may be gathered from all such permissible, pertinent facts and circumstances.").

The precise language of the contract also called for payments to be made within sixty days after the invoicing or within ten days of White Oak's receipt of payment by ConnDOT, whichever occurred first. The purchase order did not include a typical "pay-if-paid" or "pay-when-paid" provision, *see Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 239 Conn.

---

of judgment. *See* D. Conn. L.R. Civ. P. 68 (offer of judgment remains under seal until after trial). After entry of judgment, I will examine the offer of judgment to determine whether Steward is entitled to recovery under section 52-192a. *See Tureck v. George*, 44 Conn. App. 154, 162 (1997) (interpreting "after trial" to mean after a "final judgment").

708, 718 (1997), although White Oak was obligated to pay promptly after receipt of payment from ConnDOT to avoid accrual of interest charges. The defendants' arguments that White Oak was not required to pay Steward's invoices until ConnDOT issued payment and accepted the work are not consistent with the language of the purchase order.[10]

Steward performed under the purchase order contract and fabricated, to varying extent, the four bid items. White Oak, however, repeatedly failed to make all of the required payments, in breach of the parties' contract.[11] Sometimes White Oak made untimely payments; sometimes White Oak paid only part of the amount due under the invoices; eventually, White Oak ceased making any payments at all. Plaintiff's Exhibit 53, which is attached as Appendix A, summarizes the invoices issued, payments received, and running interest claimed by Steward.

Insofar as the defendants argue that the purchase order required ConnDOT's inspection and approval before payment was due, *see* National Union Trial Brief at 51, the state inspector, who was present at Steward's plants during the fabrication, did approve Steward's work in advance of the invoicing.

The calculation of Steward's damages for White Oak's breach of the purchase order contract is discussed below.

---

[10] To the contrary, the terms of the purchase order provide that payment is not to be construed as acceptance or as conclusive evidence of satisfactory performance. Pl. Ex. 3 at 8, ¶ 10.

[11] National Union has argued that, by continuing to work on the Tomlinson Bridge project after declaring White Oak in default and threatening to discontinue manufacturing, Steward waived any breach. National Union Trial Brief at 26. "The general rule . . . is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision." *Loda v. H.K. Sargeant & Associates, Inc.*, 188 Conn. 69, 77 (1982). Waiver, a question for the finder of fact, "may be inferred from the circumstances if it is reasonable so to do." *Id.* at 76. Under the circumstances of this case, Steward's continued performance did not constitute a waiver of its right to enforce payment under the purchase order contract.

2. *Relief Under Payment Bond for Payments Due Under Purchase Order*

Pursuant to Conn. Gen. Stat. § 49-41, White Oak procured a payment bond, with National Union as surety, in the amount of its prime contract with the State: $87,868,378.10. Pl. Ex. 1 (dated June 6, 1994). Connecticut's Little Miller Act requires general contractors on public construction projects to obtain payment bonds for the protection of those providing labor and materials. Conn. Gen. Stat. §§ 49-41, 49-42, & 49-43. The Connecticut Supreme Court has described the statutory bond requirement as "designed to protect and benefit those who furnish materials and labor to the contractor on public work, in that they may be sure of payment of their just claims, without defeat or undue delay." *American Masons' Supply Co. v. F.W. Brown Co.*, 174 Conn. 219, 227 (1974) (internal quotations marks and citation omitted). The "statutory provisions are to be liberally construed." *Id.*

The Connecticut Supreme Court has concluded that the legislature intended the statute to operate in general conformity with the Miller Act and has considered, as precedent, decisions from federal courts based on the "apparent kinship between our own and the federal statutes of similar purpose." *International Harvester Co. v. L.G. DeFelice & Son, Inc.*, 151 Conn. 325, 332-33 (1964). *See also, e.g.*, *Blakeslee*, 239 Conn. at 716 ("we have regularly consulted federal precedents to determine the proper scope of our statute").

The provisions of Conn. Gen. Stat. § 49-42 as in effect on June 6, 1994 govern this action. That section provided in pertinent part:

> (a) Every person who has furnished labor or material in the prosecution of the work provided for in [a contract for which] a payment bond is furnished under the provisions of section 49-41 and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which the claim is made, may enforce his right to payment under the bond by serving a notice of claim within one

-27-

hundred eighty days after the date on which he performed the last of the labor
or furnished the last of the material for which the claim is made . . . .

(b) . . . no [suit under this section] may be commenced after the expiration of
one year after the day on which the last of the labor was performed or
material was supplied by the claimant.

Conn. Gen. Stat. § 49-42 (1994).[12]  Thus, to recover payment under the bond, Steward must have

filed a notice of claim within 180 days of the date when it last performed labor or furnished

material.  Conn. Gen. Stat. § 49-42(a) (1994).  To be timely, Steward's lawsuit under section 49-

42 must have been commenced within one year from the date when it last performed labor or

supplied material under the contract.  Conn. Gen. Stat. § 49-42(b) (1994).

Steward filed its notice of claim on December 20, 1999.  That filing was timely under

section 49-42(a) because Steward continued to perform labor or furnish material under the

purchase order contract into 2000.  In particular, Steward performed intermittent machining on

pieces of the Tomlinson Bridge equipment.  Steward's lawsuit, commenced approximately seven

months later in July 2000, was timely under section 49-42(b).

3.    *Calculation of Damages for Breach of Purchase Order Contract*

a.    Liability of White Oak

Because it breached its contract with the subcontractor, White Oak is liable for the unpaid

balance and interest due under the purchase order contract.  To the extent properly invoiced

amounts were never paid, White Oak is liable to Steward for the amount of the unpaid balance

plus interest at one percent per month under the terms of the purchase order contract.  *See West

Haven Sound Development Corp. v. West Haven*, 201 Conn. 305, 319 (1986) (noting that the

---

[12] Section 49-42 was revised in October 1994.  Citations to Conn. Gen. Stat. § 49-42
(1994) refer to the statute as of June 2004.

general rule in breach of contract cases is that an award of damages should place the injured party in the same position it would have been absent the breach). Calculation of that amount, however, is problematic. During the project and after some invoices had been issued and paid, the parties reallocated the bid item prices, and invoices were adjusted to reflect that reallocation.

As detailed above, Steward, the subcontractor, invoiced White Oak, the general contractor, and White Oak in turn invoiced ConnDOT, the project owner. Initially, Steward's invoices reflected the bid item values listed on the purchase order contract, including retainage of 2.5%.[13] ConnDOT, however, issued payments to White Oak based on the value of the items according to the prime contract. In order to facilitate White Oak's collection of payment from ConnDOT, Steward and White Oak decided to adjust the bid amounts – though not the overall purchase order contract price. The adjusted contract prices mirrored the bid item values in White Oak's prime contract with ConnDOT. Three of the four individual items were priced higher in the prime contract than in the purchase order. For example, the most costly item, the counterweight sheaves, were initially invoiced at the purchase order value of $4.4 million, but after the reallocation, they were invoiced at the prime contract value of $5 million. White Oak and National Union have labeled this excess "overbilling."

In other words, after the parties' reallocation, Steward billed White Oak based on the prime contract values, eventually charging White Oak amounts in excess of the bid items' prices in the purchase order contract. Although the parties agreed to the reallocation in an effort to collect more money from ConnDOT, Steward's invoices exceeded the contractual amounts on certain individual items. As a result, interest charges on the unpaid balances were also inflated.

---

[13] Steward invoiced the entire amount due but immediate payment was not required for the 2.5% retainage.

-29-

Plaintiff's Exhibit 53, Appendix A to this decision, summarizes the invoices submitted by Steward, White Oak's payments, and the running balance for principal and interest. From November 1994 to June 1996, the invoices were based on the purchase order values. During that period, Steward properly billed White Oak, and White Oak is liable for failing to timely pay those invoices (less retainage) in full.

Starting on August 18, 1996, Steward began invoicing White Oak using the prime contract values. The change in pricing was an effort to "help White Oak get paid so [Steward Machine] could get paid." In addition, at some later date, a credit was issued against the principal balance in the amount of $338,529.74. It appears that the parties intended that sum to be credited against the principal balance as of November 15, 1996. Pl. Ex. 53. The credit was an attempt to adjust the amounts due based on the difference between the purchase order and the prime contract. It was not apparent from the evidence why Steward issued a credit in the amount of $338,529.74 when the difference between the two contracts was $367,000. Moreover, the credit did not account for interest that eventually accumulated based on the higher, prime contract values.

Because Steward invoiced White Oak for the bid items at the prime contract values, its post-reallocation bills were inflated, sometimes reflecting amounts greater than the total value of the bid item under the purchase order. With respect to the post-reallocation invoices (*i.e.*, those dating from August 18, 1996), it is necessary to calculate the amounts due by multiplying the bid item's purchase order value and the percentage complete.

The attached Schedule A ("Purchase Order Contract - Revised Amounts Due"), included in Appendix B, shows the corrected amounts due following the reallocation. The amounts due are calculated based on the percentages complete and purchase order values. The schedule

indicates the revised totals, retainage, and amounts due.

The attached Schedule B ("Purchase Order Contract - Revised Principal and Interest"), included in Appendix B, is styled on Plaintiff's Exhibit 53.[14] The schedule incorporates the payments, payment dates, invoice numbers, and "days late" that were supplied by Steward.[15] The revised amounts due are taken from Schedule A, and the calculations for interest are calculated based on those revised amounts.[16]

White Oak is liable to Steward for the unpaid balance and interest, calculated based on the values for the bid items in the parties' purchase order contract and Steward's completion percentages. In accordance with the parties' settlement agreement in the Replevin Action, contractual interest – a component of the plaintiff's damages – ceased accruing on August 24, 2000. Def. Ex. 565 at 9, ¶ 12. The sum of the total unpaid balance ($364,359) and contractual interest ($95,679) is: $460,038, and White Oak is liable for that amount.

In addition, retainage is recoverable as a component of Steward's damages despite the parties' settlement agreement precluding recovery of damages "accruing" after August 24, 2000. The retainage *accrued* when Steward invoiced for the work completed under the purchase order contract even though *payment* for the 2.5% retainage was not due until White Oak accepted all

---

[14] Plaintiff's Exhibit 53 is not helpfully organized, so deriving information from that schedule can be cumbersome. Nevertheless, I followed the format of Exhibit 53 when preparing Schedule B because Exhibit 53 accurately set forth the invoicing and payment history for the period prior to the reallocation.

[15] Three entries under the "days late" column were incorrect, based on the listed payment dates; those entries were corrected.

[16] The interest accrued was determined based on one-percent interest compounded monthly and the following formula: interest = $P - (P/1.01^n)$ where $P$ is the principal and $n$ is the number of months.

goods under the purchase order or within 180 days of their final shipment. The machinery was shipped in 2000 and 2001, and retainage in the amount of $159,712 was due 180 days following the final shipment.[17] White Oak is liable for that amount.

> b.    Liability of National Union

Steward is entitled to enforce payment under the bond pursuant to Conn. Gen. Stat. § 49-42. National Union, the surety that issued White Oak's payment bond, is liable to Steward for $619,750, the amount owed Steward under the purchase order contract for its work on the Tomlinson Bridge, including retainage and contractual interest at one-percent per month, through August 24, 2000. Conn. Gen. Stat. § 49-42 (1994) (in proceeding to enforce payment bond, court may allow interest at the rate of interested specified in the subcontract).

> B.    Storage Fees

>> 1.    *Collateral Storage Contract*

>>> a.    Liability of White Oak

Steward has argued that White Oak agreed to pay storage costs when the latter was unable to accept delivery of the Tomlinson Bridge machinery within the contracted delivery period. Steward has suggested that the agreement consisted of a collateral storage contract or, in the alternative, that the parties modified the purchase order, incorporating storage in addition to the manufacture and delivery of the machinery. The defendants contend that White Oak did not execute a separate storage contract and the purchase order's integration clause prevented its oral

---

[17] Retainage of 2.5% is calculated based on the total amount due for the counterweight ropes ($947,210) and the revised total amounts due for the other three bid items, listed on the attached Schedule A: sheaves - $4,400,000; operating machinery - $826,200; lock machinery - $215,050). Those amounts total $6,388,460. The retainage due equals $159,712, which is 2.5% of that total.

modification.

Steward's purchase order contained an integration clause and provided that the contract could not be modified unless in writing and signed by authorized representatives of Steward and White Oak.  Pl. Ex. 3 at 7, ¶ 1.  The parties' purchase order was not modified when Steward and White Oak agreed that Steward would store the machinery in exchange for additional payment. However, "nothing in the integration clause precluded the parties from forming an express agreement for additional services."  *Positive Impact Corp. v. Indotronix Intern. Corp.*, 96 Conn. App. 361, 365 (2006).

"Whether a contractual commitment has been undertaken is ultimately a question of the intention of the parties."  *Otto Contracting Co. v. S. Schinella & Son, Inc.*, 179 Conn. 704, 709 (1980).  The following evidence establishes that White Oak intended to undertake a contractual commitment to pay Steward in exchange for the subcontractor's storage and maintenance of the Tomlinson Bridge equipment.

First, the evidence at trial showed that Steward resisted long-term storage of the Tomlinson Bridge machinery, and that Morrissey, White Oak's President, assured Steward that it would be compensated for storage.  Second, in written correspondence, representatives of Steward, White Oak, and ConnDOT addressed storage options and agreed that the Tomlinson Bridge equipment would be stored and serviced at Steward's plants and that Steward would be compensated.  *See* Pl. Exs. 14, 16, 18, 20; Def. Ex. 415.  Third, their subsequent conduct was consistent with that agreement.  Steward did not object to the invoices; rather, Steward forwarded them to ConnDOT for payment as it had forwarded invoices under the purchase order.

Despite the absence of a formalized writing, White Oak and Steward did form a contract. In other words, there was a bargain between the two and a manifestation of mutual assent to the

exchange. *See Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) (*citing inter alia* Restatement

(Second), Contracts §§ 1(c), 15, 19 (Tent. Dr. 1964)). A party may manifest its assent to the

exchange wholly or partly by written or spoken words or by other acts or by failure to act. *Id.*

Here, White Oak manifested its assent to the storage agreement through: (1) Morrissey's spoken

words to DeBardeleben, (2) written correspondence, in particular Hird's November 18, 1996

memorandum, Pl. Ex. 20, (3) White Oak's failure to object to the storage invoices, and (4) its

forwarding of those invoices to the State.

Steward proposed rates of $8 and $5 per square foot for indoor and outdoor storage,

respectively, but the parties did not execute a written contract that contained a term regarding

price. Pl. Exs. 19, 21. Although Steward and White Oak discussed the rates, there was no

evidence of an explicit acceptance on the part of White Oak with respect to the amount of the

storage charges.

I find that in November 1996 Steward and White Oak agreed that Steward would store

the Tomlinson Bridge equipment when the delays at the project site prevented delivery. The

agreement to pay for storage was a separate contract, distinct from the purchase order contract.

Def. Ex. 788 ("This storage issue is not a part of our [purchase order] contract with White Oak

and should not affect our payments agreements [with White Oak and ConnDOT].").[18] The

---

[18] National Union has argued that entitlement for payment for storage was subject to
ConnDOT's approval of Steward's storage invoices. National Union Trial Brief (doc. # 89) at
30. National Union cites a letter from Shivers, Steward's project manager, to Morrissey, in
which Shivers asks White Oak to pursue past due invoices for storage with the State. Def. Ex.
788. National Union also points to a memorandum from Hird, White Oak's chief engineer, in
which he notes that White Oak will forward Steward's storage invoices to ConnDOT "for their
consideration." Def. Ex. 795. That evidence does not suggest that Steward contracted with
ConnDOT to store the machinery. Rather, as under the purchase order contract, it suggests that
Steward understood that White Oak would collect payment from ConnDOT for Steward's
services. That arrangement does not negate White Oak and Steward's agreement regarding

storage agreement contained no terms regarding payment or interest.

Connecticut courts have held that "an agreement will not be rejected if the missing terms can be ascertained, either from its express terms or by fair implication." *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507-08 (1994). "[W]here the plaintiff and the defendant have agreed that the defendant will pay for the plaintiff's services but the agreement is silent as to the amount of compensation, the court may conclude that the defendant contemplated paying a reasonable fee." *Id.* at 508.

Steward and White Oak contracted for the subcontractor to store the Tomlinson Bridge machinery when White Oak was unable to accept delivery. Steward and White Oak agreed that Steward's Birmingham plant was the only site where the machinery could be stored. DeBardeleben and Shivers attempted to locate other facilities in Birmingham in order to find comparable rates for storage. They were unable to locate any facilities that could handle the equipment, but based on their search, came up with the $8 and $5 rates as reasonable rental figures. There is no evidence of an alternative site at which the storage charges would have been lower.[19] Steward announced and used the $8 and $5 rates in its storage invoices to White Oak. White Oak, in turn, did not object to the quotations or invoices; rather, the contractor forwarded the invoices to ConnDOT as it had done with the invoices under the original purchase order

---

storage. Although White Oak may have "believed it was not responsible for the delays on the project," National Union Trial Brief at 30, and that the ConnDOT was ultimately liable for the storage costs, White Oak contracted with Steward to store the machinery when the delays prevented Steward from delivering it.

[19] Moreover, a commercial storage facility would have likely required White Oak to rent a defined area – either the entire facility or a fixed portion thereof – in excess of the "footprint" of the Tomlinson Bridge machinery. Steward charged based only on the square footage of the equipment, lowering the effective rate below $8 and $5 per square foot.

contract.[20]

Under the purchase order, Steward was required to make all deliveries in accordance with

White Oak's schedule, within 18 months of the approval of drawings. Pl. Ex. 3 at 6. Steward's

performance under the purchase order agreement, thus, required Steward to withhold delivery at

White Oak's direction as long as eighteen months after approval of the drawings. With respect to

the sheaves, delivery under the purchase order was to occur by July 30, 1997; delivery of the lock

machinery was to occur by November 16, 1999; delivery of the counterweight ropes was to occur

by September 20, 1997; and delivery of the operating machinery was to occur by July 7, 2001.

Although Steward invoiced for storage from as early as September 1996, the parties'

contract for Steward to store the machinery "beyond the original delivery date," Pl. Ex. 20, must

relate to storage subsequent to the delivery dates required under the purchase order.[21] Steward

---

[20] Apparently, White Oak believed ConnDOT was ultimately responsible for the storage costs and as a result did not negotiate lower rates with Steward. Nevertheless, it was White Oak that contracted with Steward to store the equipment.

[21] Steward invoiced White Oak for storage of the sheaves (job no. 5343-W) from September 1996 through August 21, 2000. *Id.* The sheaves were inside Steward's plants in September and October 1996, and Steward was billed for storage at a rate of $52,616.00 per month for a surface area of 6,577 square feet. Pl. Ex. 19. In a letter dated November 15, 1996, Shivers indicated that the sheaves would be moved outdoors "very soon" and that Steward would be billed for the costs associated with moving the equipment. *Id.* In December 1996, Steward invoiced White Oak $50,065.23 for the sheaves' storage. Pl. Ex. 54. From January 1997, Steward charged $37,616.00 per month for the storage of the sheaves. Steward also incurred $1,725.00 in costs to move the sheaves inside in April 1998, Pl. Ex. 57, and incurred $2,920.35 in costs to move the sheaves in November 1999. Pl. Ex. 58.
 Steward invoiced White Oak for storage of the counterweight ropes (job no. 5344-W) from September 1996 through August 21, 2000. Pl. Ex. 54. Steward charged $1,762.00 per month. *Id.* That amount reflected 84 square feet of indoor storage ($672.00) and 218 square feet of outdoor storage ($1,090.00). Pl. Ex. 21.
 Steward invoiced for storage of the lock machinery (job no. 5346-W) from July 1998 through August 21, 2000, and storage of the operating machinery (job no. 5343-W) from April 1999 through August 21, 2000. Pl. Ex. 54. Steward charged $1,536.00 per month for storage of the lock machinery and $7,264.00 per month for storage of the operating machinery. *Id.*

may, therefore, only recover storage fees for storage beyond those dates.

In July 2000, White Oak and National Union requested Steward to ship the machinery to New Haven, but Steward refused to release the machinery until payment was made for White Oak's past due invoices.[22] The parties reached a settlement in August, and the equipment was shipped to Connecticut. Once the defendants sought the delivery of the equipment and Steward refused to release it, Steward was storing equipment for its own purposes rather than storing it under the parties' agreement; the storage contract was then terminated. Steward, thus, may not recover for storage fees for any period after July 2000.

The storage periods for which Steward may recover fees are:

| | |
|---|---|
| Counterweight ropes | September 20, 1997 - July 1, 2000 |
| Sheaves | July 30, 1997 - July 1, 2000 |
| Lock machinery | November 16, 1999 - July 1, 2000 |

In addition, I note that Steward and White Oak's collateral storage agreement did not detail when the machinery would be stored inside and when it would be stored outside. As a result, Steward was free to move the machinery outside – and charge the lower rate – whenever it chose; in effect, Steward had the ability to mitigate its damages by moving the machinery outside. Because it was up to Steward to determine where to store the machinery, reasonable fees must be based on the lower, $5 rate.

With respect to the sheaves, storage fees at a rate of $5 per square foot, based on 6,577 square feet, and dating from July 30, 1997 through July 1, 2000 total: $1,545,595.[23]

---

[22] In July 1999, Steward had the opportunity to ship certain pieces of the machinery. Def. Ex. 612.

[23] 47 months at $32,885 per month equals $1,545,595.

With respect to the lock machinery, storage fees at a rate of $5 per square foot, based on 192 square feet, and dating from November 16, 1999 through July 1, 2000 total: $7,200.[24]

With respect to the counterweight ropes, storage fees at a rate of $5 per square foot, based on 302 square feet, and dating from September 20, 1997 through July 1, 2000 total: $49,981.[25]

No storage fees are due for storage of the operating machinery, which was not stored beyond the applicable delivery date, July 7, 2001.

Steward performed under its contract with White Oak to store the Tomlinson Bridge equipment. White Oak's failure to pay Steward for the storage constituted a breach of the parties' contract. Therefore, White Oak is liable to Steward for the total storage costs of $1,602,776.

### b.    Liability of National Union

National Union's liability for the storage fees requires further analysis.

National Union argues that its liability under the payment bond does not extend to the costs of storing the sheaves and other equipment even if White Oak contracted with Steward for that storage because: storage was not part of Steward's purchase order contract; the items were not available for use at the project site; Steward's costs are fictitious and unrealized; and the statute of limitations on oral contracts bars Steward's recovery.

### (1)    Storage Fees Outside the Scope of the Purchase Order

At trial Steward produced evidence that the prime contract, which was not itself offered as evidence, incorporated ConnDOT's specification 1.09.06, which set forth the general

---

[24] 7.5 months at $960 per month equals $7,200.

[25] 33.1 months at $1,510 per month equals $49,981.

contractor's responsibility for the "condition, protection, and replacement of materials wherever stored." Standard Specifications for Roads, Bridges and Incidental Construction, Form 815, Article 1.09.06 (1988). Although the subcontract did not include a term regarding storage, the prime contract did assign to White Oak responsibility for the "condition, protection, and replacement" of materials during any storage period.

The plaintiff points to a Second Circuit decision to bolster its argument that work required under the prime contract (here, the protection of materials wherever stored) is covered by the payment bond, and the subcontractor may make a claim based on such work even if it was not work identified in its original subcontract with the general contractor. *See Cam-Ful Industries, Inc. v. Fidelity and Deposit Co. of Maryland*, 922 F.2d 156 (2d Cir. 1991). In *Cam-Ful*, the Second Circuit reversed a district court that had relieved a surety from its bond obligation because the contractor and subcontractor had effectively modified their subcontract. *Id.* at 161. The Court of Appeals noted that the general rule, discharging a surety from its bond obligation when the contract it has guaranteed has been materially altered, "only applies to alterations of the *prime contract*." *Id.* (emphasis added).

The dispute in *Cam-Ful* arose because a subcontractor completed additional work – namely, wood sheeting – that was not detailed in its subcontract, but was required under the prime contract. The subcontract was "based on Adams's [the contractor's] assurances to Cam-Ful [the subcontractor] . . . that if wood sheeting were to be required for areas other than the manholes, Cam-Ful was to be paid for that work by Adams Electric." *Id.* at 161. The Court of Appeals also noted:

> As a practical matter, if Cam-Ful had refused to do any wood sheeting or if it
> had refused entirely to enter into the subcontract because of the wood
> sheeting problem, then Adams Electric would have had to obtain another

-39-

> subcontractor who would, of course, have required reasonable compensation to do the wood sheeting work.

*Id.*

Under *Cam-Ful*, if storage of the Tomlinson Bridge machinery were required under the prime contract, for which National Union issued the payment bond, Steward is entitled to recover "the reasonable value of the extra work." *Id.* at 163. The present case, however, unlike *Cam-Ful*, presents a different question: may storage be covered by the payment bond if it is not expressly required under the prime contract?

### (2)    Is Storage Covered by the Payment Bond?

There is no evidence that the prime contract expressly required the contractor to store the Tomlinson Bridge equipment if delays prevented its acceptance at the site. There is evidence, however, that White Oak and the State communicated regarding the necessity to store the equipment and disputed ultimate responsibility for the storage payments based on their apparent disagreement over the cause of the delays. Pl. Ex. 18. I infer from that communication that the prime contract between the State and White Oak included a requirement that the contractor was responsible for storage caused by project delays.

More importantly, the scope of the payment bond is determined in part by the Little Miller Act whose purpose is broad protection of subcontractors that provide labor or materials in prosecution of a public works contract. The payment bond statute requires general contractors on public works projects to furnish a bond "for the protection of persons supplying labor or materials in the prosecution of the work provided for in the contract." Conn. Gen. Stat. § 49-41 (1994). Section 49-42 sets forth the process for enforcing a right to payment under the bond. Conn. Gen. Stat. § 49-42(a) (1994). The statute permits a subcontractor to enforce its right to

payment for "labor or materials in the prosecution of the work" provided for in the prime

contract. The question is then: is storage of machinery, constructed for the project, "labor or

materials" when the delay in delivery is not the fault of the subcontractor?

Steward points to the Ninth Circuit's decision in *Taylor Construction, Inc. v. ABT Service

Corp.*, 163 F.3d 1119 (9th Cir. 1998), to argue that the statutory language – "[e]very person who

has furnished labor or material" – limits *who* can recover under a payment bond, but not *what* is

recoverable. In that case, a surety refused to pay a subcontractor pursuant the subcontract's

savings clause, arguing that the amount due under that clause was not "labor" or "material"

covered under the Miller Act. *Id.* at 1121. The Ninth Circuit rejected that argument. The court

held that the subcontractor could recover "the sums due the party under the bonded contract." *Id.*

at 1122. Those sums may include profits. *Id.* at 1123; *see also Price v. H.L. Coble Construction

Co.*, 317 F.2d 312 (5th Cir. 1963).

The threshold issue presented in the present case, however, is not *how much* Steward can

recover for storage under the bond, but whether storage fees are properly recoverable under the

bond at all. The reasoning in *Taylor Construction* concerned the scope of the Miller Act and

whether profits were recoverable, but did not address a subcontractor seeking to recover costs for

services that were arguably not "labor or material." There appears to be no case law addressing

the precise question whether someone who has "furnished labor or material in the prosecution of

the work" can recover the costs of storage of material furnished under the Miller Act or parallel

Little Miller Acts.

The terms "material" and "labor" are both undefined, but the statute does provide that:

"[t]he word 'material' as used in sections 49-41 to 49-43, inclusive, includes the rental of

equipment used in the prosecution of work provided for in the contract." Conn. Gen. Stat. § 49-

42(c).  In addition, there is case law, suggesting that "labor and material" should be broadly

construed.

The Connecticut Supreme Court considered the scope of a surety's liability in light of the

purpose of section 49-41 and noted that:

> [T]he interpretation of the statute must be approached on the premise that the
> purpose of the bond under section 49-41 is to facilitate the expeditious and
> uninterrupted completion of public works by furnishing a means through
> which suppliers of labor and material in the prosecution of the work are
> afforded protection in extending credit to contractors.

*International Harvester Co. v. L.G. DeFelice and Son, Inc.*, 151 Conn. 325, 333 (1964).  The

Court also noted decisions among the federal courts that have held items such as gas, oil, fuel,

feed, food for employees, freight charges, and the replacement value of lost equipment to be

covered by the bond.  *Id.* at 644 n.3.

In *Blakeslee*, the Connecticut Supreme Court held a surety liable to a subcontractor for

damages – including the rental value of idle equipment – arising out of construction delays.  239

Conn. at 725.   The Court ruled that the rental value of equipment that was not actually used in

the project, standby labor costs, and the rental and liquidation values of steel sheeting and

structural members were all recoverable as items of "labor and material" under section 49-42 and

the payment bond.  *Id.* at 724-32.

National Union has attempted to limit the applicability of *Blakeslee* by emphasizing that

there the equipment whose rental value was recoverable was available at the job site.  Here, the

Tomlinson Bridge machinery was being stored at Steward's plants in Alabama and was not

available at the site.  Unlike in *Blakeslee*, the equipment at issue here is machinery that Steward

manufactured for the project, and during the storage period it was, in large part, available for use

– or more precisely, for installation – at the job site but for White Oak's inability to receive the

machinery there. The liberal definition of "labor and material" afforded by the Court in *Blakeslee* is not confined to circumstances where machinery or equipment is present at the job site.

The United States Supreme Court has considered the scope of liability of a surety issuing a payment bond pursuant to the Miller Act and its predecessor statute and has broadly interpreted the statutory provisions. For example, in *Standard Accident Ins. Co. v. United States*, 302 U.S. 442, 444 (1938), the Court held that a railroad carrier's transportation of materials for a public works project qualified as "labor," within the meaning of the act requiring a bond, and the carrier was entitled to recover against the surety.

In *Brogan v. National Surety Co.*, 246 U.S. 257 (1918), the United States Supreme Court held that the bond covered the cost of food consumed by laborers when the remote location of the work site made their boarding necessary. The Court considered the "supplies furnished" by the subcontractor (*i.e.*, groceries for the laborers) when the job site was located in a "comparative wilderness at some distance from any settlement" to be "used in prosecution of the work." *Id.* at 260. The Court emphasized that the "special circumstances" were decisive for establishing "the conditions essential to liability on the bond." *Id.* at 262.

As in *Brogan*, the special circumstances of the present case qualify the storage of the Tomlinson Bridge equipment as "labor or material" used in prosecution of the bonded work. Steward was not at fault for the extended delay in delivering the machinery. All parties agreed that Steward's Birmingham plants were the only location available for the unexpected, but long-term storage of the equipment. The sheaves were massive, and their storage impacted Steward's productivity. Although there is no evidence that storage was an express requirement of White Oak's prime contract, the storage of the Tomlinson Bridge equipment was necessary for the

completion of the bonded work and was provided in prosecution of that work.

(3)    Storage Fees Are Not "Delay Damages"

In an attempt to limit Steward's recovery, National Union has argued that it is not liable for the storage fees because they are "delay damages" that were not incurred in the prosecution of work on the Tomlinson Bridge and were not out-of-pocket costs.  National Union Trial Brief at 96-112, *citing*, *e.g.*, *United States ex rel. Lochridge-Priest, Inc. v. Con-Real Support Group, Inc.*, 950 F.2d 284, 287 (5th Cir. 1992) (limiting surety's liability for delay damages to those costs actually expended in the prosecution of the bonded work).

The cases that National Union cites as addressing "the type of damages" claimed by Steward do not, however, deal with storage fees charged by a subcontractor as a result of an express agreement with the contractor.[26]  Rather, those cases address delay damages and lost profits and the limited scope of a surety's liability when delays on public works projects damage a subcontractor.  *E.g.*, *United States ex rel. T.M.S. Mechanical Contractors, Inc. v. Millers Mutual Fire Ins. Co. of Texas*, 942 F.2d 946, 952 (5th Cir. 1991) (subcontractor may recover for additional or increased costs expended in furnishing labor or material in prosecution of the work, but not lost profits, that are attributable to delay); *Mai Steel Service, Inc. v. Blake Construction Co.*, 981 F.2d 414, 418 (9th Cir. 1992) (surety's liability does not extend to lost profits because they do not involve actual outlay and fall outside the Miller Act); *Consolidated Electrical & Mechanicals, Inc. v. Biggs General Contracting, Inc.*, 167 F.3d 432, 436 (8th Cir. 1999) (under the Miller Act, delay damages are limited to out-of-pocket expenditures).

---

[26] While attempting to address Steward's alternative and overlapping theories of recovery, National Union does not distinguish been the storage fees as damages recoverable under a collateral storage contract, incidental damages under the Uniform Commercial Code, and damages claimed pursuant to the lost profits or lost efficiency claim.

The reasonable storage costs, even if not out-of-pocket, are not akin to lost profits based on delay that courts have found are outside the scope of Miller Act payments bonds. Although the need for storage was a result of delay on the project, the storage fees claimed under the collateral storage contract are not "delay damages" that must be actually expended in order to be recovered from the surety.

Moreover, under the reasoning of *Millers Mutual* and similar cases, Steward could recover for storage fees, as delay damages, if the subcontractor had used a commercial storage facility to house the machinery. Those damages would have then been "additional or increased costs *actually expended* in furnishing the labor or material in the prosecution of the work provided for in the [prime] contract and *attributable to the delay.*" *Millers Mutual*, 942 F.2d at 952 (emphasis in original). Here, the parties agree that there was no commercial facility available to store the machinery, and White Oak contracted with Steward to store the equipment. To require that Steward have expended the out-of-pocket costs, rather than providing the service itself, in order to recover from the surety would be an unfair reading of the payment bond statute and contrary to Steward and White Oak's express agreement.

White Oak and National Union also argue that they are not liable for storage costs because Steward refused to ship the machinery to the job site even when White Oak was prepared to receive it. Def. Ex. 612. That refusal ultimately led to the Replevin Action. Although delivery of certain pieces was requested in July 1999, the defendants did not principally seek shipment of the machinery until July 2000. That is the date after which the defendants are not liable for continuing storage costs.

### (4)    Statute of Limitations

Finally, the defendants have argued that the statute of limitations on oral contracts bars

recovery. Under Conn. Gen. Stat. § 52-581(a), the statute of limitations is three years for an

action "founded upon any express contract or agreement which is not reduced to writing, or of

which some note or memorandum is not made in writing and signed by the party to be charged

therewith or his agent." The statute of limitations for a written contract is six years. Conn. Gen.

Stat. § 52-576.

First, the collateral storage agreement is a written contract. *See Anthem Health Plans,*

*Inc. v. Action Motors Corp.*, 83 Conn. App. 715, 720 (2004) (discussing section 52-581(a)'s

"statutory requirement of a contract in writing" to be satisfied by two documents, each denoting

agreement of one of the parties). Steward and White Oak exchanged written correspondence

regarding the issues surrounding storage. Hird, White Oak's project engineer who

communicated with Steward regarding the extended delay, storage, and associated maintenance,

wrote and signed a memorandum to Steward, giving instructions regarding storage protection and

acknowledging "certain additional costs" to Steward. Pl. Ex. 20. As a written contract, the six-

year statute of limitations applies, and Steward's case is timely. Conn. Gen. Stat. § 52-576.

Second, even if the collateral storage contract were considered an oral contract, the three-

year limitations period does not bar Steward's claims under that agreement. Steward filed suit

against White Oak and National Union in May 2000, and both parties had filed an appearance by

July 24, 2000.[27] The storage contract is limited to the time period following Steward's

obligations under the purchase order contract. Thus, there are no claims that pre-date July 30,

1997, when Steward began performance under the collateral agreement. The claims under the

---

[27] Under Connecticut state law, applicable in this diversity action, an action is
commenced for purposes of the statute of limitations on the date of service of the complaint upon
the defendant. *See, e.g., Converse v. General Motors Corp.*, 893 F.2d 513, 515-16 (2d Cir.
1990).

collateral storage contract are timely.

(5)    Amount of National Union's Liability

Accordingly, National Union is liable for $1,602,776 for the cost of storage during the period detailed above.

2.    *Maintenance of Tomlinson Bridge Machinery During Storage Period*

Steward produced evidence of the cost of maintaining the Tomlinson Bridge machinery during a portion of the storage period. In an effort to capture the cost of storing and maintaining the machinery, Steward began to keep track of the time its employees spent working on and around the Tomlinson Bridge equipment. Steward created a new work order number specific to "storage and interest" and requested its employees to punch in and out of that number when they were moving the Tomlinson Bridge machinery, navigating around it in the shop, or tending to its maintenance. A job history detail report shows the material and labor charged to that job number. Pl. Ex. 55. When quoting and later invoicing storage costs, however, Steward did not list maintenance as a distinct category of costs nor did it charge additional fees for maintenance in its invoices. The only reasonable reading of the evidence demonstrates that maintenance was included within the monthly storage charges.

Without knowledge concerning the prospect of future payments, Steward attempted to track the expenses it incurred for maintenance during the storage period. Because White Oak is liable to Steward Machine for the storage costs, and those amounts reasonably encompass compensation for maintenance, Steward is not entitled to additional damages for maintenance costs.

### 3.    *Additional Costs Relating to Storage*

Certain other costs associated with storage, such as crane rentals, were not included in the $8 and $5 fees. When the parties discussed the storage agreement, Steward specified that the subcontractor would charge White Oak "the costs for handling such as crane rental." Pl. Ex. 19. Those costs were part of the collateral storage contract and distinct from the $8 and $5 fees.

Steward presented evidence of two invoices for such additional costs, totaling $4,645. Pl. Ex. 57 (invoice for crane rental) & Pl. Ex 58 (invoices for labor and equipment to load pump and move eight sheaves). DeBardeleben testified that the labor and equipment services detailed in Plaintiff's Exhibit 58 were "outside services."

White Oak and National Union are liable for $4,645 in additional costs relating to the storage of the Tomlinson Bridge machinery.

### 4.    *Incidental Damages under UCC*

As an alternative to the contract modification or collateral contract theories, Steward also argued that the storage fees were recoverable as incidental damages under Uniform Commercial Code sections 42a-2-708 and 42a-2-710.[28]

Because Steward is recovering its storage fees under the collateral storage agreement, it is unnecessary to consider its claim for the cost of storage as incidental damages under the UCC.

---

[28] The statute provides:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

Conn. Gen. Stat. § 42a-2-710.

C.    Lost Efficiency

In addition to storage fees, Steward seeks damages for "lost efficiency," *i.e.*, higher costs of production incurred on other projects due to the presence and interference of the Tomlinson Bridge equipment at Steward's plants.

Neither White Oak nor National Union are liable for the so-called lost efficiency damages.  First, the fees charged for storing the Tomlinson Bridge equipment at Steward's plant compensate Steward for the impact of the equipment's presence.  *See* Def. Ex. 663 (letter from Shivers regarding interference with other projects, storage costs at other facilities, and Steward's charges).  Steward may not both recover on the storage fees claim and obtain further damages because the storage may have impacted its efficiency.

Second, damages relating to the higher costs of production on other projects are the type of lost profits damages that courts have regularly found are  not recoverable under the Miller Act.  *E.g.*, *Millers Mutual*, 942 F.2d at 952.

D.    Attorneys' Fees and Statutory Interest

1.    *Liability of White Oak*

Connecticut's Little Miller Act requires that the general contractor, upon demand of its subcontractor, "place funds in the amount of the claim, plus interest of one per cent, in an interest-bearing escrow account in a bank in this state," but permits the general contractor to "refuse to place the funds in escrow on the grounds that the subcontractor has not substantially performed the work according to the terms of his or its employment."  Conn. Gen. Stat. § 49-41(a) (1994).

If the general contractor refuses to place the funds in escrow, and the subcontractor "is found to have substantially performed its work in accordance with the terms of its employment in

any arbitration or litigation to determine the validity of such claim," the general contractor is liable for the subcontractor's attorneys' fees.[29]  *Id.*

When Steward demanded that White Oak place the disputed amount in an interest-bearing escrow account, White Oak refused.  Because I find that Steward substantially performed its work in accordance with the terms of its employment, and its claim against White Oak is valid, White Oak is liable under section 49-41a(b) for Steward's attorneys' fees.

As noted above, I interpret the parties' August 2000 settlement agreement to bar interest accruing after the date of that agreement.  There is no evidence, however, that suggests that the parties intended the term "damages accruing" under the settlement agreement to refer to statutory attorneys' fees that might be awarded.  I find that the settlement agreement does not preclude an award of attorneys' fees.

2.    *Liability of National Union*

In an action brought under section 49-42 for payment under the bond, the court shall award costs to the prevailing party and allow interest at the rate specified in the labor or materials contract under which the claim arises, or, if none, under section 37-3a.  Conn. Gen. Stat. § 49-42(a).  I may require National Union to pay Steward's reasonable attorneys' fees only if National

---

[29] Steward also argued that it was due attorneys' fees under the terms of the purchase order contract.  The terms of the purchase order contract provide: "In the event that Buyer is required to engage the services of an attorney-at-law to enforce its rights under this contract Prevailing Party shall be liable for reasonable attorneys' fees and costs."  Pl. Ex. 3 at ¶ 16.  That provision does not permit Steward to collect attorneys' fees from either defendant.  First, the attorneys' fees provision does not appear to apply to Steward's attorneys' fees at all.  It refers only to the Buyer's (that is, White Oak's) need to engage an attorney.  Second, the contract specifies that the prevailing party is liable for attorneys' fees, not that the prevailing party shall be awarded attorneys' fees.  The language of this provision may reflect a mutual mistake of the parties.  In any event, no one has claimed that the prevailing party in the instant lawsuit should be liable for the attorneys' fees of another party.

Union's denial of liability or its defense to Steward's claim is "without substantial basis in fact or law." *Id.*

National Union is liable under section 49-42 for both the unpaid principal balance of the purchase order and one-percent per month interest on that balance, as specified in Steward's purchase order contract.[30]  National Union is also liable for the unpaid storage fees ($1,602,776) based on White Oak and Steward's collateral storage agreement, for crane rental ($4,645) and for interest on their total amount ($1,607,421).  Because that agreement contained no interest rate, a rate of ten percent per year is applied pursuant to sections 49-42 and 37-3a.  Therefore, National Union is liable for statutory interest in the amount of $99,968.[31]

Because National Union's denial of Steward's claim and the defenses it put forth in litigating the instant action were not without substantial basis in fact or law, I decline to find National Union liable for Steward's attorneys' fees.

---

[30] The interest calculations in Schedule B are based on one-percent interest compounded monthly, the rate of interest in the parties' purchase order contract.  The interest rate is the same under the contract as under section 49-41a(b).  Thus, whether the interest is understood to be contractual interest running until the execution of the settlement agreement or contractual interest until the notice of claim and, from that point, statutory interest under section 49-42, the end result is the same.

[31] Interest at ten percent is calculated from January 10, 2000, the date of the notice of claim, until August 24, 2000, the date of the settlement agreement: 227 days.

E.     Conclusion

The defendants are jointly and severally liable for damages in the amount of $1,477,171,

detailed below:

| | |
|---|---:|
| Unpaid balance on purchase order, including interest | 460,038 |
| Retainage | 159,712 |
| Storage fees | 1,602,776 |
| Crane rental, etc. | 4,645 |
| (Settlement Agreement) | (750,000) |
| Total | $1,477,171 |

In addition, National Union is liable for statutory interest in the amount of $99,968.

Conn. Gen. Stat. §§ 49-42 and 37-3a.  White Oak is liable for attorneys' fees.  Conn. Gen. Stat.

§ 49-41a(b).

The clerk shall enter judgment and close the file.[32]

It is so ordered.

Dated at Bridgeport, Connecticut, this 16th day of November 2006.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

[32] Any motion for attorneys' fees shall be filed no later than fourteen days after entry of judgment, Fed. R. Civ. P. 54(d)(2)(B), and shall be supported by affidavits and contemporaneous time records.